**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHILDREN'S HOSPITAL ASSOCIATION OF TEXAS; CHILDREN'S HEALTH CARE d/b/a CHILDREN'S HOSPITAL AND CLINICS OF MINNESOTA; GILLETTE CHILDREN'S SPECIALTY HEALTHCARE; CHILDREN'S HOSPITAL OF THE KING'S DAUGHTERS, INCORPORATED; SEATTLE CHILDREN'S HOSPITAL, <br><br>    Plaintiffs, <br><br> v. <br><br> THOMAS E. PRICE, in his official capacity, Secretary, Department of Health and Human Services; SEEMA VERMA, in her official capacity, Administrator, Centers for Medicare and Medicaid Services; and the CENTERS FOR MEDICARE AND MEDICAID SERVICES, <br><br>    Defendants. | Case No.: 1:17-cv-00844-EGS |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**THEIR APPLICATION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................1

STATUTORY AND REGULATORY BACKGROUND.....................................2

    The Medicaid Program ...................................................................................2

    The Disproportionate Share Hospital Program...............................................3

    The CMS Regulations.....................................................................................5

    The Final Rule.................................................................................................6

    Litigation Challenging the Policy of Including Third Party Payments in the HSL,
        Which is Now Codified in the Final Rule.................................................7

STATEMENT OF FACTS ....................................................................................9

    The Plaintiffs..................................................................................................9

    The 2014 DSH Audits..................................................................................11

    DSH Program Year Funding.........................................................................11

STANDARD OF REVIEW .................................................................................12

ARGUMENT .......................................................................................................12

    I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF ITS
            CLAIMS .........................................................................................12

          A.    The Final Rule Is Not Authorized By the Medicaid Act and
              Therefore Violates APA § 706 (2)(C). .....................................13

               1.    *Chevron* Step 1 - §  1396r (g)(1)(A) Is Unambiguous: Only
                    Medicaid Payments Are Subtracted From Costs in the
                    Medicaid Shortfall Component of the HSL ...................................14

               2.    *Chevron* Step 2 – CMS's Interpretation of the Medicaid
                    Statute Is Not Reasonable .............................................19

                  (a)    The Final Rule Is Unreasonable Because It Denies
                        DSH Funding To Statutorily "Deemed" DSH
                        Hospitals In Violation of the Medicaid Act......................19

                  (b)    Defendant's Interpretation of §1396r(g)(1) Is
                        Unreasonable Because the Secretary Does Not Have
                        Discretion to Determine That "Costs Incurred"
                        Means Subtraction of Private Insurance Payments...........21

           B.    The Final Rule Violates APA § 706(2)(A) Because It Is Arbitrary
               and Capricious and Not Otherwise In Accordance With Law.................23

**TABLE OF CONTENTS**
**(continued)**

**Page**

| | | |
|---|---|---|
| 1. | CMS Fails to Explain Any Rational Relationship Between the Final Rule and the Record Facts. | 24 |
| 2. | The Final Rule is Not the Product of Reasoned Decision-Making. | 26 |
| 3. | The Final Rule Is Not A Clarification of Existing Policy | 30 |

II.   PLAINTIFFS FACE THE LIKELIHOOD OF IRREPARABLE INJURY ..........33

III.  THE BALANCE OF EQUITIES FAVORS PLAINTIFFS..................................38

IV.   AN INJUNCTION IS IN THE PUBLIC INTEREST ..........................................39

V.    THE COURT SHOULD EXERCISE ITS DISCRETION TO ISSUE A NATIONWIDE INJUNCTION ...........................................................................40

CONCLUSION...................................................................................................................43

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allina Health Servs. v. Sebelius*,
   756 F. Supp. 2d 61 (D.D.C. 2010) ........................................................................39

*\*Banner Health v. Sebelius*,
   715 F.Supp.2d 142 (D.D.C. 2010) .......................................................................20

*Barrick Goldstrike Mines, Inc. v. Whitman*,
   260 F. Supp. 2d 28, 36 (D.D.C. 2003) .................................................................31

*Bhd. of R.R. Trainmen v. Balt. & Ohio R.R. Co.*,
   331 U.S. 519 (1947) ..............................................................................................16

*Bracco Diagnostics, Inc. v. Shalala*,
   963 F. Supp. 20 (D.D.C. 1997) ............................................................................33

*Brendsel v. Office of Fed. Hous. Enter. Oversight*,
   339 F. Supp. 2d 52 (D.D.C. 2004) .......................................................................34

*Chevron U.S.A., Inc. v. NRDC*,
   467 U.S. 837 (1984) ..................................................................................13, 14, 19

*Citizens Coal Council v. Norton*,
   330 F.3d 478 (D.C. Cir. 2003) .............................................................................13

*\*D.C. Hosp. Ass'n v. D.C.*,
   224 F.3d 776 (D.C. Cir. 2000) .............................................................................16

*Davenport v. Int'l Bhd. of Teamsters*,
   166 F.3d 356 (D.C. Cir. 1999) .............................................................................12

*Davis v. PGBC*,
   571 F.3d 1288 (D.C. Cir. 2009) ...........................................................................12

*Doe v. Rumsfeld*,
   341 F. Supp. 2d 1 (D.D.C. 2004) .........................................................................40

*Edmonds v. Levine*,
   417 F. Supp. 2d 1323 (S.D. Fla. 2006) ................................................................39

*Franciscan All., Inc. v. Burwell*,
   No. 7:16-CV-00108-O, 2016 WL 7638311 (N.D. Tex. Dec. 31, 2016) ..........41, 42

*Grant Med. Ctr. v. Burwell*,
   204 F. Supp. 3d 68 (D.D.C. 2016) .......................................................................30

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Harmon v. Thornburgh,*
    878 F.2d 484 (D.C. Cir. 1989) .............................................................................41

*Harris v. McRae,*
    448 U.S. 297 (1980) ...............................................................................................2

*Hoffman-Laroche, Inc. v. Califano,*
    453 F. Supp. 900 (D.D.C. 1978) ..........................................................................34

*Huidekoper's Lesee v. Douglas,*
    7 U.S. 1 (1805) .....................................................................................................30

*Indep. Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly,*
    572 F.3d 644 (9th Cir. 2009) ................................................................................39

*Int'l Refugee Assistance Project v. Trump,*
    No. CV TDC-17-0361, 2017 WL 1018235 (D. Md. Mar. 16, 2017) ...................40

*Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Social & Rehab. Servs.,*
    31 F.3d 1536 (10th Cir. 1994) ..............................................................................34

*La. Dep't of Health & Hosps. v. CMS,*
    346 F.3d 571 (5th Cir. 2003) ................................................................................22

*Lawson v. FMR LLC,*
    134 S. Ct. 1158 (2014) ..........................................................................................17

*League of Woman Voters of the United States v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) ..................................................................................12

*In re Medicare Reimbursement Litig.,*
    309 F. Supp. 2d 89 (D.D.C. 2004) ........................................................................40

*\*Missouri Department of Social Services,* DAB No. A-07-124 (March 17, 2008) ................23

*\*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ...........................................................................23, 24, 25, 30

*N.H. Hosp. Ass'n v. Burwell,*
    No. 1:15-cv-00460, 2017 WL 822094 (D.N.H. Mar. 2, 2017) ................1, 8, 17, 31

*N. Mariana Islands v. United States,*
    686 F. Supp. 2d 7 (D.D.C. 2009) ..........................................................................40

*Nat'l Fed'n of Fed. Employees v. Carlucci,*
    680 F.Supp. 416 (D.D.C. 1988) .......................................................................40, 42

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Nat'l Min. Ass'n v. U.S. Army Corps of Engineers*,
  145 F.3d 1399 (D.C. Cir. 1998)................................................................40, 41, 42

*Ne. Hosp. Corp. v. Sebelius*,
  657 F.3d 1 (D.C.Cir.2011)................................................................30, 32

*New Hampshire Dept. of Health and Human Services*,
  DAB No. 2399 (2011)................................................................23, 32

*North Dakota v. EPA*,
  127 F. Supp. 3d 1047 (D.N.D. 2015)................................................................39

*Pharm. Research & Mfrs. of Am. v. Thompson*,
  251 F.3d 219 (D.C. Cir.2001)................................................................13

*Russello v. United States*,
  464 U.S. 16 (1983)................................................................15

*Schalk v. Teledyne, Inc.*,
  751 F. Supp.1261 (W.D. Mich. 1990)................................................................37

*Serono Labs., Inc. v. Shalala*,
  158 F.3d 1313 (D.C. Cir. 1998)................................................................39

*Smoking Everywhere, Inc. v. FDA*,
  680 F. Supp. 2d 62 (D.D.C. 2010)................................................................33

*Synagro–Wwt, Inc. v. Louisa Cty.*,
  2001 WL 868638 (W.D. Va. July 17, 2001)................................................................38

*Tafas v. Dudas*,
  511 F.Supp. 2d 652 (E.D.Va. 2007)................................................................37

*Texas Children's Hosp. v. Burwell*,
  76 F. Supp. 3d 224 (D.D.C. 2014)................................................................ *passim*

*Texas v. U.S.*,
  809 F.3d 134 (5th Cir. 2015)................................................................40

*In the Matter of Townview Nursing Home*,
  28 B.R. 431 (Bankr. S.D.N.Y. 1983)................................................................22

*Va. Dep't of Med. Assistance Servs. v. Johnson*,
  609 F. Supp. 2d 1 (D.D.C. 2009)................................................................2, 22, 25, 26

**TABLE OF AUTHORITIES**
(continued)

<u>Page(s)</u>

*Whitecliff, Inc. v. Shalala*,
    20 F.3d 488 (D.C. Cir. 1994) .............................................................................22

*Winter v. NRDC*,
    555 U.S. 7 (2008) ..............................................................................................12

*Wis. Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) ..........................................................................33

**Statutes**

5 U.S.C. § 500 *et seq.* ........................................................................... *passim*

5 U.S.C. § 706(2)(A) ..............................................................................12, 23, 33

5 U.S.C. § 706(2)(C) ..............................................................................12, 13, 41

42 U.S.C. § 1316(a) ..............................................................................................2

42 U.S.C. § 1396a(10)(A)(i)(II) ...........................................................................2

42 U.S.C. § 1396a(13)(A)(iv) ..............................................................................3

42 U.S.C. § 1396a(a) ............................................................................................2

42 U.S.C. § 1396b(a)(1) .......................................................................................3

42 U.S.C. § 1396b(d)(2)(C) ..................................................................................5

42 U.S.C. § 1396b(d)(2)(D) ..................................................................................5

42 U.S.C. § 1396r–4(g) .........................................................................................3

42 U.S.C. § 1396r–4(g)(1)(A) ..............................................................................4

42 U.S.C. § 1396r–4(j)(2) .....................................................................................5

42 U.S.C. §1396r-4(a)(1) ..............................................................................19, 20

42 U.S.C. § 1396r-4(a)(1)(B) .............................................................................20

42 U.S.C. § 1396r-4(b) .........................................................................................3

42 U.S.C. § 1396r-4(b)(1) ...................................................................................20

42 U.S.C. § 1396r-4(c) .......................................................................................16

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

42 U.S.C. § 1396r-4(d)(3) ........................................................................................20

42 U.S.C. § 1396r-4(g) ...............................................................................................3

42 U.S.C. § 1396r-4(g)(1) .......................................................................16, 18, 21, 23

42 U.S.C. § 1396r-4(g)(1)(A) ...............................................................................4, 14

42 U.S.C. § 1396r-4(g)(2) ........................................................................................15

42 U.S.C. § 1396r-4(g)(2)(A) ...................................................................................15

42 U.S.C. § 1396r-4(j)(2)(C) ...............................................................................17, 18

42 U.S.C. § 1396r-4(j)(2)(D) ....................................................................................27

42 U.S.C. § 1396r(g)(1) ............................................................................................21

42 U.S.C. § 1396r (g)(1)(A) .................................................................................14, 31

Medicare Prescription Drug, Improvement, and Modernization Act, Pub. L. No.
    108-173, section 1001 Stat. 2066 .........................................................................4

Pub. L. No. 108-173, § 1001(d) (codified at 42 U.S.C. § 1396r-4(j)(2)(C), (D)) ...........4

**Regulations**

20 C.F.R. § 416.934(j) .................................................................................................2

20 C.F.R. § 416.934(k) ................................................................................................2

42 C.F.R. § 413.5(a) ..................................................................................................27

42 C.F.R. § 433.302 ...................................................................................................11

42 C.F.R. § 433.312(a) ..............................................................................................38

42 C.F.R. § 447.299(c) ...........................................................................................5, 32

42 C.F.R. § 447.299(c)(10) .....................................................................................6, 32

42 C.F.R. § 447.299(c)(16) ........................................................................................31

42 C.F.R § 455.301 ......................................................................................................5

42 C.F.R. § 455.304 ...................................................................................................11

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

42 C.F.R. § 455.304(b) ..............................................................................38

42 C.F.R. § 455.304(d)(4)..........................................................................27

73 Fed. Reg. 77,906 ....................................................................................5

73 Fed. Reg. 77,950 ............................................................................ *passim*

81 Fed. Reg. 53,980 ....................................................................................6

81 Fed. Reg. 53,983 ....................................................................................6

82 Fed. Reg. at 16,116 ........................................................................16, 26

82 Fed. Reg. 16,117 ...............................................................................6, 27

82 Fed. Reg. 16,122 ....................................................................................7

82 Fed. Reg. 16114 ................................................................................1, 6

82 Fed. Reg. 16116/2 ................................................................................30

82 Fed. Reg. 16117 ................................................................................1, 29

82 Fed. Reg. 16117/2 ................................................................................24

82 Fed. Reg. 16118/3 ................................................................................30

**Other Authorities**

2A Sutherland Statutory Construction §47:26 (7th ed.) ................................30

DSH Audit and Rep. Protocol, CMS- 2198-F, *available at*
    https://www.medicaid.gov /medicaid/financing-and-
    reimbursement/downloads/general_dsh_audit_reporting-protocol.pdf (last
    visited April 5, 2017). ........................................................................18

H. R. No. 103-111, *reprinted in* 1993 U.S.C.C.A.N. 378....................21, 22

H.R. No. 103-111...............................................................................22, 23

H.R. Rep. No. 100-391(I) (1987)................................................................19

H.R. Rep. No. 101-247 (1989); Pub. L. No.101-239 (1989) ........................27

H.R.Rep. No. 103–111 (1993), *reprinted in* 1993 U.S.C.C.A.N. 278............3

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

H.R. Rep. No. 103-111 (1993), reprinted in 1993 U.S.C.C.A.N. 378 ............................................20

H.R. Rep. No. 103-213(1993) (House Conference Report), *reprinted at* 1993
    U.S.C.C.A.N. 1088, 1993 WL 302291 ...........................................................................15, 17

H.R. Rep. No. 105-149 (1997), 1997 WL 353017 (Leg.Hist.) ......................................................22

H.R. Rep. No. 108-391 (Nov. 21, 2003) .......................................................................................18

Henry J. Kaiser Family Foundation, Health, insurance coverage of children 0-18,
    *available at*  http://kff.org/other/state-indicator/children-0-18/ (last visited
    May 11, 2017)..............................................................................................................................2

U.S. Const. Art. III § 1 ...............................................................................................................40

University Dictionary 562 (1999) ...........................................................................................22

# LIST OF ACRONYMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| CMS | Centers for Medicare and Medicaid Services |
| DAB | Departmental Appeals Board |
| DSH | Disproportionate Share Hospital |
| DSH Program | The Disproportionate Share Hospital Program |
| FAQs | Frequently Asked Questions contained in a CMS guidance document titled "Additional Information on the DSH Reporting and Audit Requirements" |
| FFP | Federal Financial Participation |
| Final Rule | "Medicaid Program: Disproportionate Share Hospital Payments – Treatment of Third Party Payers in Calculating Uncompensated Care Costs" promulgated on April 3, 2017 |
| HSL | Hospital Specific Limit |
| IP/OP | Inpatient/Outpatient |
| Medicaid shortfall | The component of the HSL calculation that calculates the costs of hospitals services to individuals eligible for Medicaid net of Medicaid payments |
| MCO | Managed Care Organization |
| MIUR | Medicaid Inpatient Utilization Rate |
| SSA | Social Security Act |
| 2008 Rule | CMS regulations implementing the DSH reporting and auditing requirements |

## **INTRODUCTION**

Plaintiffs seek this Court's immediate intervention to enjoin a final rule titled "Medicaid Program: Disproportionate Share Hospital Payments – Treatment of Third Party Payers in Calculating Uncompensated Care Costs" promulgated by Defendant Centers for Medicaid and Medicare Services ("CMS").  82 Fed. Reg. 16,114, 16,117 (April 3, 2017) (hereinafter the "Final Rule").  The Final Rule codifies the policy of including third-party payments (private insurance and Medicare payments) in the calculation of the hospital specific limit ("HSL") which determines the maximum amount of supplemental Medicaid funds a Disproportionate Share Hospital ("DSH") may receive.  This Court preliminarily enjoined the same policy contained in CMS guidance in *Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 241 (D.D.C. 2014),[1] and a second federal court permanently enjoined the policy in *N.H. Hosp. Ass'n v. Burwell*, No. 1:15-cv-00460, 2017 WL 822094, at *16-17 (D.N.H. Mar. 2, 2017).  Twelve children's hospitals located in four states that treat disproportionate numbers of Medicaid children request the Court's intervention to maintain the status quo because once effective after June 2, the Final Rule will deny tens of millions of dollars of future supplemental Medicaid payments to Plaintiffs and will require the recoupment of tens of millions more in past payments.  Absent an injunction Plaintiffs will be irreparably harmed because once DSH payments are recouped or denied, Plaintiffs have no recourse to recover the funds.  Plaintiffs further request that the Court exercise its discretion and enter a nationwide injunction because the Final Rule has national applicability and importance.

---

[1] Judgment on the merits is pending in the *Texas Children's Hosp.* case.  The policy before the Court was embodied in an informal auditing guideline known as Frequently Asked Question No. 33 ("FAQ 33") requiring that private insurance payments be subtracted in the calculation of a DSH hospital's HSL.

## STATUTORY AND REGULATORY BACKGROUND

### The Medicaid Program

Established in 1965, the Medicaid program (Title XIX of the Social Security Act, 42

U.S.C. § 1396 *et seq.*, also referred to as the "Medicaid Act") is "a cooperative venture between

the federal and state governments to assist states in providing medical care to eligible

individuals." *Va. Dep't of Med. Assistance Servs. v. Johnson*, 609 F. Supp. 2d 1, 2 (D.D.C.

2009) (citations omitted).  The Medicaid program "provid[es] federal financial assistance to

States that choose to reimburse certain costs of medical treatment for needy persons." *Harris v.

McRae,* 448 U.S. 297, 301 (1980).  State participation in the Medicaid program is voluntary.

However, "once a State elects to participate, it must comply with the requirements of Title XIX."

*Id.*  If a state "fails to comply with the statutory or regulatory requirements governing Medicaid,

the federal government may recoup federal funds from the state." *Texas Children's Hosp.*, 76 F.

Supp. 3d at 229 (citing § 1316(a), (c)–(e)).

In addition to covering low-income individuals, Medicaid also provides benefits to

children with certain serious illnesses, without regard to family income.  *Id.* (citing 42 U.S.C. §

1396a(10)(A)(i)(II) (children are eligible for Medicaid if they are eligible for Supplemental

Security Income); 20 C.F.R. § 416.934(j), (k) (children born weighing less than 1,200 grams are

eligible for Supplemental Security Income).  In 2015, 38% of children in the United States were

insured by Medicaid (30.4 million children).[2]

Each state administers its own Medicaid program pursuant to a state Medicaid plan which

must be reviewed and approved by the Secretary of Health and Human Services.[3]  *See* 42 U.S.C.

---

[2] *See* Henry J. Kaiser Family Foundation, Health, insurance coverage of children 0-18, *available at*  http://kff.org/other/state-indicator/children-0-18/ (last visited May 11, 2017).

[3] The Secretary has delegated this authority to CMS.

§ 1396a(a).  Once the plan is approved, the federal government subsidizes the state's medical-assistance services by providing federal matching funds (the "federal financial participation" or "FFP").  *Id.* § 1396b(a)(1).

**The Disproportionate Share Hospital Program**

In 1981, Congress amended the Medicaid Act to require states to ensure that payments to hospitals "take into account ... the situation of hospitals which serve a disproportionate number of low-income patients with special needs." 42 U.S.C. § 1396a(13)(A)(iv) ("DSH payments").  Congress's intent "was to stabilize the hospitals financially and preserve access to health care services for eligible low-income patients."  *Texas Children's Hosp.*, 76 F. Supp. 3d at 230 (internal quotation marks omitted).  Congress specifically "deemed" hospitals to be DSH hospitals entitled to receive DSH payments if "the hospital's Medicaid inpatient utilization rate … is at least one standard deviation above the mean Medicaid inpatient utilization rate for hospitals receiving Medicaid payments in the State."[4]  42 U.S.C. § 1396r-4(b)(1)(A).

"In 1993, the program was amended to limit DSH payments on a hospital-specific basis." *Texas Children's Hosp.*, 76 F. Supp. 3d at 230 (citing § 1396r–4(g)).  Congress was concerned by reports that some states were "making DSH payment adjustments to hospitals that do not provide inpatient services to Medicaid beneficiaries" and "in amounts that exceed the net costs, and in some instances the total costs, of operating the facilities," as well as using DSH funds "to finance other functions of State government, such as road construction and maintenance." H.R.Rep. No. 103–111, at 211 (1993), *reprinted in* 1993 U.S.C.C.A.N. 278, 538.  Accordingly, Congress limited DSH payment adjustments to a hospital's "hospital-specific limit" or "HSL." *See* 42 U.S.C. § 1396r-4(g).  More specifically, a hospital's annual DSH payment may not

---

[4] A hospital is also deemed to be a DSH Hospital if it has a low-income utilization rate that exceeds 25 percent.  42 U.S.C. § 1396r-4(b).

exceed a hospital's "uncompensated costs" of serving Medicaid and uninsured patients.  42

U.S.C. § 1396r-4(g)(1)(A). " Uncompensated costs" are defined as:

> [T]he *costs* incurred during the year *of furnishing hospital services* (as determined by the Secretary and *net of payments under this subchapter*, other than under this section, and by uninsured patients) by the hospital *to individuals who* either *are eligible for medical assistance under the State plan* or have no health insurance (or other source of third party coverage) for services provided during the year.

*Id.* (emphases added).  Thus, a DSH hospital's total uncompensated costs are made up of two

components:  (1) the costs of hospital services to individuals eligible for Medicaid, net of

payments under the Medicaid Act (the "Medicaid shortfall"); and (2) the costs of hospital

services to individuals who have no health insurance or other third-party coverage, net of

payments by those uninsured patients (the uninsured component).  The Final Rule only affects

the method of calculating the Medicaid shortfall.  The statutory formula for calculating the

Medicaid shortfall can be expressed as:

| Medicaid Allowable Costs for All Eligible Patients | − | Medicaid Payments | = | Medicaid shortfall component of HSL |
|---|---|---|---|---|

In 2003, Congress enacted section 1001 of the Medicare Prescription Drug,

Improvement, and Modernization Act, Pub. L. No. 108-173, 117 Stat. 2066, to require states to

submit annual reports and independent certified audits to CMS on their DSH Programs.  The

reports must identify each hospital to which the state has made DSH payments and the audit

must verify that the state's DSH payments comply with the statutory requirements.  Pub. L. No.

108-173, § 1001(d) (codified at 42 U.S.C. § 1396r-4(j)(2)(C), (D)).  More specifically, the audit

must confirm, among other things, that:

> (C) Only the uncompensated care costs of providing inpatient hospital and outpatient hospital services to individuals described in [Section 1396r–4(g)(1)(A)] ... are included in the calculation of the hospital-specific limits[; and]

(D) The State included all payments under this subchapter, including supplemental payments, in the calculation of such hospital-specific limits.

§ 1396r–4(j)(2).  If the audit finds that DSH payments received exceed a hospital's HSL, the state must recoup these "overpayments" within one year of their discovery or lose the federal financial share. *See id.* § 1396b(d)(2)(C), (D).

**The CMS Regulations**

On December 19, 2008, CMS promulgated a final regulation implementing the DSH reporting and auditing requirements.  73 Fed. Reg. 77,904, 77,950 (the "2008 Rule").  The 2008 Rule requires states to submit information "for each DSH hospital to which the State made a DSH payment."  42 C.F.R. § 447.299(c).  The 2008 Rule further requires each hospital to report its "total annual uncompensated care costs" and sets forth the regulatory formula for determining such costs by specifically defining each type of cost and payment to be included in the calculation.  42 C.F.R. § 447.299(c)(16).  Private insurance payments (also referred to as commercial payments) are not included in the regulatory formula.[5]

The auditing provisions of the rule require participating states to submit annual DSH Program audits that include a CMS-approved auditor's "determination of whether or not the State made DSH payments that exceeded any hospital's specific DSH limit" in the audit year.  42 C.F.R § 455.301.  The 2011 DSH year (subject to audit in 2014) was the first year in which CMS required states to recoup overpayments or face "the return of the Federal share to the Federal government."  73 Fed. Reg. at 77,906.

---

[5] "Private insurance" means health plan coverage provided through an employer or union, or purchased by an individual or provided by their employer from a commercial health insurance company.  Revenues received from private insurers are considered third party revenues.

**The Final Rule**

On August 15, 2016, Defendants published a notice of proposed rulemaking requiring

that "[a]ll third party payments (including, but not limited to … private insurance) must be

included in the calculation of uncompensated care costs for purposes of determining the hospital

specific DSH limit." 81 Fed. Reg. 53,980, 983 (August 15, 2016).  CMS received and posted 55

individual comments on the proposed rule, which CMS identifies as raising 161 issues.  82 Fed.

Reg. at 16,117.  All but six of the 55 posted comments criticized the proposal on multiple

grounds, including that (1) the Medicaid Act did not give CMS the authority to include third-

party payments in the calculation of the HSL, (2) the proposal would deprive DSH hospitals of

funds Congress intended them to receive, and (3) the proposed rule, if promulgated, cannot have

retroactive effect.

Dismissing nearly all comments, on April 3, 2017, CMS published the Final Rule, which

amends 42 C.F.R. § 447.299(c)(10), to "modify the terms of the current regulation to make

explicit that 'costs' for purposes of calculating the hospital-specific limits are costs net of third-

party payments." 82 Fed. Reg. 16114, 16,117 (April 3, 2017).  The regulation governing how

costs must be considered in the calculation of the DSH HSL, therefore now provides:

> (10) Total Cost of Care for Medicaid IP/OP Services. The total annual costs
> incurred by each hospital for furnishing inpatient hospital and outpatient hospital
> services to Medicaid eligible individuals. The total annual costs are determined on
> a hospital-specific basis, not a service-specific basis. For purposes of this section,
> costs-
>
> (i) Are defined as costs net of third-party payments, including, but not limited to,
> payments by Medicare and private insurance.
>
> (ii) Must capture the total burden on the hospital of treating Medicaid eligible
> patients prior to payment by Medicaid.  Thus, costs must be determined in the
> aggregate and not by estimating the cost of individual patients.  For example, if a
> hospital treats two Medicaid eligible patients at a cost of $2,000 and receives a
> $500 payment from a third party for each individual, the total cost to the hospital
> for purposes of this section is $1,000, regardless of whether the third party

payment received for one patient exceeds the cost of providing the service to that individual.

82 Fed. Reg. at 16,122 (Apr. 3, 2017).  The Final Rule becomes effective on June 2, 2017.

CMS justifies the Final Rule by asserting the same legal arguments Defendants have presented to this and other courts to justify FAQs 33 and 34, which as Plaintiffs show below are contrary to the plain language of the Medicaid Act and are otherwise lacking in merit. Moreover, CMS takes the position that the Final Rule is a clarifying rule that merely clarifies the 2008 Rule, thereby asserting that the policy embodied in the Final Rule has been in effect since 2008.  *Id.* at 16, 119 ("This rule is providing clarification to existing policy, therefore there is no issue of retroactivity, nor a need for a transition period.").

**Litigation Challenging the Policy of Including Third Party Payments in the HSL, Which is Now Codified in the Final Rule**

There are currently six cases pending in federal district courts challenging Defendants' policy, set forth in the FAQs, mandating that third-party payments be included in the calculation of hospitals' DSH HSL.  In *Texas Children's Hospital,* this Court held that plaintiffs were likely to succeed in showing the policy set forth in a DSH auditing and reporting guideline requiring that private insurance payments be included in the calculation of a DSH hospital's HSL (referred to in that case as "FAQ 33") "makes a substantive change to the formula for calculating a hospital's DSH limit, binds state Medicaid agencies, and effectively amends the 2008 Rule" without following the APA's procedural requirements.  76 F. Supp. 3d at 246-47.  Similarly, on March 3, 2017, the United States District Court for the District of New Hampshire permanently enjoined Defendants from enforcing FAQs 33 and FAQ 34[6] in New Hampshire "until and unless

---

[6] Similar to FAQ 33, FAQ 34 required that Medicare payments received on behalf of Medicaid-eligible patients be included in the DSH hospital specific limit calculation.  Both FAQs appeared on CMS's website in a document titled "Additional Information on the DSH Reporting and Audit Requirements."

[its] policies and procedures are replaced by an enforceable and properly promulgated regulation." *N.H. Hosp. Ass'n v. Burwell*, 2017 WL 822094, at *16-17.  Four other cases challenging the FAQs are also pending in federal courts in Tennessee, Minnesota, Virginia, and Missouri.[7]

The cases are at different stages of proceedings, with the *N.H. Hosp. Ass'n v. Burwell* case being the only case to reach judgment.  Multiple lawsuits have been necessitated by Defendants' position that this Court's preliminary injunction applies only in the states of Texas and Washington and Defendants' non-acquiescence to the *N.H. Hosp. Ass'n* judgment.  *See* Declaration of Bridget McCabe ("McCabe Decl."), at Ex. A (5/1/2015 letter from CMS to Missouri Dept. of Social Services ("For all other states, including Missouri, CMS may disallow federal financial participation if a state does not comply with the policy articulated in FAQ No. 33.")).  The Final Rule does not moot these cases because any judgment received with respect to the FAQs would have no effect on the application of the policy after the effective date of the Final Rule.

---

[7] These include *Tennessee Hospital Association v. Burwell*, No. 3:16-cv-03263 (M.D. Tenn., filed Dec. 15, 2016); *Children's Health Care v. Burwell*, No. 0:16-cv-04064-WMW-DTS (D. Minn., filed Dec. 2, 2016); *Children's Hospital of the Kings Daughters, Inc. v. Price*, 2:17-cv-00139-RBS-LRL (E.D. Va., filed Mar. 7, 2017),  *Missouri Hospital Association v. Price*, No. 2:17-cv-04052-BCW  (W.D. Mo., filed Mar. 22, 2017).

## STATEMENT OF FACTS[8]

### The Plaintiffs

Plaintiffs are 12 free-standing children's hospitals located in four states that treat

disproportionate numbers of Medicaid children.  Compl. ¶¶ 13-17.  Plaintiffs provide specialized

care to children that cannot be provided in other hospitals, such as treating chronic and complex

conditions, including those with severe anomalies, heart ailments, cancer, low birth weight and

other long-term and severe illnesses.[9]  *See, e.g.*, Wilson Decl. ¶ 3; Kimmel Decl. ¶ 2; Ryan Decl.

¶ 3.  Plaintiffs treat these children regardless of whether their families have health insurance

coverage or the ability to pay.  *See, e.g.*, Ostendorf Decl. ¶ 2; Haddican Decl. ¶ 3.  In accordance

with the Medicaid Act, Plaintiffs are all "deemed" DSH hospitals and are entitled to receive

supplemental DSH funding.  *See, e.g.*, Wilson Decl. ¶ 7; Kinzig Decl. ¶ 9.  Plaintiffs are

precisely the safety-net hospitals Congress sought to assist financially through the DSH program.

*See, e.g.*, Ostendorf Decl. ¶ 5; Wilson Decl. ¶ 4.

Plaintiffs have among the highest Medicaid Inpatient Utilization Rates ("MIUR") of all

hospitals in their respective states.  For example, in 2014, children enrolled in Medicaid

comprised 55% of all patient days at CHAT member hospitals, while at all other hospitals in

---

[8] The Statement of Facts relies on the seven fact declarations submitted in support of Plaintiffs' Memorandum of Law in Support of Motion for Emergency Injunctive Relief, which are filed contemporaneously herewith.  *See* Declaration of Stacy Wilson from Plaintiff CHAT ("Wilson Decl."); Declaration of Robert Simon from Texas Children's Hospital, member of Plaintiff CHAT ("Simon Decl."); Declaration of Stephen Kimmel from Cook Children's Hospital, member of Plaintiff CHAT ("Kimmel Decl."); Declaration of Todd Ostendorf  from Plaintiff Children's Minnesota ("Ostendorf Decl."); Declaration of Jim Haddican from Plaintiff Gillette Children's ("Haddican Decl."); Declaration of Dennis Ryan from Plaintiff CHKD ("Ryan Decl."); and Declaration of Jerry Kinzig from Plaintiff Seattle Children's ("Kinzig Decl.").

[9] Children's hospitals are responsible for one-third of all pediatric discharges in the U.S.  For children with complex and severe illnesses, approximately one half of them are discharged from children's hospitals.  *See* McCabe Declaration, Ex. D, at 176.

Texas only 17% of their total patient days[10] were attributable to Medicaid patients.  Wilson Decl. ¶ 6; *see also id. ¶* 4 ("CHAT member hospitals have among the highest Medicaid volumes in the state" ranging from 50.8% to 79.3%).  Plaintiff CHKD has the highest MIUR in Virginia documented at 69.65% in 2012, while the next highest MIUR at a Virginia general hospital was only 41.99%.  Ryan Decl. ¶ 4.  Similarly, Gillette serves the highest proportion of patients covered by Medicaid in Minnesota, with approximately 68% of 2015 inpatient days attributable to Medicaid patients.  Haddican Decl. ¶2.  Approximately 57% of the children who have inpatient stays at Children's Minnesota are eligible to receive Medicaid.  Ostendorf Decl. ¶ 4.  In 2017, Seattle Children's MIUR for 2017 is 67.5%— the third highest in the state of Washington.  Kinzig Decl. ¶ 3.

Plaintiffs sustain substantial losses treating Medicaid-eligible children.  This is because Medicaid reimburses Plaintiffs for only a fraction of the actual costs incurred.  Ostendorf Decl. ¶ 5 (for Children's Minnesota, $0.65 for every dollar spent); Ryan Decl.¶ 5 (for CHKD, $0.69 for every dollar spent); Kinzig Decl.¶ 4 (for Seattle Children's, $0.70 for every dollar spent).  And, unlike adult hospitals, Plaintiffs do not have other multiple revenue sources that can help offset these losses.[11]  *See e.g.,* Wilson Decl. ¶ 4 (CHAT members' Medicare population is only 1% of all patient days compared to 40% at all other hospitals in Texas); Ryan Decl. ¶ 4 (CHKD is more reliant on the Medicaid program than any other hospital in Virginia).  It is because of these financial losses and limited revenue source streams that Plaintiffs rely so heavily on the DSH Program to make up some of the financial shortfalls suffered in treating disproportionately high numbers of Medicaid patients.  *See, e.g.*, Wilson Decl. ¶ 4; Ostendorf Decl. ¶ 5; Kinzig

---

[10] A "patient day" is a day for which there is a billable "room-and-board" charge for an admitted hospital inpatient who occupies a hospital bed at midnight.

[11] Adult hospitals can look to the Medicare program, which pays higher rates than Medicaid and provides supplemental funds through Medicare DSH.  *See* Wilson Decl. ¶ 4.

Decl. ¶ 4.  The DSH program is vital to Plaintiffs' ability to meet their non-profit, mission-driven objectives that provide necessary programs and services to the communities they serve.  *Id*.  The Final Rule threatens to eliminate Plaintiffs' DSH funding altogether, thereby severely harming Plaintiffs and their pediatric communities.  *See, e.g*., Simon Decl. ¶ 7; Kinzig Decl. ¶ 8-9.

## The 2014 DSH Audits

Under the regulations, states must complete an independent certified audit for each DSH program year three years after the end of the DSH year under audit.  42 C.F.R. § 455.304.  Thus, the 2014 DSH program year is subject to audit in 2017.  The audits must be completed by September 30 and submitted to CMS no later than December 31.  If the audits identify overpayments, they must be recouped within one year.  42 C.F.R. § 433.302.  The one year clock is triggered when the states submit the audits to CMS, which could occur as soon as the audits are complete, *e.g.,* anytime between October 1 and December 31, and even sooner if a state completes the audit before September 30 and submits it to CMS.

## DSH Program Year Funding

Most, if not all, states pay DSH funds in the current year based upon previous years' data to estimate the amount of DSH funds a hospital is eligible to receive.  For example, in Texas, the state Medicaid agency uses hospital cost reports from two years prior to award the upcoming DSH program year payments, with program years running from July 1 to June 30.  Simon Decl. ¶ 7.  The process for determining DSH payments for 2018 is beginning.  The Final Rule will mandate that third-party payments be included in determining the amount of 2018 DSH funds hospitals receive, thereby artificially deflating the HSL for Texas Children's and disqualifying the hospital from receiving DSH funds.

## STANDARD OF REVIEW

A plaintiff seeking a preliminary injunction must demonstrate that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable injury absent an injunction; (3) the balance of equities tips in the plaintiff's favor; and (4) a preliminary injunction is in the public interest.  *Winter v. NRDC*, 555 U.S. 7, 20 (2008).  Courts in this Circuit have weighed these factors on a "sliding scale," allowing "an unusually strong showing on one of the factors" to overcome a weaker showing on another factor.  *Davis v. PGBC*, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009); *Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 360-61 (D.C. Cir. 1999); *see also League of Woman Voters of the United States v. Newby,* 838 F.3d 1, 7 (D.C. Cir. 2016) (the D.C. Circuit has "not yet needed to decide the issue" of whether the likelihood of irreparable harm and likelihood of success are independent requirements).  Here, Plaintiffs satisfy all four injunctive factors.

Plaintiffs' claims are reviewable under the Administrative Procedure Act ("APA"), 5 U.S.C. § 500 *et seq*., which provides that the Court "shall . . . . set aside" an agency's decision if it is arbitrary, capricious, or "otherwise not in accordance with law, or if it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.*

## ARGUMENT

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS

Plaintiffs challenge the Final Rule on two grounds: (1) Defendants violated APA § 706(2)(C) by acting in excess of their statutory jurisdiction, their statutory authority, and short of statutory right under the Medicaid Act (Complaint ¶¶ 57-62); and (2) Defendant's Final Rule is arbitrary, capricious, or "otherwise not in accordance with law" thereby violating  APA § 706(2)(A) (Complaint ¶¶ 63-69).  Plaintiffs are likely to succeed on both claims.  As this Court and the New Hampshire court have already found, the policy of including private insurance and

Medicare payments in the HSL calculation is not embodied in the 2008 Rule.  The Final Rule is thus a substantive new rule that cannot have retroactive effect.  Moreover, the Final Rule is unlawful because it is contrary to the plain language of the Medicaid Act and contravenes Congress's purpose in enacting the DSH program.

> **A.      The Final Rule Is Not Authorized By the Medicaid Act and Therefore Violates APA § 706 (2)(C).**

Challenges to agency rules under section 706(2)(C) of the APA are subject to the standard of review articulated in *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984), under which the reviewing court applies a two-part inquiry.  First, the court employs traditional tools of statutory interpretation to examine whether Congress has "directly spoken" to the question at issue."  *Pharm. Research & Mfrs. of Am. v. Thompson*, 251 F.3d 219, 224 (D.C. Cir.2001).  If the statute is clear, then the unambiguous intent of Congress must control and the *Chevron* inquiry is over.  If the statute is "'silent or ambiguous with respect to the specific issue' the court must defer to the agency's interpretation if it is reasonable." *Citizens Coal Council v. Norton*, 330 F.3d 478, 481 (D.C. Cir. 2003) (*quoting Chevron,* 467 U.S. at 843).

The Final Rule fails under both *Chevron* steps.  First, the DSH provisions of the Medicaid Act are unambiguous that only Medicaid payments are netted out in the Medicaid shortfall component of the HSL and the term "uncompensated costs" is merely a shorthand referral to the statutory formula.  Second, the Final Rule is an unreasonable interpretation of the Medicaid Act because it denies DSH funding to the very hospitals Congress *deemed* entitled to receive the funds.  It also unreasonably broadens the discretion Congress gave the Secretary to determine costs incurred for DSH purposes.  Congress intended a very particular meaning of the words "costs incurred" that (1) the hospital itself incurs the costs; and (2) the costs must be covered and allowable under Medicaid.

1.      ***Chevron* Step 1 - § 1396r (g)(1)(A) Is Unambiguous: Only Medicaid Payments Are Subtracted From Costs in the Medicaid Shortfall Component of the HSL**

The Medicaid Act unambiguously specifies the "payments" that are to be included in the calculation of a hospital's HSL, *i.e.*, Medicaid payments and payments made by or on behalf of uninsured patients ("payments under this subchapter . . .  and by uninsured patients."). 42 U.S.C. § 1396r-4(g)(1)(A).  The statutory HSL calculation is expressed as follows:

$$\text{Medicaid-Allowable Costs for Eligible-Patients} \;-\; \text{Medicaid Payments} \;=\; \text{HSL}$$

Third-party payments are not included on the payment side of the statutory equation. Nevertheless, the Final Rule mandates that third-party payments must be considered on the "cost" side of the equation to calculate "uncompensated costs."  In other words, the Final Rule rewrites the statutory formula as follows:

$$\boxed{\text{Medicaid-Allowable Costs for Eligible-Patients} \;-\; \text{Third Party Payments}} \;-\; \text{Medicaid Payments} \;=\; \text{HSL}$$

The Final Rule contravenes the plain language of the statute, which sets forth the formula for calculating the HSL and plainly distinguishes between costs and payments by giving the Secretary discretion to determine the "costs . . . of furnishing hospital services" (meaning whether the costs are covered by Medicaid) to be included in the cost side of the equation, while specifying the payments that are to be netted out of the costs ("net of payments under this subchapter . . .  and by uninsured patients.").  42 U.S.C. § 1396r-4(g)(1)(A).  The statute directs

14

that only Medicaid payments received by hospitals be subtracted from the total costs of furnishing inpatient and outpatient hospital services to Medicaid-eligible individuals.[12]

Further, the structure and context of 1396r-4(g) demonstrate Congress's unambiguous intent that Medicaid payments are the only source of revenue to be netted out against costs.  It is a fundamental principle of statutory construction that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (internal quotation marks and citation omitted). This principle applies here with particular force because in the immediately following subsection, 1396r-4(g)(2), Congress established a formula for providing additional DSH payment adjustments for a two-year transitional period for state-owned hospitals in which it specified that third-party payments be considered before DSH payments were awarded.  Specifically, the hospitals could receive up to 200 percent of the costs of furnishing hospital services identified in section (g)(1) if

> the Governor … certifies … that the hospital's *applicable minimum amount* is used for health services during the year [and in] determining the amount that is used for such services …, *there shall be excluded any amounts received* under the Public Health Service Act or *from third party payors* …

§ 1396r-4(g)(2)(A) (emphasis added).  This provision unequivocally shows that where Congress intended third-party payments be considered in providing DSH payments, it knew how to say so.

---

[12] The plain meaning of this language is supported its legislative history.  The Conference Report accompanying the HSL provision explained that the HSL "[l]imits disproportionate share hospital (DSH) payment adjustments *to no more than the costs of providing inpatient and outpatient services* to Medicaid and uninsured patients, *less payments received from Medicaid* (other than DSH payment adjustments) and uninsured patients."  H.R. Rep. No. 103-213, at 835 (1993) (House Conference Report) (emphases added), *reprinted at* 1993 U.S.C.C.A.N. 1088, 1524, 1993 WL 302291.  Nowhere did Congress indicate that payments received from private insurance or Medicare should first be subtracted from the costs of furnishing hospital services before Medicaid payments are subtracted.

The D.C. Circuit applied this cannon of statutory construction to another DSH provision that directs states to use one of three formulae for calculating DSH payments to hospitals (§ 1396r-4(c)).  In *D.C. Hosp. Ass'n v. D.C.*, 224 F.3d 776 (D.C. Cir. 2000), the District of Columbia used the formula that requires the DSH payment to be in an amount equal to at least the product of the amount paid to the hospitals under the state plan (the base amount) and the hospital's DSH adjustment percentage.  In applying the formula, the District of Columbia excluded from the base amount payments made by managed care organizations ("MCOs"), arguing that MCO payments were not payments made "directly" by a state under a state plan. The D.C. Circuit rejected the District's argument, holding that if Congress intended that "only a State's 'direct' payments were to be taken into account," it could have so stated as it did in the proceeding subsection of the statute where Congress specified "the amount of the cash subsidies for patient services received *directly* from State and local governments." *Id*. at 780.  Thus, the court held that Congress's omission of the term "directly" in the DSH calculation of the base amount was "compelling evidence that Congress did not intend to limit the computation of payments to those made directly by the District." *Id*.  Here, the fact that Congress excluded third-party payments from the calculation of the Medicaid shortfall component of the HSL, but included them in an adjacent subsection, is equally compelling evidence that Congress did not intend third-party payments to be included in the calculation.

In the Final Rule, CMS offers two feeble arguments to justify its promulgation as to statutory intent.  First, CMS relies on section 1396r-4(g)(1)'s heading "uncompensated costs" to justify subtracting private payments from the cost side of the HSL calculation.  82 Fed. Reg. at 16,116.  But "the heading of a section cannot limit the plain meaning of the text." *Bhd. of R.R. Trainmen v. Balt. & Ohio R.R. Co.*, 331 U.S. 519, 528 (1947).  The statutory heading is "'but a

short-hand reference to the general subject matter' of the provision, 'not meant to take the place of the detailed provisions of the text.'" *Lawson v. FMR LLC,* 134 S. Ct. 1158, 1169 (2014). Here, Congress provided "detailed provisions" that specify the costs included and the payments subtracted to derive "uncompensated costs," with no reference to private insurance payments anywhere.  The distinction between costs and payments is reinforced repeatedly in the legislative history:  DSH payments cannot exceed "the costs of providing inpatient and outpatient services to Medicaid patients and uninsured patients, less payments received from Medicaid … and uninsured patients."  H.R. Rep. No. 103-213, at 835 (Aug. 4, 1993) (Budget Conf. Rep.).  As the New Hampshire court found, "Congress could not have intended to grant the Secretary the discretion to include other payments within the term 'costs,' while separately defining payments. If it did, the definition of payments that must be subtracted from costs to determine the Medicaid Shortfall would be surplusage."  *N.H. Hosp. Ass'n*, 2016 WL 1048023, at *12 (citations omitted).

Second, CMS relies on § 1396r-4(j)(2)(C) as justification for promulgation. *Id.* at 16115/3.  That section was added to the Medicaid Act in 2003 to require states to submit annual independent certified audits to CMS on their DSH Programs:

(2) Independent Certified Audit

The State shall annually submit to the Secretary an independent audit that verifies each of the following:

(C) Only the uncompensated care costs of providing inpatient and outpatient hospital services to individuals described in paragraph (1)(A) of such subsection are included in the calculation of the hospital-specific limits under such subsection.

The phrase "uncompensated care costs" in §1396r-4(j)(2)(C), however, is mere shorthand for the HSL "calculation" itself (costs of inpatient and outpatient hospital services minus Medicaid payments and costs of inpatient and outpatient hospital services minus payments made by or on

behalf of the uninsured).  Nowhere does this give the Secretary discretion to alter the cost side of

the formula. This is supported by that provision's legislative history.  In the 2003 Conference

Report, Congress reiterated the definition of uncompensated costs set forth in § 1396r-4(g)(1):

> DSH payments to each inpatient general hospital are limited to some percentage
> of the costs of providing inpatient and outpatient services to Medicaid and
> uninsured patients at that hospital, less payments received from or on behalf of
> Medicaid and uninsured patients. *These costs are considered to be unreimbursed
> costs.*

H.R. Rep. No. 108-391, at 807-808 (Nov. 21, 2003) (citing "Present Law").  Contrary to CMS's

position that "uncompensated costs" means "unreimbursed costs" that can only be derived after

netting out third-party payments, Congress again made clear that the HSL calculation is by

definition "unreimbursed costs," *i.e.,*  costs that have not been reimbursed by Medicaid.

Nowhere did Congress express that "uncompensated costs" or "unreimbursed costs" means costs

less third-party payments, as the Final Rule contends.

    The record evidence also defeats CMS's position.  Section 1396r-4(j)(2)(C) is one of four

auditor certification requirements that requires auditors to certify that only inpatient and

outpatient costs for hospital services are included in the HSL calculation.  With respect to the

Medicaid shortfall component of the HSL, CMS's "General Audit and Reporting Protocol"

instructs:

> To determine the existence of a Medicaid shortfall, Medicaid IP/OP hospital costs
> (including Medicaid managed care costs) must be measured against Medicaid
> IP/OP revenue received for such services in the audited State Plan rate year
> (including regular Medicaid rate payments, add-ons, supplemental and enhanced
> payments and Medicaid managed care revenues).

*See* General DSH Audit and Rep. Protocol, CMS- 2198-F.[13]  Nowhere are private insurance

payments included or referenced in this section.

---

[13] *Available at* https://www.medicaid.gov /medicaid/financing-and-
reimbursement/downloads/general_dsh_audit_reporting-protocol.pdf (last visited April 5, 2017).

Accordingly, under *Chevron*, 467 U.S. at 842-43, the Court must give effect to the unambiguous intent of Congress: "costs" means the costs of providing hospital services and "payments" means Medicaid payments in determining the Medicaid shortfall. Because Congress's intent is unambiguous, Plaintiffs are likely to succeed on the merits under *Chevron* step 1.

   2.     ***Chevron* Step 2 – CMS's Interpretation of the Medicaid Statute Is Not Reasonable**

CMS's interpretation of the Medicaid Act in the Final Rule is not reasonable because (1) it denies DSH funds to statutorily "deemed" DSH hospitals that are entitled to supplemental DSH funding, and (2) the Secretary's discretion to determine "cost incurred of furnishing hospital services" is narrowly circumscribed and does not permit CMS to subtract private insurance payments as costs incurred.

   (a)     **The Final Rule Is Unreasonable Because It Denies DSH Funding To Statutorily "Deemed" DSH Hospitals In Violation of the Medicaid Act.**

Congress enacted the DSH program in 1981, requiring states to "take into account the situation of hospitals which serve a disproportionate number of low-income patients with special needs." 42 U.S.C. §1396r-4(a)(1). However, by the mid-1980s only a few states had identified DSH hospitals or established payment adjustments for them. H.R. Rep. No. 100-391(I) at 525 (1987) (only 27 states had even defined disproportionate share hospitals and of these, only 15 states were actually making DSH payment adjustments). Thus, "[t]o assure that HCFA [now CMS] and all the States implement the 1981 requirement that Medicaid payment rates take into account the situation of disproportionate share hospitals" Congress established a federal definition of DSH hospitals and required that states make DSH payments to these facilities. H.R. Rep. No. 100-391(I) at 525 (1987).

A hospital is federally "deemed" a DSH hospital if the hospital's Medicaid inpatient utilization rate (MIUR) ". . . is at least one standard deviation above the mean Medicaid inpatient utilization rate for hospitals receiving Medicaid payments in the State; or the hospital's low-income utilization rate . . . exceeds 25 percent. 42 U.S.C. § 1396r-4(b)(1).  Section 1396r-4(a)(1) mandates that states submit a State Plan that includes the federal definition of a DSH hospital and provides "for an appropriate increase in the rate or amount of payment . . . [for] such hospitals."  § 1396r-4(a)(1)(B).  Congress's intent could not have been more clear: "a hospital is deemed to be a DSH hospital, and is *entitled to receive payment adjustments* ,…" (emphasis supplied).  H.R. Rep. No. 103-111, at 211-12 (1993), reprinted in 1993 U.S.C.C.A.N. 378, 538-39; *see also Banner Health v. Sebelius*, 715 F.Supp.2d 142, 148 (D.D.C. 2010) ("states *must* provide for an 'appropriate increase in the rate or amount of payment for [inpatient hospital] services provided by such hospitals.'") (emphasis added) (citing 42 C.F.R. § 1396r-4(a)(1)(B)).  While "deemed" DSH hospitals are required to receive DSH payments, Congress also provided states discretion to allow other hospitals to receive some DSH payments provided their MIUR is at least one percent.  § 1396r-4(d)(3).

Plaintiffs are all "deemed" DSH hospitals entitled to receive DSH payments but the Final Rule unreasonably denies them DSH funding.  Comments submitted to the record demonstrate this.  For example, Children's Minnesota has a MIUR of 57% and the rule "would have the effect of essentially eliminating our current DSH payments and recouping prior DSH payments."  Ostendorf Decl., at Ex. A, at 1.  CHAT member Cook Children's has a MIUR of 58% and is deemed a DSH hospital but the Final Rule will cause it to lose $16 million in DSH funds received in 2014.  Kimmel Decl., at Ex. A, at 3.  And at Texas Children's Hospital, another CHAT member, "[a]pproximately 55% of patient days… are for Medicaid eligible patients"

(55% MIUR), Simon Decl., at Ex. A, at 1-2, yet its supporting papers accompanying its

comment letter demonstrate that the policy of counting private insurance payments for Medicaid

eligible patients "eliminate[s] entirely Texas Children's actually incurred Medicaid shortfall for

the almost 100,000 patients who did not have private insurance and for whom Medicaid is the

sole source of coverage."  *See* Pltfs. Reply Memo Supporting  S.J., *Texas Children's Hosp. v.*

*Burwell*, Case No. 1:14-cv-02060-EGS, ECF No. 30, at 3 (D.D.C., filed May 6, 2015) (submitted

by Texas Children's Hospital with its comment letter protesting the proposed rule).

Accordingly, the Final rule is an unreasonable interpretation of §1396r-4(g)(1) because it

violates the Medicaid Act by denying DSH payments to hospitals that Congress "deemed" DSH

hospitals and mandated that they receive DSH payment adjustments.

> **(b)** **Defendant's Interpretation of §1396r(g)(1) Is Unreasonable Because the Secretary Does Not Have Discretion to Determine That "Costs Incurred" Means Subtraction of Private Insurance Payments**

The Final Rule is based on the false premise that Congress gave the Secretary unfettered

discretion to redefine the statutory phrase "costs incurred of furnishing hospital services" for

purposes of implementing the DSH program.  To the contrary, Congress circumscribed the

Secretary's discretion when it gave "costs incurred" a very specific meaning.

Congress enacted §1396r-4(g)(1) in response to concerns that DSH funds were being

redirected for many uses other than financially assisting DSH hospitals in providing hospital

services to Medicaid patients.  H. R. No. 103-111 at 212, *reprinted in* 1993 U.S.C.C.A.N. 378,

539 ("Use of Federal Medicaid funds for unrelated purposes, such as building roads, operating

correctional facilities, balancing State budgets, is a clear abuse of the program and "[t]he

Committee is concerned by reports that some States are making DSH payment adjustments to

hospitals that do not provide inpatient services to Medicaid [recipients]…").[14]   *Id.* at 538-39.   In

the context of Congress's concern about abuse as to who was receiving DSH funds, Congress

employed the term "incurred" to assure that the costs were incurred by the hospital itself.   *Va.*

*Dep't of Med. Assistance Servs. v. Johnson*, 609 F. Supp. 2d 1, 8 (D.D.C. 2009) (upholding

Secretary's discretion to deny costs because the services were not performed by the hospital

itself but were "incurred" by a physician's practice group that was a separate legal entity).

Indeed, the plain meaning of the word "incur" is "[t]o become liable or subject to, esp[ecially]

because of one's own actions." WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 562

(1999).[15]

"Costs" means the costs of inpatient and outpatient hospital services allowed under the

Medicaid Act ("The Committee bill limits the amount of payment adjustments to DSH hospitals

to the costs (as determined by the Secretary) that these facilities incur in furnishing inpatient and

outpatient services to Medicaid–eligible patients." H. R. No. 103-111 at 212 (emphasis

supplied).   *See La. Dep't of Health & Hosps. v. CMS*, 346 F.3d 571 (5th Cir. 2003) (finding the

---

[14] In 1997 Congress reiterated its concerns about how states were using DSH:  "Our experience with the disproportionate share hospital program (DSH) tells us that sometimes the funds that Congress turns over to the states do not always reach the intended beneficiaries. Congress did not intend for DSH moneys to fund state psychiatric hospitals, or roads, or prisons, but in some states that is exactly what happened." H.R. Rep. No. 105-149, at 1647 (1997), 1997 WL 353017 (Leg. Hist.).

[15] That "costs incurred" does not mean "costs reimbursed," as CMS maintains in the Final Rule, was directly addressed in the Medicaid context in *In the Matter of Townview Nursing Home*, 28 B.R. 431, 458 (Bankr. S.D.N.Y. 1983).  In *Townview Nursing Home*, the issue was whether a nursing home, as debtor, was entitled to certain Medicaid reimbursement from the state and the city.  In ruling that accrued salaries could be counted as a "cost incurred," the court rejected New York State's argument that Medicaid reimbursement regulations equated "cost incurred" with "cost paid."  The court held: "While the regulation itself does not define the phrase "costs incurred," the phrase has a fixed legal meaning.  A debt has been incurred when liability attaches… *A "cost incurred" is, thus, a "cost accrued" and not necessarily a "cost paid." Id.* (emphasis added).  *See also Whitecliff, Inc. v. Shalala*, 20 F.3d 488, 489 (D.C. Cir. 1994) ("[w]hen hospitals are used to provide services, the equipment and facilities are consumed *and therefore costs are necessarily incurred." Id.* (emphasis added).

Secretary exercised discretion arbitrarily in disallowing costs of services performed by rural health clinics as "hospital services").

That Congress intended "costs incurred" to mean the costs of inpatient and outpatient hospital services performed by a DSH hospital is precisely what CMS itself argued to the Department of Health and Human Services Departmental Appeals Board ("DAB") in *Missouri Department of Social Services*, DAB No. A-07-124 (March 17, 2008). *See* McCabe Decl., Ex. B. In upholding CMS's disallowance of certain of Missouri's Medicaid costs, the DAB analyzed the meaning of "costs incurred" in 1396r-4(g)(1) (A) and confirmed its meaning to be exactly what Plaintiffs argue here:

> the question of whether particular costs meet the statutory requirements of the payment limit provision may be broken down into two parts: 1) were the costs "incurred" by the hospitals; and 2) were the costs for "hospital services" within the meaning of section 1923(g)(1)(A). . . . To be included in the calculation of a DSH facility-specific payment limit, the costs must satisfy both requirements.

*Id.* at 10. *See also N.H. Dept. of Health and Human Services*, DAB No. 2399 (2011) (upholding CMS's interpretation of "costs" under § 1396r-4(g)(1) as meaning costs allowable under the Medicaid Act).

Thus, the Final Rule incorrectly and unreasonably interprets the scope of its discretion to mean that the Secretary may subtract private insurance payments from the cost side of the Medicaid shortfall formula of the HSL calculation.

### B.     The Final Rule Violates APA § 706(2)(A) Because It Is Arbitrary and Capricious and Not Otherwise In Accordance With Law.

An agency's decision is arbitrary or capricious if its explanation runs counter to the evidence before the agency, the agency relied on factors which Congress did not intend the agency to consider, and/or the decision is not otherwise the product of reasoned decision making. *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

The Final Rule is arbitrary and capricious for three reasons.  First, CMS's justification for the rule is contravened by the record evidence that demonstrates that federally deemed DSH hospitals that incur significant Medicaid losses are denied DSH funding.  Second, the Final Rule is not the product of reasoned decision making because it wrongly assumes that private insurance payments are for the same services provided under Medicaid, relies on a regulation governing excess Medicaid payments that has no rational relationship to private insurance payments, and claims that it reflects the "real economic burden" on hospitals when in fact it increases the economic burden on the precise hospitals Congress sought to assist through the DSH program. Finally, CMS's assertion that the Final Rule is a "clarification of the existing policy" is directly contrary to two federal district court decisions including this Court's prior ruling.

### 1. CMS Fails to Explain Any Rational Relationship Between the Final Rule and the Record Facts.

CMS was required to "articulate a satisfactory explanation" and make a "rational connection" between the policy it set in the Final Rule and the record facts.  *Motor Vehicle Mfs. Ass'n*, 463 U.S. at 43.  *Id.*  Here, CMS offered an explanation for its decision that runs directly counter to the record evidence.

CMS determined in the Final Rule that the policy was necessary: "because state DSH payments are limited to an annual federal allotment, this policy is also necessary to ensure that limited DSH resources are allocated to hospitals that have a net financial shortfall in serving Medicaid patients."  82 Fed. Reg. at 16,117.  However, CMS failed to analyze or explain whether the record facts promoted or contravened its policy justification for the Final Rule and whether there was a rational connection between the justification and the record facts.  It could not have because the record evidence demonstrates that application of private insurance payments made on behalf of Medicaid eligible patients to the HSL calculation results in denying

DSH funding to hospitals that have among the highest MIURs in their respective states and have

the highest net financial shortfalls in serving Medicaid patients.  The record facts run directly

counter to Defendant's rationale for promulgation of the rule.  For example, Children's

Minnesota, a "deemed" DSH hospital, commented that "under the Proposed Rule, our Medicaid

related costs in 2015, would have exceeded revenue by $85.8 million" and the "Proposed Rule

will completely eliminate DSH funding for Children's Minnesota."  Ostendorf Decl., Ex. A, at 2.

Similarly, CHAT member Cook Children's commented that it "still incurred a loss of over $26.6

million in fiscal year 2012" even when private insurance payments are considered.  Kimmel

Decl., at Ex. A, at 3.  These facts transgress upon the agency's articulated reason for its

promulgation and there is not even an attempt in the Final Rule to explain or analyze its policy in

light of these contravening facts.

 Moreover, Defendant's APA violation is most confounding because both of these

hospitals treat an extremely high percentage of Medicaid patients, which is the very reason

Congress enacted the DSH supplemental program.  Congress's "intent was to stabilize the

hospitals financially and preserve access to health care services for eligible low-income

patients." *Va. Dep't of Med. Assistance Servs. v. Johnson*, 609 F. Supp. 2d 1, 3 (D.D.C. 2009).

"'[S]uch hospitals, especially in urban areas, are often multifaceted health care institutions,

which provide many public health and social services to all residents of their area, in addition to

serving as hospitals of last resort for the poor.  Their sizable Medicaid populations often require

extra social and public health services.'"  *Id.* (quoting  legislative history).

 Accordingly, the Final Rule is arbitrary and capricious.  *Motor Vehicle Mfrs. Ass'n* 463

U.S. at 43.

## 2.    The Final Rule is Not the Product of Reasoned Decision-Making.

CMS justifies applying third-party payments in the calculation of the HSL by asserting

that these payments reimburse hospitals for *services covered by the Medicaid program*.  82 Fed.

Reg. at 16,116 ("payments received from third party payers that exceed *the cost of a service*

*provided to a Medicaid eligible individual*  . . . must be included in the calculation of

uncompensated care costs  . . . regardless of what the *Medicaid incurred cost* is."); *id.* at 16120

("the cost of *these services* are included in the hospital-specific limit calculation, revenue

associated *with these same services* must be applied as offsets to arrive at net costs to the hospital

*for the services."*)  CMS's justification is specious and not supported by the facts; private

insurance pays for services that not covered by Medicaid.

To offer just one example, two children received similar outpatient services at Texas

Children's Hospital, one of which was a Medicaid program patient and the other a Medicaid

eligible patient covered by private insurance (Blue Cross/ Blue Shield PPS).  Simon Decl. ¶ 10.

The physicians for both children ordered a series of laboratory services on the day of their

outpatient visit, which were coded in the records by CPT codes 87181 and 87186.[16]  *Id.*  The

Medicaid patient received a total of 10 laboratory services (five coded under 87181 and five

under 87186) on the day of the patient's visit but Medicaid paid for only two of those services

because each coded service is "limited to one per day for the same provider."  *Id.* at 11.  In stark

contrast, Blue Cross/ Blue Shield paid for all the 87181 and 87186 services for the child who was

Medicaid eligible but covered by private insurance (a total of six services in one day).  *Id.*

Accordingly, CMS's justification that private insurance payments are "revenue associated with

those same services" included on the Medicaid cost side of the HSL is erroneous.  Medicaid caps

---

[16] Services are coded on claim forms by what are known as "CPT" codes or Common Procedure
Terminology.

many services while also underpaying for them.  This was recognized by Congress.  *See, e.g.*,

H.R. Rep. No. 101-247 at 481 (1989); Pub. L. No.101-239 (1989) (Congress is "seriously

concerned by the delays in implementation of the disproportionate share hospital requirements

and, in particular, by inadequate payment adjustments that persist in some States").  Private

insurance pays for services that providers contractually negotiate and generally covers more

services than those which Medicaid covers.   By including payments for services not covered by

Medicaid, the HSL calculation does not "arrive at net costs to the hospital for the services" as

CMS claims.  Rather, it shifts Medicaid losses to commercial insurance payers and denies

Plaintiffs the supplemental DSH funds they are entitled to receive.[17]

> CMS further justifies the Final Rule by analogizing to CMS regulations governing how

excess Medicaid payments are applied in the HSL calculation.  82 Fed. Reg. 16,117 (citing

§ 455.304(d)(4)).  The regulation CMS relies upon is one of four auditor "verification"

requirements that requires the auditor to verify that "any Medicaid payments  . . . which are in

excess of the Medicaid incurred costs of such services, are applied against the uncompensated

care costs  of . . . services to individuals with no source of third-party coverage for such

services." 42 C.F.R. § 455.304(d)(4).  The regulation implements Congress's mandate that the

audit certify that the "state included *all payments under this title*, including supplemental

payments in the calculation of such hospital-specific limits."  § 1396r-4(j)(2)(D) (emphasis

added).  Congress therefore directed that all Medicaid payments ("all payments under this title")

be included in the calculation of the HSL without regard to their amount.

---

[17] By offsetting Medicaid costs by private insurance that pays for services not covered by Medicaid, CMS violates a fundamental principle of Medicaid cost reimbursement that no part of Medicaid costs are borne by other patients.  *See*  42 C.F.R. § 413.5(a) ("the share of the total institutional cost that is borne by the program is related to the care furnished beneficiaries so that no part of their cost would need to be borne by other patients").

.

Recall that the HSL is made up of two components:  the Medicaid shortfall and the uninsured component.  Thus, when Medicaid payments exceed Medicaid allowable costs (a situation that seldom occurs) and are included in the Medicaid shortfall component of the HSL calculation, they mathematically offset losses in the uninsured component of the HSL to derive total uncompensated care costs.  There is no logical relationship between Congress's mandate that all Medicaid payments be included in the HSL calculation and the Final Rule's inclusion of third-party payments in the HSL calculation.  Congress clearly did not mandate that auditors certify that all payments from third-parties are included in the calculation of the HSL.  Defendants cannot offer any reasonable justification for including in the HSL calculation payments that arise from outside of the Medicaid program and exceed Medicaid allowable costs.

Finally, as shown in the comments on the Rule, as well as in the attached declarations, hospitals that treat disproportionate numbers of Medicaid patients incur significant losses.  *See, e.g.*, Wilson Decl. ¶ 4; Kinzig Decl. ¶ 4; Haddican Decl. ¶7; Ryan Decl. ¶¶ 5-6; Kimmel Decl. ¶5.  This is especially true for children's hospitals because their Medicaid populations are typically higher than adult general hospitals and their revenue sources are more limited.  *See, e.g.*, Wilson Decl. ¶ 4.  Indeed, a recent study published in *Pediatrics*, a publication of the Journal of the American Medical Association, compared Medicaid losses across 1,485 hospitals in 23 states and found that freestanding children's hospitals' Medicaid financial losses were far greater compared to non-children's hospitals.  Wilson Decl. ¶ 5.  The study also found that the DSH program reduced these losses by almost one half.  *Id.*

Thus, children's hospitals rely heavily on DSH funds.  As Plaintiff Children's Minnesota's Chief Financial Officer attests, from 2011-2015, DSH funding accounted for nearly 60% of Plaintiff Children's Minnesota's total operating margin, which was only 3.2%.

Ostendorf Decl. ¶ 25.  Even though modest compared to other health systems, it permitted the hospital's reinvestment in essential services and facilities to maintain adequate access to quality care for their patients.  *Id.*  Had Children's Minnesota not received DSH funding for those years, its operating margin would have dropped to 1.3% or $9.4 million annually, on average.  *Id.*  An operating margin of $9.4 million is not adequate to ensure reasonable liquidity for the 4,200 employee health system or fund the annual investments in technology, care delivery equipment and general facilities that are required to continue to provide essential pediatric services for the region.  *Id.*

Despite these well-documented disproportionate Medicaid losses, the Final Rule denies DSH funding to children's hospitals—the very hospitals that most need and rely upon the funding.  CMS justifies this absurd result by maintaining that the Final Rule is necessary to "ensure[] that the DSH payment reflects the real economic burden of hospitals that treat a disproportionate share of low-income patients," 82 Fed. Reg. at 16,117.  To the contrary, the Final Rule ignores the "real economic burden" on DSH hospitals like Plaintiffs by considering only the Medicaid-allowable costs (rather than the actual costs) in the HSL calculation and offsetting them against private insurance payments that pay far in excess of Medicaid-allowable costs and for services not covered by Medicaid.  Ostendorf Decl. ¶ 14.  By skewing the HSL calculation in this manner, the Final Rule increases Plaintiffs' economic burden in treating large numbers of Medicaid patients by forcing Plaintiffs to shift revenues earned from outside of the Medicaid program to further offset the significant loses they incur treating Medicaid patients— all at the expense of the important programs and services Plaintiffs provide.  Kimmel Decl. ¶ 5 (CMS's rationale that Final Rule reflects the "real economic burden" of hospitals "does not take into account the realty that hospitals like Cook Children's invest in technologies, programs, and

services that are central to their non-profit mission of serving as centers of excellence for children."). CMS undeniably failed to consider this very "important aspect of the problem"— how the Final Rule adversely impacts children's hospitals, which as shown above treat larger numbers of Medicaid patients, incur greater financial losses, and more heavily depend upon the DSH program to help offset those losses than do other general hospitals. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

### 3.    The Final Rule Is Not A Clarification of Existing Policy

Defendant characterizes the rule as a so-called "clarifying" amendment, meaning that the Final Rule "is only a clarification of existing policy" and "the policy has been articulated in the 2008 DSH final rule,[18] as well as implementing guidance." 82 Fed. Reg. 16,118/3, 16,119/1. As this Court has found, "a clarifying amendment, which does not change the law, can be applied retroactively." *Grant Med. Ctr. v. Burwell*, 204 F. Supp. 3d 68, 81 (D.D.C. 2016).

Here, however, two federal courts, including this Court, have dissected existing law (the 2008 Rule) and found that the policy of subtracting private insurance payments in the DSH HSL calculation was not contained in the 2008 Rule. *Ne. Hosp. Corp. v. Sebelius*, 657 F.3d 1, 14

---

[18] The Final Rule also identifies an August 16, 2002 letter as containing the policy. 82 Fed. Reg *Id* at 16116/2. But that letter is harmonious with the statute: only Medicaid payments are subtracted in the Medicaid shortfall component of the HSL, and separately only third party payments are subtracted in the uninsured component of the HSL. Construing the letter, the term "Medicaid patients" corresponds to the term "Medicaid payments" and the term "uninsured patients" corresponds to the term "third party payments." This reading must be correct because "net of Medicaid payments" cannot apply to the uninsured for the uninsured are without any insurance including Medicaid. This reading follows the interpretive canon *reddendo singular singulis* (referring each to each), 2A Sutherland Statutory Construction §47:26 (7th ed.) ("The maxim *reddendo singular singulis*… is a method to limit the effect of expressions which would reach to far if construed literally"). *See, e.g.*, *Huidekoper's Lesee v. Douglas*, 7 U.S. 1, 67 (1805) ("[T]he plain and natural mode of construing the act, is to apply the provisions distributively to the description of persons to whom they are adapted, *reddendo singular singulis*.) Like the statute, the 2002 letter does not connect third party payments to the Medicaid shortfall component but only to the uninsured.

(D.C.Cir.2011) (a rule is impermissibly retroactive if "it effects a substantive change from the agency's prior regulation or practice.") (internal quotation marks and citation omitted).  As this Court found in enjoining FAQ 33, the Government's proffered preamble statements "are not representative"; the codified formula "d[oes] not contemplate the inclusion of private-insurance payments for Medicaid eligible individuals"; and "to the extent that the [codified] definition is contradicted by the Rule's Preamble, the definition controls."  *Texas Children's Hosp*., 76 F. Supp. 3d at 237 (citing *Barrick Goldstrike Mines, Inc. v. Whitman*, 260 F. Supp. 2d 28, 36 (D.D.C. 2003) ("Because the preamble to the 1988 rulemaking is inconsistent with the plain language of the regulation, it is invalid.")).  Thus, this Court found that the source of the policy is not the 2008 Rule and CMS "offer[s] no convincing interpretation of this regulation."  *Id*.

        In *N.H. Hosp. Ass'n*, the Court was even more direct: "Defendants' argument is without merit.  The text of the 2008 Rule and other sections in the preamble make clear that the "'Rule cannot support defendants' policy . . . FAQ 33 [and FAQ 34 are] the sole authority for it."  2017 WL 822094, at *10 (alteration in original).  After analyzing both the text of the Rule and the preamble, the court specifically found that "the text of the 2008 Rule plainly does not include…private insurance payments in calculating the hospital-specific DSH limit."  *Id*. at *11 (citing 42 C.F.R. § 447.299(c)(16)).  The court further found that "[e]ach of these sections of the Preamble [cited by the government] limits revenues and payments to be considered to those enumerated in §1396r(g)(1)(A), which do not include payments from private health insurance…" *Id*.  The court concluded the "authority for the relevant policies, is FAQ[] 33," which does "not carry the force of law" *Id.*

        The courts' findings are correct.  Consistent with the Medicaid Act, the 2008 Rule expressly provides the methodology for calculating Medicaid shortfall component of the HSL:

> The total annual uncompensated care cost equals the total cost of care for furnishing inpatient hospital and outpatient hospital services to Medicaid eligible individuals . . . *less the sum of regular Medicaid FFS rate payments, Medicaid managed care organization payments, [and] supplemental/enhanced Medicaid payments*[.]

42 C.F.R. § 447.299(c)(16) (emphasis added). More specifically, the CMS regulations direct that the Medicaid shortfall component of the HSL is calculated by "subtracting the amount identified in § 447.299(c)(9) [Total Medicaid IP/OP Payments] from the amount identified in § 447.299(c)(10) [Total Cost of Care for Medicaid IP/OP Services]." *Id.* § 447.299(c)(11). Total Medicaid IP/OP Payments are further delineated as (1) "Medicaid fee-for-service (FFS) basic rate payments" ("FFS Payments") (§ 447.299(c)(6)); (2) "Medicaid managed care organization payments" ("MCO Payments") (§ 447.299(c)(7)); and "Supplemental/enhanced Medicaid IP/OP payments" ("Supplemental Payments") (§ 447.299(c)(8)). The regulatory formula for calculating the Medicaid shortfall [19] can properly be expressed as:

| Total cost of care for Medicaid inpatient/outpatient services | − | Total Medicaid inpatient/outpatient payments (the sum of Medicaid FFS, MCO; and Supplemental payments) | = | Medicaid shortfall |
|---|---|---|---|---|

Accordingly, the Final Rule is "a substantive change from the agency's prior regulation or practice," and thus cannot have retroactive effect. *Ne. Hosp. Corp.*, 657 F.3d at 14.

---

[19] Shortly after the HSL provisions were enacted, CMS sent a letter to all state Medicaid directors informing them that it was providing guidance which "represents [CMS's] interpretation of the new DSH statute" (the "1994 Letter"). McCabe Decl., Ex. C, at 1. Under the title "CALCULATION OF THE LIMIT", the 1994 Letter unambiguously provides: "The [Medicaid] shortfall is the cost of services furnished to Medicaid patients, less the amount paid under the non-DSH payment method under the state plan," *i.e.*, Medicaid payments. *Id.* at 3. The 1994 Letter is mentioned five times in the Preamble to the 2008 Rule as support and does not once suggest the subtraction of private insurance in the Medicaid shortfall formula. Moreover, the DAB has held that the 1994 Letter is "an official CMS interpretation of the relevant language in section 1923(g)(1)(A)." *N.H. Dept. of Health and Human Services*, DAB NO. 2399 at 10.

Moreover, the Final Rule takes away and impairs Plaintiffs rights to 2014 DSH funds.  For these reasons, the Final Rule is arbitrary and capricious and violates the APA § 706 (2)(A).

## II.     PLAINTIFFS FACE THE LIKELIHOOD OF IRREPARABLE INJURY

Plaintiffs satisfy the criteria for demonstrating immediate, irreparable harm from the Final Rule.  *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (the injury must be certain, great and actual—not theoretical—and imminent, creating a clear and present need for relief to prevent the harm).

First, the harm is great and the monetary loss is unrecoverable.  Plaintiffs are irreparably harmed because the Final Rule will result in the certain recoupment of at least $75 million dollars that Plaintiffs collectively received in 2014 with no recourse to recover these DSH funds should Plaintiffs prevail on the merits of their claim.[20]  For example, in Minnesota "once the funds are recouped, the Minnesota state plan directs MDHS to redistribute them to other qualifying hospitals in the state and there is no administrative legal way "to get the funds back." Haddican Decl. ¶ 19.  In Texas, once DSH funds are recouped they are also redistributed to other hospitals and there is no legal avenue for the Texas Plaintiffs to recover the recouped monies. Kimmel Decl. ¶ 8.

Economic injury for which Plaintiffs have no right of recourse constitutes irreparable harm.  *See Smoking Everywhere, Inc. v. FDA*, 680 F. Supp. 2d 62, 77 n.19 (D.D.C. 2010) (holding that economic injury caused by APA violation by the FDA is irreparable "because plaintiffs cannot recover money *damages* against FDA."); *Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20, 29 (D.D.C. 1997) ("While the injury to plaintiffs is admittedly economic, there

---

[20] CHAT member plaintiffs collectively will be forced to repay $47 million, Wilson Decl. ¶ 10; $16 million will be recouped from Children's Minnesota, Ostendorf Decl. ¶ 18; Gillette will lose $3.9 million, Haddican Decl.¶ 20; and CHKD will lose $8 million, Ryan Decl.¶ 7.

is no adequate compensatory or other corrective relief that can be provided at a later date, tipping

the balance in favor of injunctive relief.") (internal quotation marks omitted); *Hoffman-Laroche,*

*Inc. v. Califano*, 453 F. Supp. 900, 903 (D.D.C. 1978) ("[S]ince no adequate compensatory or

other corrective relief will be available at a later date, it is not one of the mere economic injuries

[that are] insufficient to warrant a [n injunction].") (internal quotation marks omitted).  This

Court has found that the inability to recover monetary damages from a federal agency "is more

than sufficient, especially when considered together with the other factors, to justify a

[preliminary] injunction."  *Brendsel v. Office of Fed. Hous. Enter. Oversight*, 339 F. Supp. 2d 52,

67 (D.D.C. 2004) (citing *Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Social & Rehab. Servs.*,

31 F.3d 1536, 1543 (10th Cir. 1994) ("Because the Eleventh Amendment bars a legal remedy in

damages, . . . no adequate state administrative remedy existed . . . [and] plaintiffs' injury was

irreparable.").

Critically, Plaintiffs' harm is great because the loss of these funds severely damages

Plaintiffs' ability to deliver critical programs and services to the communities they serve.  As the

Court found in the *Texas Children's Hospital* case, "[p]laintiffs  . . . are not for-profit entities

facing the loss of profit; rather, they are non-profits for whom lost funds would mean reducing

hospital services to children." 76 F.Supp.3d at 243.  As attested to by Plaintiff Gillette's Chief

Financial Officer, losing 2014 DSH funds "will have a major impact on the hospital." Haddican

Decl. ¶ 24.  It would harm "important services funded exclusively by Gillette because Gillette

will need to reallocate revenues from other sources to subsidize actual losses it incurs in treating

Medicaid patients." *Id.* ¶ 25.  For example, Gillette funds outreach clinics to rural areas and a

critical access dental program, as well as provides social work and child & family support

programs, including interpreter services and a 24/7 telehealth service the costs of which together

exceed the DSH funds subject to recoupment.  *Id.*  These programs exceed revenues by millions

of dollars.  *Id.* Thus, "it would be difficult to continue these services without DSH funding."  *Id.*

For Children's Minnesota, the Final Rule will force the recoupment of $16 million in

2014 DSH funds as soon as the ongoing audit is complete.  A loss of $16 million will have a

devastating impact on 2017 operations and planning.  Ostendorf Decl. ¶¶ 20-21.  Capital

expenditures for 2017 are planned to be just under $54.0 million, with the majority of the

planned expenditures necessary just to sustain existing operations (*e.g.*, care delivery equipment,

imaging equipment, technology, facility improvements, etc.).  *Id.* ¶ 21. If the Final Rule is not

enjoined, "the hospital's planned 2017 capital expenditures must be re-evaluated and potentially

delayed or stopped altogether."  *Id.*  These include construction projects needed to meet the

growing demand for services, *e.g.*, MRI facilities, outpatient clinics, operating rooms, as well as

replacing aged equipment and investing in new technologies.  *Id.*  In addition to impacting

capital expenditures made by the hospital, losing $16 million will have a major impact on the

day-to-day operations of the hospital.  *Id.* ¶ 22.  $16 million would pay the full actual cost of  the

annual salaries and benefits for 120 full-time registered nurses (10.1% of Children's Minnesota

total RN staff); hospital care for 68 low-weight newborns (babies born weighting less than 1249

grams / 2.75 pounds); hospital care for 1,522 children requiring a hospital inpatient stay due to

Bronchiolitis, one of the most common reasons for pediatric inpatient admissions; 193 bone

marrow biopsies that are done to diagnose leukemia, some types of anemia and other blood

disorders; 300 surgical procedures to expel excess cerebral spinal fluid from the brain for kids

diagnosed with hydrocephalus; and 155 surgical procedures to repair atrioventricular canal

defects.  *Id.*

Cook Children's also faces great and actual harm because the Final Rule would require recoupment in connection with the ongoing 2014 audit of $17.1 million of DSH funding the hospital already received.  Kimmel Decl. ¶¶ 9-10. Recoupment of $17.1 million of 2014 DSH payments will restrict Cook Children's ability to make substantial investments in programs such as Texas' Medicaid Star Kids managed care, neighborhood clinics, asthma programs, mental health/behavioral health initiatives and other community efforts established to better care for complex patients.  The hospital will be forced to erode the continued investment in such under-reimbursed programs and services, from which Medicaid patients have always benefited. The impact of losing DSH funding of $17.1 million already paid to the hospital is the equivalent of 115 kidney transplants; or 775 inpatient behavioral health interventions; or 17,652 emergency room visits; or 97,844 urgent care visits.  In short, the loss of DSH funding has significant programmatic implications.  *Id.* ¶ 10.

Further, the Final Rule creates immediate and substantial financial uncertainty for Plaintiffs during the period of this lawsuit. For example, Generally Accepted Accounting Principles would hold that DSH funds subject to recoupment cannot be accrued as income or spent, and would be held as liabilities to be repaid.  Haddican Decl. ¶ 26.  This would severely curtail future capital expenditures impacting Gillette's ability to maintain a safe environment of care, assure medical technologies are up-to-date and safe, and assure appropriate instruments and diagnostic equipment for diagnoses  and treatment of complex conditions in the most effective and safe manner.  *Id.*  For Children's Minnesota, "[s]tripping $16 million from the balance sheet would "significantly impair" the hospital's liquidity position and "severely limit the organization's ability to make capital investments and support existing clinical programs." Ostendorf Decl. ¶ 21.

Moreover, the fact that the Final Rule will shut Plaintiffs out of the DSH program on June 2, 2017 creates immediate further financial uncertainty for Plaintiffs.  For example, the Final Rule will deny Seattle Children's approximately $6 million in DSH funds for the 2018 DSH program year which runs from July 1, 2017 to June 30, 2018 and will disqualify the hospital from ever receiving DSH funds in the future.[21]  Kinzig Decl. ¶ 8.  It will be shut out of the program despite the fact that:  (1) its Medicaid-eligible patient population is 67.5 percent, *id*. ¶ 3; (2) it sustains significant losses in treating Medicaid patients, *id*. ¶ 4; and (3) it does not bill Medicaid for any costs for which it receives payment from private insurers.  Similarly, Texas Children's will not receive approximately $35.6 million in 2018 it would otherwise be entitled to receive.  Simon Decl. ¶ 7.  And, even if some Plaintiffs do receive 2018 DSH funds, they cannot rely upon the funds knowing that they will eventually be recouped.  Haddican ¶ 26.  This type of financial uncertainty constitutes irreparable harm.  *See Schalk v. Teledyne, Inc.*, 751 F. Supp.1261, 1268 (W.D. Mich. 1990) ("irreparable harm in the financial planning burden placed on plaintiffs" was caused  by "the uncertainty posed by the lack of knowing just how much money will be needed to cover" expenses) (granting preliminary injunction in ERISA context); *see also Tafas v. Dudas*, 511 F.Supp. 2d 652 (E.D.Va. 2007) (finding irreparable harm where

---

[21] Seattle Children's is a plaintiff in the *Texas Children's Hospital* case.  The application of the policy of including third-party payments in the HSL calculation, embodied in FAQ 33, shut the hospital out of DSH funding for 2012, 2013, and 2014 and would cause $7 million in DSH funding received in 2011 to be recouped.  After this Court entered its injunction, the state did not recoup the $7 million and Seattle Children's qualified to receive DSH funding in 2015, 2016, and 2017.  However, because the preliminary injunction is not a final judgment, the state has held the money in reserve pending outcome of the litigation.  Thus, should plaintiffs prevail in the *Texas Children's Hospital* case, Seattle Children's will be made whole.  However, any relief granted in the *Texas Children's Hospital* case would not be complete because the Final Rule shuts Seattle Children's out of the DSH program for 2018 and beyond.  In addition, even if plaintiffs prevail in the *Texas Children's Hospital* case, the Final Rule will apply to the audits of 2015, 2016, and 2017, which will result in the recoupment of all DSH dollars Seattle Children's received for those years.

uncertainty caused by challenged regulations will cause harm to investments) (citing *Synagro–Wwt, Inc. v. Louisa Cty.*, 2001 WL 868638 (W.D. Va. July 17, 2001)).

Lastly, the harm is not only great and actual; it is imminent and certain to occur.  The Final Rule becomes effective June 2, 2017 and Plaintiffs will be shut out from receiving any DSH funds after that date even though they are all "deemed" DSH hospitals entitled to receive supplemental DSH payment adjustments.  Further, the 2014 audits are currently ongoing and must be complete no later than September 30 and submitted to CMS no later than December 31. 42 C.F.R. § 455.304(b); Kimmel Decl.¶ 9; Ostendorf Decl. ¶ 18; Ryan Decl. ¶ 8; Simon Decl. ¶ 6.  Although the states must recoup within one year of discovery of "overpayments" (42 C.F.R. § 433.312(a)), the states could move to recoup those funds immediately after submission between October 1 and December 31, 2017 or earlier if a state completes the audit before September 30 and submits it to CMS.  This Court has held the harm is imminent when the DSH audit is submitted to CMS because the states could recoup those funds "immediately and irrevocably" thereafter.  *Texas Children's Hosp.*, 76 F. Supp. 3d at 243.  Once taken, Plaintiffs will have no recourse to recover these DSH funds even if Plaintiffs fully prevail on the merits of their suit. Thus, Plaintiffs will likely suffer irreparable harm.

## III.     THE BALANCE OF EQUITIES FAVORS PLAINTIFFS

The Final Rule results in Plaintiffs losing millions of dollars that they will be unable to recover, thereby jeopardizing their ability to provide vital health care programs and services.  In contrast, there is no harm to the government because, as it has conceded elsewhere, the federal government will pay the same amount of DSH funds to any given state regardless of the Final Rule.  *See* Def. Memo in Support of Motion for Summary Judgment, at 2, *Texas Children's Hosp.*, No. 14-2060 (D.D.C. filed Mar. 18, 2015) [ECF No. 25-1] ("[T]he provisions at issue in this case do not affect the total amount of DSH payments paid to hospitals in a given state; they

affect only how those funds are allocated among hospitals.").  "It is thus not the case that 'the alleged irreparable economic injury suffered by . . . Plaintiff[] would be offset by the corresponding economic injury to the Secretary.'"  76 F. Supp. 3d at 246 (quoting *Allina Health Servs. v. Sebelius*, 756 F. Supp. 2d 61, 69 (D.D.C. 2010)).

## IV.    AN INJUNCTION IS IN THE PUBLIC INTEREST

The public interest also weighs in favor of granting preliminary injunctive relief. "[T]here is a robust public interest in safeguarding access to health care for those eligible for Medicaid, whom Congress has recognized as the most needy in the country." *Indep. Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly*, 572 F.3d 644, 659 (9th Cir. 2009) (internal quotations omitted). For this reason, "[i]ssuance of an injunction to enforce the federal Medicaid Act is without question in the public interest." *Edmonds v. Levine*, 417 F. Supp. 2d 1323, 1342 (S.D. Fla. 2006) (issuing permanent injunction compelling coverage for eligible drug).  As this Court has found, "[w]here, as here, the plaintiffs are hospitals that disproportionately serve Medicaid-eligible patients, it is important to keep in mind that "there is a robust public interest in safeguarding access to health care for those eligible for Medicaid, whom Congress has recognized as the most needy in the country." *Texas Children's Hosp*., 76 F. Supp. 3d at 246 (internal quotations omitted).

The public interest is likewise served by Defendants' compliance with the law.  *See, e.g*., *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326-27 (D.C. Cir. 1998) ("The final preliminary injunction factor, the public interest, . . . is inextricably linked with the merits of the case."). Where "[a] statute's standards . . . were not met, then the public interest balance plainly would weigh in favor of an injunction." *Id.* at 1326.  *Accord North Dakota v. EPA*, 127 F. Supp. 3d 1047, 1060 (D.N.D. 2015) ("A far broader segment of the public would benefit from the preliminary injunction because it would ensure that federal agencies do not extend their power

beyond the express delegation from Congress.").  Indeed, in the context of Medicare

reimbursement, "the Secretary's compliance with applicable law constitutes a separate,

compelling public interest."  *In re Medicare Reimbursement Litig*., 309 F. Supp. 2d 89, 99

(D.D.C. 2004).  "The public interest is [also] served when administrative agencies comply with

their obligations under the APA."  *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21

(D.D.C. 2009) (preliminarily enjoining interim rule allegedly promulgated without APA

compliance) (citation omitted).

## V.   THE COURT SHOULD EXERCISE ITS DISCRETION TO ISSUE A NATIONWIDE INJUNCTION

"District courts enjoy broad discretion in awarding injunctive relief," *Nat'l Min. Ass'n v.*

*U.S. Army Corps of Engineers*, 145 F.3d 1399, 1408 (D.C. Cir. 1998), and "[t]here is no general

requirement that an injunction affect only the parties in the suit," *Doe v. Rumsfeld*, 341 F. Supp.

2d 1, 16–19 (D.D.C. 2004).  "The Constitution vests the District Court with 'the judicial Power

of the United States.'  That power is not limited to the district wherein the court sits but extends

across the country.  It is not beyond the power of a court, in appropriate circumstances, to issue a

nationwide injunction."  *Texas v. U.S.*, 809 F.3d 134, 188 (5th Cir. 2015) (quoting U.S. CONST.

ART. III § 1); *accord Int'l Refugee Assistance Project v. Trump*, No. CV TDC-17-0361, 2017

WL 1018235, at *18 (D. Md. Mar. 16, 2017) (granting nationwide preliminary injunction, when

plaintiffs were likely to succeed on the merits, because the government's alleged violation was

manifested in policy "with nationwide effect").

In the D.C. Circuit, when an agency regulation is deemed to be unlawful, "'the ordinary

result is that the rules are vacated—not that their application to the individual petitioners is

proscribed.'"  *Nat'l Min. Ass'n*, 145 F.3d at 1409–10; *Nat'l Fed'n of Fed. Employees v. Carlucci,*

680 F.Supp. 416, 435-36 (D.D.C. 1988) (entering a nationwide preliminary injunction enjoining

a U.S. Department of the Army policy likely to violate the Fourth Amendment).  In *National Mining*, the D.C. Circuit upheld the nationwide injunction issued by the district court, even though non-parties to the litigation would be affected.  145 F.3d at 1409–10.  The court reasoned that because "the APA[] command[ed]" that rules exceeding the agency's jurisdiction "shall not only be 'held unlawful' but 'set aside,'" enjoining the agency-action nationwide was warranted. *Id.* (citing 5 U.S.C. § 706(2)(C)).  *See also Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.")); *Franciscan All., Inc. v. Burwell*, No. 7:16-CV-00108-O, 2016 WL 7638311, at *22 (N.D. Tex. Dec. 31, 2016) (granting preliminary injunction in an APA challenge, explaining that a "nationwide injunction is appropriate when a party brings a facial challenge to agency action under the APA").  The D.C. Circuit also announced that nationwide injunctions are particularly appropriate in the district of D.C. to conserve judicial resources by avoiding repetitive filings.  *Nat'l Min. Ass'n*, 145 F.3d at 1409-10 (noting the district's  broad jurisdiction for APA cases and explaining that an injunction against agency action issued "only as to the plaintiff" would cause "all others" affected by the invalid rule to file separate actions in the circuit, whereas a nationwide injunction would "obviate[] such repetitions fillings").

The Final Rule has broad applicability—it applies to every state in the United States.  A nationwide preliminary injunction is warranted because Plaintiffs are likely to succeed in showing that the Final Rule exceeds Defendants' statutory authority and is otherwise not in accordance with law and therefore should be vacated and set aside, *see supra*, Section I.  *Nat'l Min. Ass'n*, 145 F.3d at 1409–10; *Franciscan All., Inc.*, 2016 WL 7638311, at *22.  Preserving the status quo as to all hospitals—nationwide—that are affected by the Final Rule is appropriate,

while the Court has time to consider the merits.  *See Franciscan All., Inc.*, 2016 WL 7638311, at

*22 (APA challenge to an HHS regulation was preliminarily enjoined because the regulation

applied broadly to physicians nationwide and the regulation's "harm was felt by healthcare

providers and states across the country"); *see also Nat'l Fed'n of Fed. Employees*, 680 F. Supp.

435-436.

Moreover, a nationwide injunction is needed here to preserve judicial resources, *Nat'l

Min. Ass'n*, 145 F.3d at 1409-10, and prevent confusion.  As the government made clear

following this Court's preliminary injunction in the *Texas Children's Hospital* case, it intended

to apply the policy of including private insurance payments in the HSL calculation in every state

where the FAQs were not enjoined.  *See* McCabe Decl., Ex. A (5/1/2015 letter from CMS to

Missouri Dept. of Social Services ("For all other states, including Missouri, CMS may disallow

federal financial participation if a state does not comply with the policy articulated in FAQ No.

33.").  Thus, five additional cases had to be filed to challenge the FAQs.  In addition, in 2015,

the Missouri state Medicaid agency brought a case before this Court seeking to have the *Texas

Children's Hospital* injunction apply in Missouri.  *See Missouri Dep't Social Svces. v. H.H.S.*,

Case No. 1:15-cv-01329-EGS, ECF No. 1 (D.D.C., filed Aug. 17, 2015).  There is no reason to

believe that the government would take a different position with respect to the Final Rule,

resulting in duplicative litigation, unless the Final Rule is enjoined nationwide.  To ensure

uniform conformity, Plaintiffs respectfully request that the Court enter a nationwide injunction

precluding defendants from imposing the Final Rule in any state.  *See, e.g.*, *Nat'l Min. Ass'n*, 145

F.3d at 1409–10; *Franciscan All., Inc.*, 2016 WL 7638311, at *22.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court preliminarily enjoin—on a nationwide basis—the Defendants from enforcing, applying, or implementing (or requiring any state to enforce, apply, or implement) the Final Rule pending a decision on the merits.

Dated:  May 15, 2017                              Respectfully submitted,


*/s/* Geraldine E. Edens
Geraldine E. Edens
D.C. Bar No. 437056
Christopher H. Marraro
D.C. Bar No. 395152

**Baker & Hostetler LLP**
Washington Square, Suite 1100
1050 Connecticut Avenue, NW
Washington, DC  20036-5304
Telephone:   (202) 861-1500
Facsimile:    (202) 861-1783
gedens@bakerlaw.com
cmarraro@bakerlaw.com

Susan Feigin Harris (admitted *pro hac vice*)
Texas Bar No.06876980

**Baker & Hostetler LLP**
811 Main St. Suite 1100
Houston, Texas 77002
Telephone: 713-646-1307
Facsimile: 713-751-1717
sharris@bakerlaw.com

*Attorneys for Plaintiffs Children's Hospital Association of Texas, Children's Health Care d/b/a Children's Hospitals and Clinics of Minnesota, Gillette Children's Specialty Healthcare, Children's Hospital of the King's Daughters, Incorporated, and Seattle Children's Hospital*

43

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 15th day of May, 2017, a true and exact copy of Plaintiffs' Memorandum of Law in Support of Their Application for a Preliminary Injunction, and the supporting papers filed contemporaneously therewith, were served via overnight delivery to:

       Channing D. Phillips
       United States Attorney's Office
       555 4th Street, NW
       Washington, D.C.  20530

                                        */s/* Geraldine E. Edens
                                        Geraldine E. Edens