**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHILDREN'S HOSPITAL ASSOCIATION OF TEXAS; CHILDREN'S HEALTH CARE d/b/a CHILDREN'S HOSPITAL AND CLINICS OF MINNESOTA; GILLETTE CHILDREN'S SPECIALTY HEALTHCARE; CHILDREN'S HOSPITAL OF THE KING'S DAUGHTERS, INCORPORATED; SEATTLE CHILDREN'S HOSPITAL, <br><br>    Plaintiffs, <br><br>    v. <br><br> THOMAS E. PRICE, in his official capacity, Secretary, Department of Health and Human Services; SEEMA VERMA, in her official capacity, Administrator, Centers for Medicare and Medicaid Services; and the CENTERS FOR MEDICARE AND MEDICAID SERVICES, <br><br>    Defendants. | Case No.: 1:17-cv-00844-EGS |

**PLAINTIFFS' COMBINED MEMORANDUM OF LAW IN SUPPORT OF
APPLICATION FOR A PRELIMINARY INJUNCTION AND
FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................1

PROCEDURAL POSTURE ................................................................................................2

STATUTORY AND REGULATORY BACKGROUND ....................................................3

    The Medicaid Program .................................................................................................3

    The Disproportionate Share Hospital Program .............................................................4

    The CMS 2008 Regulations ..........................................................................................6

    The Final Rule ...............................................................................................................7

    Litigation Challenging the Policy of Including Third Party Payments in the HSL,
        Which is Now Codified in the Final Rule ...............................................................8

STATEMENT OF FACTS ................................................................................................11

    The Plaintiffs ...............................................................................................................11

    DSH Program Year Funding ......................................................................................14

    The 2014 DSH Audits ................................................................................................14

STANDARD OF REVIEW ..............................................................................................14

ARGUMENT ....................................................................................................................15

    I.     The Final Rule Is Not Authorized By the Medicaid Act and Therefore
           Violates APA § 706 (2)(C) ...........................................................................16

          A.    *Chevron* Step 1 - § 1396r (g)(1)(A) Is Unambiguous: Only
                Medicaid Payments Are Subtracted From Costs in the Medicaid
                Shortfall Component of the HSL ...........................................................16

          B.    *Chevron* Step 2 – CMS's Interpretation of the Medicaid Statute Is
                Not Reasonable ......................................................................................22

                1.    The Final Rule Is Unreasonable Because It Denies DSH
                        Funding To Statutorily "Deemed" DSH Hospitals In
                        Violation of the Medicaid Act. ....................................................23

                  2.    Defendants' Interpretation of §1396r(g)(1) Is Unreasonable
                        Because the Secretary Does Not Have Discretion to
                        Determine That "Costs Incurred" Means Subtraction of
                        Private Insurance Payments ..........................................................25

          C.    The Final Rule Violates APA § 706(2)(A) Because It Is Arbitrary
                 and Capricious and Not Otherwise In Accordance With Law ................27

**TABLE OF CONTENTS**
**(continued)**

Page

1.   CMS Fails to Explain Any Rational Relationship Between the Final Rule and the Record Facts. .............................................28

2.   The Final Rule is Not the Product of Reasoned Decision-Making. ........................................................................................29

3.   The Final Rule Is Not A Clarification of Existing Policy.............35

II.   UNTIL A JUDGMENT ON THE MERITS IS REACHED, PLAINTIFFS FACE IRREPARABLE INJURY ........................................................................37

A.   The Final Rule Will Cause the Recoupment of $75 Million ....................38

B.   The Final Rule Denies Plaintiffs Current Year DSH Funds and in Some Cases, Shuts Plaintiffs Out of the DSH Program Altogether ..........42

CONCLUSION...................................................................................................44

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Banner Health v. Sebelius*,
   715 F.Supp.2d 142 (D.D.C. 2010) .......................................................................................23

*Barrick Goldstrike Mines, Inc. v. Whitman*,
   260 F. Supp. 2d 28, 36 (D.D.C. 2003) ................................................................................36

*Bhd. of R.R. Trainmen v. Balt. & Ohio R.R. Co.*,
   331 U.S. 519 (1947) ............................................................................................................19

*Bloch v. Powell*,
   227 F.Supp.2d 25 (D.D.C.2002) .........................................................................................15

*Bracco Diagnostics, Inc. v. Shalala*,
   963 F. Supp. 20 (D.D.C. 1997) ...........................................................................................39

*Brendsel v. Office of Fed. Hous. Enter. Oversight*,
   339 F. Supp. 2d 52 (D.D.C. 2004) ......................................................................................39

*Chevron U.S.A., Inc. v. NRDC*,
   467 U.S. 837 (1984) ......................................................................................................16, 22

*Citizens Coal Council v. Norton*,
   330 F.3d 478 (D.C. Cir. 2003) ............................................................................................16

*Coe v. McHugh*,
   968 F.Supp.2d 237 (D.D.C. 2013) ......................................................................................15

*Cronin v. U.S. Dep't of Agric.*,
   919 F.2d 439 (7th Cir. 1990) ................................................................................................2

*D.C. Hosp. Ass'n v. D.C.*,
   224 F.3d 776 (D.C. Cir. 2000) ............................................................................................19

*Dangler v. Yorktown Central Schools*,
   771 F. Supp. 625 (S.D.N.Y. 1991) .......................................................................................2

*Fund for Animals v. Babbitt*,
   903 F. Supp. 96 (D.D.C.1995) ............................................................................................15

*Grant Med. Ctr. v. Burwell*,
   204 F. Supp. 3d 68 (D.D.C. 2016) ......................................................................................35

*Harris v. McRae*,
   448 U.S. 297 (1980) ..............................................................................................................3

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Herman v. Assoc. Elec. Coop., Inc.*,
  994 F. Supp. 1147 (E.D. Mo. 1998), *rev'd on other grounds,* 172 F.3d 1078
  (8th Cir. 1999).................................................................................................................2

*Hoffman-Laroche, Inc. v. Califano*,
  453 F. Supp. 900 (D.D.C. 1978).......................................................................................39

*Huidekoper's Lesee v. Douglas*,
  7 U.S. 1 (1805).................................................................................................................35

*Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Social & Rehab. Servs.*,
  31 F.3d 1536 (10th Cir. 1994) .........................................................................................39

*La. Dep't of Health & Hosps. v. CMS*,
  346 F.3d 571 (5th Cir. 2003) ...........................................................................................26

*Lawson v. FMR LLC*,
  134 S. Ct. 1158 (2014).....................................................................................................20

*Marsh v. Oregon Natural Res. Council*,
  490 U.S. 360 (1989).........................................................................................................15

*\*Missouri Department of Social Services*,
  DAB No. A-07-124 (March 17, 2008)..............................................................................26

*\*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983).................................................................................27, 28, 29, 34

*N.H. Hosp. Ass'n v. Burwell*,
  No. 1:15-cv-00460, 2017 WL 822094 (D.N.H. Mar. 2, 2017)..................................1, 9, 20, 36

*Ne. Hosp. Corp. v. Sebelius*,
  657 F.3d 1 (D.C.Cir.2011) ..........................................................................................35, 37

*New Hampshire Dept. of Health and Human Services*,
  DAB No. 2399 (2011)....................................................................................27, 35, 37

*Pharm. Research & Mfrs. of Am. v. Thompson*,
  251 F.3d 219 (D.C. Cir.2001) ..........................................................................................16

*Russello v. United States*,
  464 U.S. 16 (1983)...........................................................................................................18

*Schalk v. Teledyne, Inc.*,
  751 F. Supp.1261 (W.D. Mich. 1990) ..............................................................................43

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Smoking Everywhere, Inc. v. FDA,*
  680 F. Supp. 2d 62 (D.D.C. 2010) .................................................................39

*Synagro–Wwt, Inc. v. Louisa Cty.,*
  2001 WL 868638 (W.D. Va. July 17, 2001)....................................................43

*Tafas v. Dudas,*
  511 F.Supp. 2d 652 (E.D.Va. 2007) ...............................................................43

*Tennessee Hospital Association v. Burwell,*
  No. 3:16-cv-03263 (M.D. Tenn., filed Dec. 15, 2016) ...................................9

*\*Texas Children's Hosp. v. Burwell,*
  76 F. Supp. 3d 224 (D.D.C. 2014) ...................................................... *passim*

*In the Matter of Townview Nursing Home,*
  28 B.R. 431 (Bankr. S.D.N.Y. 1983)...............................................................26

*Va. Dep't of Med. Assistance Servs. v. Johnson,*
  609 F. Supp. 2d 1 (D.D.C. 2009) ...........................................................3, 25, 29

*Whitecliff, Inc. v. Shalala,*
  20 F.3d 488 (D.C. Cir. 1994) ..........................................................................26

**Statutes**

5 U.S.C. § 500 *et seq.*.............................................................................14, 16, 29, 39

5 U.S.C. § 706(2)(A)............................................................................15, 27, 37

5 U.S.C. § 706(2)(C)..................................................................................15, 16

42 U.S.C. § 1316(a) ...........................................................................................3

42 U.S.C. § 1396a(10)(A)(i)(II)........................................................................3

42 U.S.C. § 1396a(13)(A)(iv)............................................................................4

42 U.S.C. § 1396a(a)..........................................................................................4

42 U.S.C. § 1396b(a)(1)......................................................................................4

42 U.S.C. § 1396b(d)(2)(C)................................................................................6

42 U.S.C. § 1396b(d)(2)(D)................................................................................6

42 U.S.C. § 1396r–4(g)......................................................................................4

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

42 U.S.C. § 1396r–4(g)(1)(A) ..............................................................................6

42 U.S.C. § 1396r–4(j)(2) ....................................................................................6

42 U.S.C. §1396r-4(a)(1) ...................................................................................23

42 U.S.C. § 1396r-4(a)(1)(B) .............................................................................23

42 U.S.C. § 1396r-4(b) ........................................................................................4

42 U.S.C. § 1396r-4(b)(1) ..................................................................................23

42 U.S.C. § 1396r-4(c) .......................................................................................19

42 U.S.C. § 1396r-4(d)(3) ..................................................................................24

42 U.S.C. § 1396r-4(g) .........................................................................................5

42 U.S.C. § 1396r-4(g)(1) ............................................................................ *passim*

42 U.S.C. § 1396r-4(g)(1)(A) ...................................................................5, 17, 36

42 U.S.C. § 1396r-4(g)(2) ..................................................................................18

42 U.S.C. § 1396r-4(g)(2)(A) .............................................................................18

42 U.S.C. § 1396r-4(j)(2)(C) .........................................................................20, 21

42 U.S.C. § 1396r-4(j)(2)(D) ..............................................................................31

42 U.S.C. § 1396r(g)(1) .....................................................................................25

42 U.S.C. § 1396r (g)(1)(A) ...............................................................................16

Medicare Prescription Drug, Improvement, and Modernization Act, Pub. L. No.
   108-173, section 1001 Stat. 2066.......................................................................5

Pub. L. No. 108-173, § 1001(d) (codified at 42 U.S.C. § 1396r-4(j)(2)(C), (D)).........................6

Social Security Act Title XIX, 42 U.S.C. § 1396 *et seq.* ....................................3

**Rules**

Federal Rules of Civil Procedure 56(a) .............................................................14

Federal Rules of Civil Procedure 65(a)(2) ......................................................1, 2

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

FED. R. CIV. P. 65(a)(2) advisory committee's note (1966)..................................................2

**Regulations**

20 C.F.R. § 416.934(j) ..........................................................................................4

20 C.F.R. § 416.934(k) .........................................................................................4

42 C.F.R. § 413.5(a) ............................................................................................31

42 C.F.R. § 433.302 ...........................................................................................14

42 C.F.R. § 433.312(a) .........................................................................................43

42 C.F.R. § 447.299(c) .......................................................................................6, 36

42 C.F.R. § 447.299(c)(6) ......................................................................................37

42 C.F.R. § 447.299(c)(7) ......................................................................................37

42 C.F.R. § 447.299(c)(8) ......................................................................................37

42 C.F.R. § 447.299(c)(10) ...................................................................................7, 37

42 C.F.R. § 447.299(c)(11) .....................................................................................37

42 C.F.R. § 447.299(c)(16) .....................................................................................36

42 C.F.R § 455.301 .............................................................................................7

42 C.F.R. § 455.304 ...........................................................................................14

42 C.F.R. § 455.304(b) .........................................................................................43

42 C.F.R. § 455.304(d)(4) ......................................................................................31

73 Fed. Reg. 77,904 ...........................................................................................6

73 Fed. Reg. 77,906 ...........................................................................................7

73 Fed. Reg. 77,950 ..................................................................................... *passim*

73 Fed. Reg. 77921 ...........................................................................................22

81 Fed. Reg. 53,980 ...........................................................................................7

81 Fed. Reg. 53,983 ...........................................................................................7

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

82 Fed. Reg. 16,116 ................................................................................................19, 29

82 Fed. Reg. 16,117 ..................................................................................................7, 31

82 Fed. Reg. 16,118/3 ....................................................................................................35

82 Fed. Reg. 16,119/1 ....................................................................................................35

82 Fed. Reg. 16,122 ........................................................................................................8

82 Fed. Reg. 16114 ......................................................................................................1, 7

82 Fed. Reg. 16116 ........................................................................................................35

82 Fed. Reg. 16117 ....................................................................................................1, 33

82 Fed. Reg. 16117/2 ....................................................................................................28

**Other Authorities**

2A Sutherland Statutory Construction §47:26 (7th ed.) ...............................................35

DSH Audit and Rep. Protocol, CMS- 2198-F, *available at*
https://www.medicaid.gov /medicaid/financing-and-
reimbursement/downloads/general_dsh_audit_reporting-protocol.pdf (last
visited April 5, 2017). ........................................................................................21

H. R. No. 103-111, *reprinted in* 1993 U.S.C.C.A.N. 378...........................................25

H.R. No. 103-111 ......................................................................................................26, 27

H.R. Rep. No. 100-391(I) (1987)...................................................................................23

H.R. Rep. No. 101-247 (1989); Pub. L. No.101-239 (1989) .........................................30

H.R.Rep. No. 103–111 (1993), *reprinted in* 1993 U.S.C.C.A.N. 278............................5

H.R. Rep. No. 103-111 (1993), reprinted in 1993 U.S.C.C.A.N. 378...........................23

H.R. Rep. No. 103-213(1993) (House Conference Report), *reprinted at* 1993
U.S.C.C.A.N. 1088, 1993 WL 302291 ..............................................................18

H.R. Rep. No. 103-213 (Aug. 4, 1993).........................................................................20

H.R. Rep. No. 105-149 (1997), 1997 WL 353017 (Leg.Hist.).....................................25

H.R. Rep. No. 108-391 (Nov. 21, 2003).......................................................................21

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

Henry J. Kaiser Family Foundation, Health, insurance coverage of children 0-18,
   *available at*  http://kff.org/other/state-indicator/children-0-18/ (last visited
   May 11, 2017). ................................................................................................................4

UNIVERSITY DICTIONARY 562 (1999) ............................................................................................26

# LIST OF ACRONYMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| CMS | Centers for Medicare and Medicaid Services |
| DAB | Departmental Appeals Board |
| DSH | Disproportionate Share Hospital |
| DSH Program | The Disproportionate Share Hospital Program |
| FAQs | Frequently Asked Questions contained in a CMS guidance document titled "Additional Information on the DSH Reporting and Audit Requirements" |
| FFP | Federal Financial Participation |
| Final Rule | "Medicaid Program: Disproportionate Share Hospital Payments – Treatment of Third Party Payers in Calculating Uncompensated Care Costs" promulgated on April 3, 2017 |
| HSL | Hospital Specific Limit |
| IP/OP | Inpatient/Outpatient |
| Medicaid shortfall | The component of the HSL calculation that calculates the costs of hospitals services to individuals eligible for Medicaid net of Medicaid payments |
| MCO | Managed Care Organization |
| MIUR | Medicaid Inpatient Utilization Rate |
| SSA | Social Security Act |
| 2008 Rule | CMS regulations implementing the DSH reporting and auditing requirements |

## INTRODUCTION

In accordance with the Court's May 24, 2017 Minute Order, Plaintiffs hereby file this Combined Memorandum of Law in support of their Motions for a Preliminary Injunction and for Summary Judgment pursuant to Federal Rules of Civil Procedure 65(a)(2).

Plaintiffs seek this Court's intervention to vacate and enjoin a final rule titled "Medicaid Program: Disproportionate Share Hospital Payments – Treatment of Third Party Payers in Calculating Uncompensated Care Costs" promulgated by Defendant Centers for Medicaid and Medicare Services ("CMS"). 82 Fed. Reg. 16,114, 16,117 (April 3, 2017) (hereinafter the "Final Rule"). The Final Rule codifies the policy of including third-party payments (private insurance and Medicare payments) in the calculation of the Medicaid shortfall component of the hospital specific limit ("HSL") which determines the maximum amount of supplemental Medicaid funds a Disproportionate Share Hospital ("DSH") may receive. This Court preliminarily enjoined the same policy contained in CMS guidance in *Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 241 (D.D.C. 2014),[1] and a second federal court permanently enjoined the policy in *N.H. Hosp. Ass'n v. Burwell*, No. 1:15-cv-00460, 2017 WL 822094, at *16-17 (D.N.H. Mar. 2, 2017).

The Final Rule denies Plaintiffs, 12 children's hospitals located in four states that treat disproportionate numbers of Medicaid children, tens of millions of dollars of future supplemental Medicaid payments and will require the recoupment of tens of millions more in past payments. Plaintiffs are irreparably harmed by the Final Rule because once DSH payments are recouped or denied, Plaintiffs have no recourse to recover the funds.

---

[1]Judgment on the merits is pending in *Texas Children's Hosp.* The policy before the Court was embodied in an informal auditing guideline known as Frequently Asked Question No. 33 ("FAQ 33") requiring that private insurance payments be subtracted in the calculation of the Medicaid shortfall component of a DSH hospital's HSL.

**PROCEDURAL POSTURE**

Plaintiffs filed their Complaint on May 8, 2017 (ECF No. 1) and an Application for Preliminary Injunctive Relief on May 15, 2017 (ECF No. 8).  The Court held a status conference on May 23, 2017, where the parties agreed to consolidate the motions for preliminary injunctive relief and summary judgment under Fed. R. Civ. P. 65(a)(2).  On May 24, 2017, the Court entered a Minute Order consolidating the motions and scheduling the parties briefing.

Consolidation under Rule 65(a)(2) effectively moots the Court's consideration of the preliminary injunctive factors because the court will enter judgment on the merits.  *See, e.g.*, *Cronin v. U.S. Dep't of Agric.*, 919 F.2d 439, 445 (7th Cir. 1990) (if the preliminary injunction is combined with "a full hearing" on plaintiff's claim, "considerations of irreparable harm are out the window"); *Herman v. Assoc. Elec. Coop., Inc.*, 994 F. Supp. 1147, 1153 (E.D. Mo. 1998), *rev'd on other grounds,* 172 F.3d 1078 (8th Cir. 1999); *Dangler v. Yorktown Central Schools*, 771 F. Supp. 625, 632 (S.D.N.Y. 1991).  However, as the Advisory Committee Notes to Rule 65(a)(2) explain,

> [t]he fact that the proceedings have been consolidated should cause no delay in the disposition of the application for the preliminary injunction, for the evidence will be directed in the first instance to that relief, and the preliminary injunction, if justified by the proof, may be issued in the course of the consolidated proceedings.

FED. R. CIV. P. 65(a)(2) advisory committee's note (1966).  As discussed in Section II, *infra*, until the Court reaches a decision on the merits, Plaintiffs face irreparable harm in three distinct ways.  First, the Final Rule will cause the certain recoupment of at least $75 million dollars that Plaintiffs collectively received in 2014 with no recourse to recover these DSH funds.  This will occur as soon as the 2014 audits are complete, *i.e.*, anytime between October 1 and December 31, and even sooner if a state completes the audit before September 30 and submits it to CMS.  Second, the Final Rule creates immediate and substantial financial uncertainty for Plaintiffs.

This uncertainty severely hampers Plaintiffs in making strategic decisions regarding investments necessary to sustain their mission-driven objectives, which include improvements to clinical programs and facilities, pediatric research, and pediatric educational supports.  Finally, the Final Rule denies Plaintiffs DSH funds for the current and upcoming DSH program years and will, for some hospitals, shut them out of the DSH program altogether, creating immediate harm and further financial uncertainty for Plaintiffs.  For these reasons, Plaintiffs respectfully request that the Court render a decision on the merits of this case with the same expediency it would decide Plaintiffs' motion for a preliminary injunction.

## STATUTORY AND REGULATORY BACKGROUND

### The Medicaid Program

Established in 1965, the Medicaid program (Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, also referred to as the "Medicaid Act") is "a cooperative venture between the federal and state governments to assist states in providing medical care to eligible individuals." *Va. Dep't of Med. Assistance Servs. v. Johnson*, 609 F. Supp. 2d 1, 2 (D.D.C. 2009) (citations omitted).  The Medicaid program "provid[es] federal financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons." *Harris v. McRae,* 448 U.S. 297, 301 (1980).  State participation in the Medicaid program is voluntary. However, "once a State elects to participate, it must comply with the requirements of Title XIX." *Id.*  If a state "fails to comply with the statutory or regulatory requirements governing Medicaid, the federal government may recoup federal funds from the state." *Texas Children's Hosp.*, 76 F. Supp. 3d at 229 (citing § 1316(a), (c)–(e)).

In addition to covering low-income individuals, Medicaid also provides benefits to children with certain serious illnesses, without regard to family income.  *Id.* (citing 42 U.S.C. § 1396a(10)(A)(i)(II) (children are eligible for Medicaid if they are eligible for Supplemental

Security Income); 20 C.F.R. § 416.934(j), (k) (children born weighing less than 1,200 grams are eligible for Supplemental Security Income).  In 2015, 38% of children in the United States were insured by Medicaid (30.4 million children).[2]

Each state administers its own Medicaid program pursuant to a state Medicaid plan which must be reviewed and approved by the Secretary of Health and Human Services.[3]  *See* 42 U.S.C. § 1396a(a).  Once the plan is approved, the federal government subsidizes the state's medical-assistance services by providing federal matching funds (the "federal financial participation" or "FFP").  *Id.* § 1396b(a)(1).

**The Disproportionate Share Hospital Program**

In 1981, Congress amended the Medicaid Act to require states to ensure that payments to hospitals "take into account ... the situation of hospitals which serve a disproportionate number of low-income patients with special needs." 42 U.S.C. § 1396a(13)(A)(iv) ("DSH payments"). Congress's intent "was to stabilize the hospitals financially and preserve access to health care services for eligible low-income patients."  *Texas Children's Hosp.*, 76 F. Supp. 3d at 230 (internal quotation marks omitted).  Congress specifically "deemed" hospitals to be DSH hospitals entitled to receive DSH payments if "the hospital's Medicaid inpatient utilization rate … is at least one standard deviation above the mean Medicaid inpatient utilization rate for hospitals receiving Medicaid payments in the State."[4]  42 U.S.C. § 1396r-4(b)(1)(A).

"In 1993, the program was amended to limit DSH payments on a hospital-specific basis." *Texas Children's Hosp.*, 76 F. Supp. 3d at 230 (citing § 1396r–4(g)).  Congress was concerned

---

[2]*See* Henry J. Kaiser Family Foundation, Health, insurance coverage of children 0-18, *available at*  http://kff.org/other/state-indicator/children-0-18/ (last visited May 11, 2017).

[3]The Secretary has delegated this authority to CMS.

[4]A hospital is also deemed to be a DSH Hospital if it has a low-income utilization rate that exceeds 25 percent.  42 U.S.C. § 1396r-4(b).

by reports that some states were "making DSH payment adjustments to hospitals that do not provide inpatient services to Medicaid beneficiaries" and "in amounts that exceed the net costs, and in some instances the total costs, of operating the facilities," as well as using DSH funds "to finance other functions of State government, such as road construction and maintenance." H.R.Rep. No. 103–111, at 211 (1993), *reprinted in* 1993 U.S.C.C.A.N. 278, 538.  Accordingly, Congress limited DSH payment adjustments to a hospital's "hospital-specific limit" or "HSL." *See* 42 U.S.C. § 1396r-4(g).  More specifically, a hospital's annual DSH payment may not exceed a hospital's "uncompensated costs" of serving Medicaid and uninsured patients.  42 U.S.C. § 1396r-4(g)(1)(A).  "Uncompensated costs" are defined as:

> [T]he *costs* incurred during the year *of furnishing hospital services* (as determined by the Secretary and *net of payments under this subchapter*, other than under this section, and by uninsured patients) by the hospital *to individuals who* either *are eligible for medical assistance under the State plan* or have no health insurance (or other source of third party coverage) for services provided during the year.

*Id.* (emphases added).  Thus, a DSH hospital's total uncompensated costs are made up of two components:  (1) the costs of hospital services to individuals eligible for Medicaid, net of payments under the Medicaid Act (the "Medicaid shortfall"); and (2) the costs of hospital services to individuals who have no health insurance or other third-party coverage, net of payments by those uninsured patients (the uninsured component).  The Final Rule only affects the method of calculating the Medicaid shortfall.  The statutory formula for calculating the Medicaid shortfall can be expressed as:

| Medicaid Allowable Costs for All Eligible Patients | − | Medicaid Payments | = | Medicaid shortfall component of HSL |
|---|---|---|---|---|

In 2003, Congress enacted section 1001 of the Medicare Prescription Drug, Improvement, and Modernization Act, Pub. L. No. 108-173, 117 Stat. 2066, to require states to submit annual reports and independent certified audits to CMS on their DSH Programs.  The

reports must identify each hospital to which the state has made DSH payments and the audit

must verify that the state's DSH payments comply with the statutory requirements.  Pub. L. No.

108-173, § 1001(d) (codified at 42 U.S.C. § 1396r-4(j)(2)(C), (D)).  More specifically, the audit

must confirm, among other things, that:

> (C) Only the uncompensated care costs of providing inpatient hospital and
> outpatient hospital services to individuals described in [Section 1396r–4(g)(1)(A)]
> ... are included in the calculation of the hospital-specific limits[; and]
>
> (D) The State included all payments under this subchapter, including
> supplemental payments, in the calculation of such hospital-specific limits.

§ 1396r–4(j)(2).  If the audit finds that DSH payments received exceed a hospital's HSL, the

state must recoup these "overpayments" within one year of their discovery or lose the federal

financial share. *See id.* § 1396b(d)(2)(C), (D).

**The CMS 2008 Regulations**

On December 19, 2008, CMS promulgated a final regulation implementing the DSH

reporting and auditing requirements.  73 Fed. Reg. 77,904, 77,950 (the "2008 Rule").  The 2008

Rule requires states to submit information "for each DSH hospital to which the State made a

DSH payment."  42 C.F.R. § 447.299(c).  The 2008 Rule further requires each hospital to report

its "total annual uncompensated care costs" and sets forth the regulatory formula for determining

such costs by specifically defining each type of cost and payment to be included in the

calculation.  42 C.F.R. § 447.299(c)(16).  Private insurance payments (also referred to as

commercial payments) are not included in the regulatory formula.[5]

The auditing provisions of the rule require participating states to submit annual DSH

Program audits that include a CMS-approved auditor's "determination of whether or not the

---

[5]"Private insurance" means health plan coverage provided through an employer or union, or
purchased by an individual or provided by their employer from a commercial health insurance
company.  Revenues received from private insurers are considered third party revenues.

State made DSH payments that exceeded any hospital's specific DSH limit" in the audit year.  42

C.F.R § 455.301.  The 2011 DSH year (subject to audit in 2014) was the first year in which CMS

required states to recoup overpayments or face "the return of the Federal share to the Federal

government."  73 Fed. Reg. at 77,906.

**The Final Rule**

On August 15, 2016, Defendants published a notice of proposed rulemaking requiring

that "[a]ll third party payments (including, but not limited to … private insurance) must be

included in the calculation of uncompensated care costs for purposes of determining the hospital

specific DSH limit." 81 Fed. Reg. 53,980, 983 (August 15, 2016).  CMS posted on the

rulemaking website (www.regulations.gov) 55 individual comments on the proposed rule, which

CMS identifies as raising 161 issues.  82 Fed. Reg. at 16,117.  The posted comments include

comments submitted by individual hospitals, hospital associations representing hundreds of

hospitals throughout the United States, and state Medicaid departments.  All but six of the 55

posted comments criticized the proposal on multiple grounds, including that (1) the Medicaid

Act did not give CMS the authority to include third-party payments in the Medicaid shortfall

component of the HSL calculation, (2) the proposal would deprive DSH hospitals of funds

Congress intended them to receive, and (3) the proposed rule, if promulgated, cannot have

retroactive effect.

Dismissing nearly all comments, on April 3, 2017, CMS published the Final Rule, which

amends 42 C.F.R. § 447.299(c)(10), to "modify the terms of the current regulation to make

explicit that 'costs' for purposes of calculating the hospital-specific limits are costs net of third-

party payments."  82 Fed. Reg. 16114, 16,117 (April 3, 2017).  The regulation governing how

costs must be considered in the calculation of the DSH HSL, therefore now provides:

(10) Total Cost of Care for Medicaid IP/OP Services. The total annual costs incurred by each hospital for furnishing inpatient hospital and outpatient hospital services to Medicaid eligible individuals. The total annual costs are determined on a hospital-specific basis, not a service-specific basis. For purposes of this section, costs-

(i) Are defined as costs net of third-party payments, including, but not limited to, payments by Medicare and private insurance.

(ii) Must capture the total burden on the hospital of treating Medicaid eligible patients prior to payment by Medicaid.  Thus, costs must be determined in the aggregate and not by estimating the cost of individual patients.  For example, if a hospital treats two Medicaid eligible patients at a cost of $2,000 and receives a $500 payment from a third party for each individual, the total cost to the hospital for purposes of this section is $1,000, regardless of whether the third party payment received for one patient exceeds the cost of providing the service to that individual.

82 Fed. Reg. at 16,122 (Apr. 3, 2017).  The Final Rule became effective on June 2, 2017.

CMS justifies the Final Rule by asserting the same legal arguments Defendants have presented to this and other courts to justify FAQs 33 and 34,[6] which as Plaintiffs show below are contrary to the plain language of the Medicaid Act and are otherwise lacking in merit. Moreover, CMS takes the position that the Final Rule merely *clarifies* the 2008 Rule, thereby asserting that the policy embodied in the Final Rule has been in effect since 2008.  *Id.* at 16, 119 ("This rule is providing clarification to existing policy, therefore there is no issue of retroactivity, nor a need for a transition period.").

**Litigation Challenging the Policy of Including Third Party Payments in the HSL, Which is Now Codified in the Final Rule**

There are currently six cases pending in federal district courts challenging Defendants' policy, set forth in the FAQs, mandating that third-party payments be included in the calculation of hospitals' DSH HSL.  In *Texas Children's Hospital,* this Court held that plaintiffs were likely

---

[6]Similar to FAQ 33, FAQ 34 required that Medicare payments received on behalf of Medicaid-eligible patients be included in the DSH hospital specific limit calculation.  Both FAQs appeared on CMS's website in a document titled "Additional Information on the DSH Reporting and Audit Requirements."

to succeed in showing the policy set forth in a DSH auditing and reporting guideline, requiring that private insurance payments be included in the calculation of a DSH hospital's HSL (referred to in that case as "FAQ 33"), "makes a substantive change to the formula for calculating a hospital's DSH limit, binds state Medicaid agencies, and effectively amends the 2008 Rule" without following the APA's procedural requirements.  76 F. Supp. 3d at 246-47.  Similarly, on March 3, 2017, the United States District Court for the District of New Hampshire permanently enjoined Defendants from enforcing FAQs 33 and FAQ 34 in New Hampshire "until and unless [its] policies and procedures are replaced by an enforceable and properly promulgated regulation."  *N.H. Hosp. Ass'n v. Burwell*, 2017 WL 822094, at *16-17.  Four other cases challenging FAQ 33 and/or 34 are also pending in federal courts in Tennessee, Minnesota, Virginia, and Missouri.[7]

The cases are at different stages of proceedings, with the *N.H. Hosp. Ass'n v. Burwell* case being the only case to reach judgment on the merits.  Multiple lawsuits have been necessitated by Defendants' position that this Court's preliminary injunction applies only in the states of Texas and Washington and Defendants' non-acquiescence to the *N.H. Hosp. Ass'n* judgment.  *See* Declaration of Bridget McCabe ("McCabe Decl."), at Ex. A (5/1/2015 letter from CMS to Missouri Dept. of Social Services ("For all other states, including Missouri, CMS may disallow federal financial participation if a state does not comply with the policy articulated in FAQ No. 33.")).

---

[7]These include *Tennessee Hospital Association v. Burwell*, No. 3:16-cv-03263 (M.D. Tenn., filed Dec. 15, 2016); *Children's Health Care v. Burwell*, No. 0:16-cv-04064-WMW-DTS (D. Minn., filed Dec. 2, 2016); *Children's Hospital of the Kings Daughters, Inc. v. Price*, 2:17-cv-00139-RBS-LRL (E.D. Va., filed Mar. 7, 2017), *Missouri Hospital Association v. Price*, No. 2:17-cv-04052-BCW  (W.D. Mo., filed Mar. 22, 2017).  A preliminary injunction was entered in the *Tennessee Hospital Association* action on May 30, 2017 to preserve the status quo while the Court renders its merits ruling, which is promised by June 30, 2017.  *See* No. 3:16-cv-03263, ECF No. 82 (M.D. Tenn., filed May 30, 2017).

The Final Rule does not moot these cases because any judgment issued with respect to FAQ 33 and/or 34 would have no effect on the application of the policy of netting third-party payments in determining the Medicaid shortfall component of the HSL after the effective date of the Final Rule.  As discussed in the parties' Joint Status Report (ECF No. 11), Plaintiffs raise three issues here: (1) whether Defendants acted in excess of their statutory authority in issuing the Final Rule; (2) whether the Final Rule is a clarifying rule; and (3) whether the Final Rule is arbitrary and capricious.  The question of whether the agency exceeded its statutory authority is common to both the *Texas Children's Hospital* and this litigation and Plaintiffs believe that the statutory authority issue should be decided here because Plaintiffs raise additional arguments in support and present new authorities that were not raised in *Texas Children's Hospital.*  The Court has preliminarily determined in the *Texas Children's* case that the policy set forth in FAQ 33 is not embodied in the 2008 Rule and a decision on the merits is pending before the Court.  Should the Court permanently decide the issue in that case consistent with its preliminary injunction ruling, that ruling would decide the issue presented here as to whether the Final Rule is a clarifying rule.  While this would be more form over substance, Plaintiffs nevertheless believe the Court would have to enter a ruling on that issue in this case, with respect to the Final Rule, to avoid any confusion about its application.  The issue of whether Defendants acted arbitrarily and capriciously in promulgating the Final Rule is not relevant to *Texas Children's Hospital.*

## STATEMENT OF FACTS[8]

### The Plaintiffs

Plaintiffs are 12 free-standing children's hospitals located in four states that treat disproportionate numbers of Medicaid children.  Compl. ¶¶ 13-17.  Plaintiffs provide specialized care to children that cannot be provided in other hospitals, such as treating chronic and complex conditions, including those with severe anomalies, heart ailments, cancer, low birth weight and other long-term and severe illnesses.[9] See, e.g., Wilson Decl. ¶ 3; Kimmel Decl. ¶ 2; Ryan Decl. ¶ 3.  Plaintiffs treat these children regardless of whether their families have health insurance coverage or the ability to pay.  See, e.g., Ostendorf Decl. ¶ 2; Haddican Decl. ¶ 3.  In accordance with the Medicaid Act, Plaintiffs are all "deemed" DSH hospitals and are entitled to receive supplemental DSH funding.  See, e.g., Wilson Decl. ¶ 7; Kinzig Decl. ¶ 9.  Plaintiffs are precisely the safety-net hospitals Congress sought to assist financially through the DSH program.  See, e.g., Ostendorf Decl. ¶ 5; Wilson Decl. ¶ 4.

Plaintiffs have among the highest Medicaid Inpatient Utilization Rates ("MIUR") of all hospitals in their respective states.  For example, in 2014, children enrolled in Medicaid comprised 55% of all patient days at CHAT member hospitals, while at all other hospitals in

---

[8]In support of their Combined Memorandum of Law in Support of Application for a Preliminary Injunction and for Summary Judgment, Plaintiffs submit seven fact declarations.  *See* Declaration of Stacy Wilson from Plaintiff CHAT ("Wilson Decl."); Declaration of Robert Simon from Texas Children's Hospital, member of Plaintiff CHAT ("Simon Decl."); Declaration of Stephen Kimmel from Cook Children's Hospital, member of Plaintiff CHAT ("Kimmel Decl."); Declaration of Todd Ostendorf  from Plaintiff Children's Minnesota ("Ostendorf Decl."); Declaration of Jim Haddican from Plaintiff Gillette Children's ("Haddican Decl."); Declaration of Dennis Ryan from Plaintiff CHKD ("Ryan Decl."); and Declaration of Jerry Kinzig from Plaintiff Seattle Children's ("Kinzig Decl.").

[9]Children's hospitals are responsible for one-third of all pediatric discharges in the U.S.  For children with complex and severe illnesses, approximately one half of them are discharged from children's hospitals.  *See* McCabe Decl., Ex. D, at 176.

Texas only 17% of their total patient days[10] were attributable to Medicaid patients.  Wilson Decl. ¶ 6; *see also id.* ¶ 4("CHAT member hospitals have among the highest Medicaid volumes in the state" ranging from 50.8% to 79.3%).Plaintiff CHKD has the highest MIUR in Virginia documented at 69.65% in 2012, while the next highest MIUR at a Virginia general hospital was only 41.99%.  Ryan Decl. ¶ 4.  Similarly, Gillette serves the highest proportion of patients covered by Medicaid in Minnesota, with approximately 68% of 2015 inpatient days attributable to Medicaid patients.  Haddican Decl. ¶ 2.  Approximately 57% of the children who have inpatient stays at Children's Minnesota are eligible to receive Medicaid.  Ostendorf Decl. ¶ 4.  In 2017, Seattle Children's MIUR for 2017 is 67.5%— the third highest in the state of Washington. Kinzig Decl. ¶ 3.

Plaintiffs sustain substantial losses treating Medicaid-eligible children.  This is because Medicaid reimburses Plaintiffs for only a fraction of the actual costs incurred.  Ostendorf Decl. ¶ 5 (for Children's Minnesota, $0.65 for every dollar spent); Ryan Decl.¶ 5 (for CHKD, $0.69 for every dollar spent); Kinzig Decl.¶ 4 (for Seattle Children's, $0.70 for every dollar spent). And, unlike adult hospitals, Plaintiffs do not have other meaningful revenue sources that can help offset these losses.[11]  *See e.g.,* Wilson Decl. ¶ 4 (CHAT members' Medicare population is only 1% of all patient days compared to 40% at all other hospitals in Texas); Ryan Decl. ¶ 4 (CHKD is more reliant on the Medicaid program than any other hospital in Virginia); *see also* McCabe Declaration, Ex. E, Children's Hospital Association Record Comments at 2-3 ("With the exception of children with end stage renal disease, children's hospitals do not treat individuals

---

[10]A "patient day" is a day for which there is a billable "room-and-board" charge for an admitted hospital inpatient who occupies a hospital bed at midnight.

[11]Adult hospitals can look to the Medicare program, which pays higher rates than Medicaid and provides supplemental funds through Medicare DSH.  *See* Wilson Decl. ¶ 4.

who are covered by Medicare.").[12]  It is because of these financial losses and limited revenue

source streams that Plaintiffs rely so heavily on the DSH Program to make up some of the

financial shortfalls suffered in treating disproportionately high numbers of Medicaid patients.

*See, e.g*., Wilson Decl. ¶ 4; Ostendorf Decl. ¶ 5; Kinzig Decl. ¶ 4.  The DSH program is vital to

Plaintiffs' ability to meet their non-profit, mission-driven objectives that provide necessary

programs and services to the communities they serve.  *Id*.  The Final Rule threatens to eliminate

Plaintiffs' DSH funding altogether, thereby severely harming Plaintiffs and their pediatric

communities.  *See, e.g*., Simon Decl. ¶ 7; Kinzig Decl. ¶ 8-9; *see also* McCabe Decl., Ex. F,

Federation of American Hospitals' Record Comments at 3 ("Given that there are insufficient

alternate payment opportunities for hospitals to access which would help ensure that Medicaid

rates are sufficient, it is challenging for them to continue to furnish the broad range of needed

care to the communities they serve . . . .  As a result, the Medicaid DSH payment is essential for

these institutions to continue to provide the broad range and quality of care and services to needy

populations."); McCabe Decl., Ex. G, Hospital Healthsystem Association of Pennsylvania

Record Comments at 1 ("[D]isproportionate share hospital (DSH) payments provide essential

financial support to safety net hospitals in Pennsylvania and across the nation."); McCabe Decl.,

Ex. H, Minnesota Hospital Association Record Comments ("DSH payments are critical,

especially to children's specialty and safety net hospitals . . . [they] help to make these specialty

hospitals whole by supplementing below-cost Medicaid reimbursements").

---

[12]Throughout their brief, Plaintiffs cite to comments CMS received during the rulemaking
process for the Final Rule.  These comments will eventually be part of the administrative record
that the Government must file on June 16.  Until that time, however, Plaintiffs have attached the
comments as exhibits to the Declaration of Bridget McCabe, for the Court's convenience.

**DSH Program Year Funding**

Most, if not all, states pay DSH funds in the current year based upon previous years' data to estimate the amount of DSH funds a hospital is eligible to receive.  For example, in Texas, the state Medicaid agency uses hospital cost reports from two years prior to award the upcoming DSH program year payments, with program years running from July 1 to June 30.  Simon Decl. ¶ 7.  The process for determining DSH payments for 2018 is beginning.  If nothing changes, the Final Rule will mandate that third-party payments be included in determining the amount of 2018 DSH funds hospitals receive, thereby artificially deflating the HSL for Texas Children's and disqualifying the hospital from receiving any DSH funds.

**The 2014 DSH Audits**

Under the regulations, states must complete an independent certified audit for each DSH program year three years after the end of the DSH year under audit.  42 C.F.R. § 455.304.  Thus, the 2014 DSH program year is subject to audit in 2017.  The audits must be completed by September 30 and submitted to CMS no later than December 31.  If the audits identify overpayments, they must be recouped within one year.  42 C.F.R. § 433.302.  The one year clock is triggered when the states submit the audits to CMS, which could occur as soon as the audits are complete, *i.e.,* anytime between October 1 and December 31, and even sooner if a state completes the audit before September 30 and submits it to CMS.

**STANDARD OF REVIEW**

Plaintiffs' claims are reviewable under the Administrative Procedure Act ("APA"), 5 U.S.C. § 500 *et seq*., which provides that the Court "shall . . . . set aside" an agency's decision if it is arbitrary, capricious, or "otherwise not in accordance with law, or if it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.*  In a motion for summary judgment under the APA, "the standard set forth in Rule 56(a) does not apply because

14

of the court's limited role in reviewing the administrative record." *Coe v. McHugh*, 968 F. Supp. 2d 237, 239 (D.D.C. 2013) (citations omitted). "'Summary judgment is an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based upon the administrative record.'" *Bloch v. Powell*, 227 F. Supp. 2d 25, 30-31 (D.D.C. 2002) (quoting *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995)). In reviewing the agency action, "the court considers whether the agency acted within the scope of its legal authority, whether the agency has explained its decision, whether the facts on which the agency purports to have relied have some basis in the record, and whether the agency considered the relevant factors." *Fund for Animals,* 903 F. Supp. at 105 (citing *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989)).

## ARGUMENT

Plaintiffs challenge the Final Rule on two grounds: (1) Defendants violated APA § 706(2)(C) by acting in excess of their statutory jurisdiction, their statutory authority, and short of statutory right under the Medicaid Act (Complaint, ECF No. 1, ¶¶ 57-62); and (2) Defendants' Final Rule is arbitrary, capricious, or "otherwise not in accordance with law" thereby violating APA § 706(2)(A) (Complaint, ECF No. 1, ¶¶ 63-69). The Final Rule is unlawful because it is contrary to the plain language of the Medicaid Act and contravenes Congress's purpose in enacting the DSH program. The Final Rule is arbitrary and capricious because (1) CMS's justification for the rule is contravened by the record evidence that demonstrates that federally deemed DSH hospitals that incur significant Medicaid losses are denied all DSH funding; (2) it is not the product of reasoned decision making; and (3) CMS's assertion that the Final Rule is a "clarification of the existing policy" is directly contrary to two federal district court decisions including this Court's prior ruling.

I.      **The Final Rule Is Not Authorized By the Medicaid Act and Therefore Violates APA § 706 (2)(C)**

Challenges to agency rules under section 706(2)(C) of the APA are subject to the standard of review articulated in *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984), under which the reviewing court applies a two-part inquiry.  First, the court employs traditional tools of statutory interpretation to examine whether Congress has "directly spoken" to the question at issue."  *Pharm. Research & Mfrs. of Am. v. Thompson*, 251 F.3d 219, 224 (D.C. Cir.2001).  If the statute is clear, then the unambiguous intent of Congress must control and the *Chevron* inquiry is over.  If the statute is "'silent or ambiguous with respect to the specific issue' the court must defer to the agency's interpretation if it is reasonable." *Citizens Coal Council v. Norton*, 330 F.3d 478, 481 (D.C. Cir. 2003) (*quoting Chevron,* 467 U.S. at 843).

The Final Rule fails under both *Chevron* steps.  First, the DSH provisions of the Medicaid Act are unambiguous that only Medicaid payments are netted out in the Medicaid shortfall component of the HSL and the term "uncompensated costs" is merely a shorthand referral to the statutory formula.  Second, the Final Rule is an unreasonable interpretation of the Medicaid Act because it denies DSH funding to the very hospitals Congress *deemed* entitled to receive the funds.  It also unreasonably broadens the discretion Congress gave the Secretary to determine costs incurred for DSH purposes.  Congress intended a very particular meaning of the words "costs incurred" that (1) the hospital itself incurs the costs; and (2) the costs must be covered and allowable under Medicaid.

A.      ***Chevron* Step 1 - § 1396r (g)(1)(A) Is Unambiguous: Only Medicaid Payments Are Subtracted From Costs in the Medicaid Shortfall Component of the HSL**

The Medicaid Act unambiguously specifies the "payments" that are to be included in the calculation of a hospital's HSL, *i.e*., Medicaid payments and payments made by or on behalf of

uninsured patients ("payments under this subchapter . . . and by uninsured patients."). 42 U.S.C. § 1396r-4(g)(1)(A).  The statutory HSL calculation is expressed as follows:

| Medicaid-Allowable Costs for Eligible-Patients | − | Medicaid Payments | = | HSL |

Third-party payments are not included on the payment side of the statutory equation. Nevertheless, the Final Rule mandates that third-party payments must be considered on the "cost" side of the equation to calculate "uncompensated costs."  In other words, the Final Rule rewrites the statutory formula as follows:



| Medicaid-Allowable Costs for Eligible-Patients | − | Third Party Payments | − | Medicaid Payments | = | HSL |

The Final Rule contravenes the plain language of the statute, which sets forth the formula for calculating the HSL and plainly distinguishes between costs and payments by giving the Secretary discretion to determine the "costs . . . of furnishing hospital services" (meaning whether the costs are covered by Medicaid) to be included in the cost side of the equation, while specifying the payments that are to be netted out of the costs ("net of payments under this subchapter . . . and by uninsured patients.").  42 U.S.C. § 1396r-4(g)(1)(A).  The statute directs that only Medicaid payments received by hospitals be subtracted from the total costs of furnishing inpatient and outpatient hospital services to Medicaid-eligible individuals.[13]

---

[13]The plain meaning of this language is supported its legislative history.  The Conference Report accompanying the HSL provision explained that the HSL "[l]imits disproportionate share hospital (DSH) payment adjustments *to no more than the costs of providing inpatient and outpatient services* to Medicaid and uninsured patients, *less payments received from Medicaid*

Further, the structure and context of 1396r-4(g) demonstrate Congress's unambiguous intent that Medicaid payments are the only source of revenue to be netted out against costs.  It is a fundamental principle of statutory construction that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (internal quotation marks and citation omitted). This principle applies here with particular force because in the immediately following subsection, 1396r-4(g)(2), Congress established a formula for providing additional DSH payment adjustments for a two-year transitional period for state-owned hospitals in which it specified that third-party payments be considered before DSH payments were awarded.  Specifically, the hospitals could receive up to 200 percent of the costs of furnishing hospital services identified in section (g)(1) if

> the Governor … certifies … that the hospital's *applicable minimum amount* is used for health services during the year [and in] determining the amount that is used for such services …, *there shall be excluded any amounts received* under the Public Health Service Act or *from third party payors* …

§ 1396r-4(g)(2)(A) (emphasis added).  These two subsections of the same statute are directed to the same statutory objective: to provide supplemental DSH funding to DSH hospitals but limit that funding to the hospitals performed services.  This provision unequivocally shows that where Congress intended third-party payments be considered in providing DSH payments, it knew how to say so.

---

(other than DSH payment adjustments) and uninsured patients."  H.R. Rep. No. 103-213, at 835 (1993) (House Conference Report) (emphases added), *reprinted at* 1993 U.S.C.C.A.N. 1088, 1524, 1993 WL 302291.  Nowhere did Congress indicate that payments received from private insurance or Medicare should first be subtracted from the costs of furnishing hospital services before Medicaid payments are subtracted.

The D.C. Circuit applied this cannon of statutory construction to another DSH provision that directs states to use one of three formulae for calculating DSH payments to hospitals (§ 1396r-4(c)).  In *D.C. Hosp. Ass'n v. D.C.*, 224 F.3d 776 (D.C. Cir. 2000), the District of Columbia used the formula that requires the DSH payment to be in an amount equal to at least the product of the amount paid to the hospitals under the state plan (the base amount) and the hospital's DSH adjustment percentage.  In applying the formula, the District of Columbia excluded from the base amount payments made by managed care organizations ("MCOs"), arguing that MCO payments were not payments made "directly" by a state under a state plan. The D.C. Circuit rejected the District's argument, holding that if Congress intended that "only a State's 'direct' payments were to be taken into account," it could have so stated as it did in the proceeding subsection of the statute where Congress specified "the amount of the cash subsidies for patient services received *directly* from State and local governments."  *Id*. at 780.  Thus, the court held that Congress's omission of the term "directly" in the DSH calculation of the base amount was "compelling evidence that Congress did not intend to limit the computation of payments to those made directly by the District."  *Id*.  Here, the fact that Congress excluded third-party payments from the calculation of the Medicaid shortfall component of the HSL, but included them in an adjacent subsection, is equally compelling evidence that Congress did not intend third-party payments to be included in the calculation.

In the Final Rule, CMS offers two feeble arguments to justify its promulgation as to statutory intent.  First, CMS relies on section 1396r-4(g)(1)'s heading "uncompensated costs" to justify subtracting private payments from the cost side of the HSL calculation.  82 Fed. Reg. at 16,116.  But "the heading of a section cannot limit the plain meaning of the text."  *Bhd. of R.R. Trainmen v. Balt. & Ohio R.R. Co.*, 331 U.S. 519, 528 (1947).  The statutory heading is "'but a

short-hand reference to the general subject matter' of the provision, 'not meant to take the place of the detailed provisions of the text.'" *Lawson v. FMR LLC,* 134 S. Ct. 1158, 1169 (2014). Here, Congress provided "detailed provisions" that specify the costs included and the payments subtracted to derive "uncompensated costs," with no reference to private insurance payments anywhere.  The distinction between costs and payments is reinforced repeatedly in the legislative history:  DSH payments cannot exceed "the costs of providing inpatient and outpatient services to Medicaid patients and uninsured patients, less payments received from Medicaid … and uninsured patients."  H.R. Rep. No. 103-213, at 835 (Aug. 4, 1993) (Budget Conf. Rep.).  As the New Hampshire court found, "Congress could not have intended to grant the Secretary the discretion to include other payments within the term 'costs,' while separately defining payments. If it did, the definition of payments that must be subtracted from costs to determine the Medicaid Shortfall would be surplusage."  *N.H. Hosp. Ass'n*, 2016 WL 1048023, at *12 (citations omitted).

Second, CMS relies on § 1396r-4(j)(2)(C) as justification for promulgation.  *Id.* at 16115/3.  That section was added to the Medicaid Act in 2003 to require states to submit annual independent certified audits to CMS on their DSH Programs:

(2) Independent Certified Audit

The State shall annually submit to the Secretary an independent audit that verifies each of the following:

(C) Only the uncompensated care costs of providing inpatient and outpatient hospital services to individuals described in paragraph (1)(A) of such subsection are included in the calculation of the hospital-specific limits under such subsection.

The phrase "uncompensated care costs" in §1396r-4(j)(2)(C), however, is mere shorthand for the HSL "calculation" itself (costs of inpatient and outpatient hospital services minus Medicaid payments and costs of inpatient and outpatient hospital services minus payments made by or on

behalf of the uninsured).   Nowhere does this give the Secretary discretion to alter the cost side of

the formula. This is supported by that provision's legislative history.   In the 2003 Conference

Report, Congress reiterated the definition of uncompensated costs set forth in § 1396r-4(g)(1):

> DSH payments to each inpatient general hospital are limited to some percentage
> of the costs of providing inpatient and outpatient services to Medicaid and
> uninsured patients at that hospital, less payments received from or on behalf of
> Medicaid and uninsured patients.   *These costs are considered to be unreimbursed
> costs.*

H.R. Rep. No. 108-391, at 807-808 (Nov. 21, 2003) (citing "Present Law").   Contrary to CMS's

position that "uncompensated care costs" means "unreimbursed costs" that can only be derived

after netting out third-party payments, Congress again made clear that the HSL calculation is by

definition "unreimbursed costs," *i.e.*, costs that have not been reimbursed by Medicaid.   Nowhere

did Congress express that "uncompensated care costs" or "unreimbursed costs" means costs less

third-party payments, as the Final Rule contends.

The record evidence also defeats CMS's position.   Section 1396r-4(j)(2)(C) is one of four

auditor certification requirements that requires auditors to certify that only inpatient and

outpatient costs for hospital services are included in the HSL calculation.   With respect to the

Medicaid shortfall component of the HSL, CMS's "General Audit and Reporting Protocol"

instructs:

> To determine the existence of a Medicaid shortfall, Medicaid IP/OP hospital costs
> (including Medicaid managed care costs) must be measured against Medicaid
> IP/OP revenue received for such services in the audited State Plan rate year
> (including regular Medicaid rate payments, add-ons, supplemental and enhanced
> payments and Medicaid managed care revenues).

*See* General DSH Audit and Rep. Protocol, CMS- 2198-F.[14]   Nowhere are private insurance

payments included or referenced in this section.   Moreover, the Preamble to the 2008 Rule

---

[14]*Available at* https://www.medicaid.gov /medicaid/financing-and-
reimbursement/downloads/general_dsh_audit_reporting-protocol.pdf (last visited April 5, 2017).

expressly contradicts the position Defendants now take in the Final Rule.  In response to a comment seeking clarification of the term "uncompensated care costs," CMS explained that the Medicare program uses

> a different broader definition of uncompensated care than is authorized for purposes of the Medicaid DSH hospital-specific limit.  It is important to note that the statutory provision at Section 1923(g)(1) does not use the term "uncompensated care" and we use it only because of its longstanding use in this context.  *The definition we have been using tracks the statutory requirements for the hospital-specific DSH limit.*

73 Fed. Reg. at 77921 (emphasis added).[15]  CMS cannot now claim that § 1396r-4(j)(2)(C)'s use of the term "uncompensated care costs" alters the statutory HSL calculation to include private insurance payments.

Accordingly, under *Chevron*, 467 U.S. at 842-43, the Court must give effect to the unambiguous intent of Congress:  "costs" means the costs of providing hospital services and "payments" means Medicaid payments in determining the Medicaid shortfall.  Because Congress's intent is unambiguous, Plaintiffs are likely to succeed on the merits under *Chevron* step 1.

### B.    *Chevron* Step 2 – CMS's Interpretation of the Medicaid Statute Is Not Reasonable

CMS's interpretation of the Medicaid Act in the Final Rule is not reasonable because (1) it denies DSH funds to statutorily "deemed" DSH hospitals that are entitled to supplemental DSH funding, and (2) the Secretary's discretion to determine "cost incurred of furnishing hospital services" is narrowly circumscribed and does not permit CMS to subtract private insurance payments as costs incurred.

---

[15]Medicare's definition of uncompensated care includes charity care, non-Medicare bad debt, and non-reimbursable Medicare bad debt, whereas for Medicaid DSH purposes uncompensated costs are costs that have not already been reimbursed by Medicaid and costs attributable to the uninsured.

1.    **The Final Rule Is Unreasonable Because It Denies DSH Funding To Statutorily "Deemed" DSH Hospitals In Violation of the Medicaid Act.**

Congress enacted the DSH program in 1981, requiring states to "take into account the situation of hospitals which serve a disproportionate number of low-income patients with special needs." 42 U.S.C. §1396r-4(a)(1).  However, by the mid-1980s only a few states had identified DSH hospitals or established payment adjustments for them.  H.R. Rep. No. 100-391(I) at 525 (1987) (only 27 states had even defined disproportionate share hospitals and of these, only 15 states were actually making DSH payment adjustments).  Thus, "[t]o assure that HCFA [now CMS] and all the States implement the 1981 requirement that Medicaid payment rates take into account the situation of disproportionate share hospitals" Congress established a federal definition of DSH hospitals and required that states make DSH payments to these facilities.  H.R. Rep. No. 100-391(I) at 525 (1987).

A hospital is federally "deemed" a DSH hospital if the hospital's Medicaid inpatient utilization rate (MIUR) ". . . is at least one standard deviation above the mean Medicaid inpatient utilization rate for hospitals receiving Medicaid payments in the State; or the hospital's low-income utilization rate . . . exceeds 25 percent.  42 U.S.C. § 1396r-4(b)(1).  Section 1396r-4(a)(1) mandates that states submit a State Plan that includes the federal definition of a DSH hospital and provides "for an appropriate increase in the rate or amount of payment . . . [for] such hospitals."  § 1396r-4(a)(1)(B).  Congress's intent could not have been more clear: "a hospital is deemed to be a DSH hospital, and is *entitled to receive payment adjustments*,…" (emphasis supplied).  H.R. Rep. No. 103-111, at 211-12 (1993), reprinted in 1993 U.S.C.C.A.N. 378, 538-39; *see also Banner Health v. Sebelius*, 715 F.Supp.2d 142, 148 (D.D.C. 2010) ("states *must* provide for an 'appropriate increase in the rate or amount of payment for [inpatient hospital] services provided by such hospitals.'") (emphasis added) (citing 42 C.F.R. § 1396r-4(a)(1)(B)).

While "deemed" DSH hospitals are required to receive DSH payments, Congress also provided states discretion to allow other hospitals to receive some DSH payments provided their MIUR is at least one percent.  § 1396r-4(d)(3).

Plaintiffs are all "deemed" DSH hospitals entitled to receive DSH payments but the Final Rule unreasonably denies them DSH funding.  Comments submitted to the record demonstrate this.  For example, Children's Minnesota has a MIUR of 57% and the rule "would have the effect of essentially eliminating our current DSH payments and recouping prior DSH payments." Ostendorf Decl., at Ex. A, at 1.  CHAT member Cook Children's has a MIUR of 58% and is deemed a DSH hospital but the Final Rule will cause it to lose $16 million in DSH funds received in 2014.  Kimmel Decl., at Ex. A, at 3.  And at Texas Children's Hospital, another CHAT member, "[a]pproximately 55% of patient days… are for Medicaid eligible patients" (55% MIUR), Simon Decl., at Ex. A, at 1-2, yet its supporting papers accompanying its comment letter demonstrate that the policy of counting private insurance payments for Medicaid eligible patients "eliminate[s] entirely Texas Children's actually incurred Medicaid shortfall for the almost 100,000 patients who did not have private insurance and for whom Medicaid is the sole source of coverage."  *See* Pltfs. Reply Memo Supporting S.J., *Texas Children's Hosp. v. Burwell*, Case No. 1:14-cv-02060-EGS, ECF No. 30, at 3 (D.D.C., filed May 6, 2015) (submitted by Texas Children's Hospital with its comment letter protesting the proposed rule).

Accordingly, the Final rule is an unreasonable interpretation of §1396r-4(g)(1) because it violates the Medicaid Act by denying DSH payments to hospitals that Congress "deemed" DSH hospitals and mandated that they receive DSH payment adjustments.  Defendants' interpretation of the statute not only frustrates Congress's intent, it reads the federal definition of "deemed" DSH hospitals out of the Medicaid out.

**2.** **Defendants' Interpretation of §1396r(g)(1) Is Unreasonable Because the Secretary Does Not Have Discretion to Determine That "Costs Incurred" Means Subtraction of Private Insurance Payments**

The Final Rule is based on the false premise that Congress gave the Secretary unfettered discretion to redefine the statutory phrase "costs incurred of furnishing hospital services" for purposes of implementing the DSH program.  To the contrary, Congress circumscribed the Secretary's discretion when it gave "costs incurred" a very specific meaning that has two inquiries involving (1) whether the costs were performed by the DSH hospital itself; and (2) whether the costs are costs for hospital services allowable under the Medicaid program.

Congress enacted §1396r-4(g)(1) in response to concerns that DSH funds were being redirected for many uses other than financially assisting DSH hospitals in providing hospital services to Medicaid patients.  H. R. No. 103-111 at 212, *reprinted in* 1993 U.S.C.C.A.N. 378, 539 ("Use of Federal Medicaid funds for unrelated purposes, such as building roads, operating correctional facilities, balancing State budgets, is a clear abuse of the program and "[t]he Committee is concerned by reports that some States are making DSH payment adjustments to hospitals that do not provide inpatient services to Medicaid [recipients]…").[16]  *Id.* at 538-39.  In the context of Congress's concern about abuse as to who was receiving DSH funds, Congress employed the term "incurred" to assure that the costs were incurred by the hospital itself.  *Va. Dep't of Med. Assistance Servs. v. Johnson*, 609 F. Supp. 2d 1, 8 (D.D.C. 2009) (upholding Secretary's discretion to deny costs because the services were not performed by the hospital itself but were "incurred" by a physician's practice group that was a separate legal entity).

---

[16]In 1997 Congress reiterated its concerns about how states were using DSH:  "Our experience with the disproportionate share hospital program (DSH) tells us that sometimes the funds that Congress turns over to the states do not always reach the intended beneficiaries. Congress did not intend for DSH moneys to fund state psychiatric hospitals, or roads, or prisons, but in some states that is exactly what happened." H.R. Rep. No. 105-149, at 1647 (1997), 1997 WL 353017 (Leg. Hist.).

Indeed, the plain meaning of the word "incur" is "[t]o become liable or subject to, esp[ecially] because of one's own actions." WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 562 (1999).[17]

"Costs" means the costs of inpatient and outpatient hospital services allowed under the Medicaid Act ("The Committee bill limits the amount of payment adjustments to DSH hospitals to the costs (as determined by the Secretary) that these facilities incur in furnishing inpatient and outpatient services to Medicaid–eligible patients." H. R. No. 103-111 at 212 (emphasis supplied). *See La. Dep't of Health & Hosps. v. CMS*, 346 F.3d 571 (5th Cir. 2003) (finding the Secretary exercised discretion arbitrarily in disallowing costs of services performed by rural health clinics as "hospital services").

That Congress intended "costs incurred" to mean the costs of inpatient and outpatient hospital services performed by a DSH hospital is precisely what CMS itself argued to the Department of Health and Human Services Departmental Appeals Board ("DAB") in *Missouri Department of Social Services*, DAB No. A-07-124 (March 17, 2008). *See* McCabe Decl., Ex. B. In upholding CMS's disallowance of certain of Missouri's Medicaid costs, the DAB analyzed the meaning of "costs incurred" in 1396r-4(g)(1) (A) and confirmed its meaning to be exactly what Plaintiffs argue here:

---

[17]That "costs incurred" does not mean "costs reimbursed," as CMS maintains in the Final Rule, was directly addressed in the Medicaid context in *In the Matter of Townview Nursing Home*, 28 B.R. 431, 458 (Bankr. S.D.N.Y. 1983). In *Townview Nursing Home*, the issue was whether a nursing home, as debtor, was entitled to certain Medicaid reimbursement from the state and the city. In ruling that accrued salaries could be counted as a "cost incurred," the court rejected New York State's argument that Medicaid reimbursement regulations equated "cost incurred" with "cost paid." The court held: "While the regulation itself does not define the phrase "costs incurred," the phrase has a fixed legal meaning. A debt has been incurred when liability attaches… *A "cost incurred" is, thus, a "cost accrued" and not necessarily a "cost paid." Id.* (emphasis added). *See also Whitecliff, Inc. v. Shalala*, 20 F.3d 488, 489 (D.C. Cir. 1994) ("[w]hen hospitals are used to provide services, the equipment and facilities are consumed *and therefore costs are necessarily incurred*." *Id.* (emphasis added).

> the question of whether particular costs meet the statutory requirements of the payment limit provision may be broken down into two parts: 1) were the costs "incurred" by the hospitals; and 2) were the costs for "hospital services" within the meaning of section 1923(g)(1)(A). . . . To be included in the calculation of a DSH facility-specific payment limit, the costs must satisfy both requirements.

*Id.* at 10.  *See also N.H. Dept. of Health and Human Services*, DAB No. 2399 (2011) (upholding CMS's interpretation of "costs" under § 1396r-4(g)(1) as meaning costs allowable under the Medicaid Act).

Thus, the Final Rule incorrectly and unreasonably interprets the scope of its discretion to mean that the Secretary may subtract private insurance payments from the cost side of the Medicaid shortfall formula of the HSL calculation.

### C.    The Final Rule Violates APA § 706(2)(A) Because It Is Arbitrary and Capricious and Not Otherwise In Accordance With Law.

An agency's decision is arbitrary or capricious if its explanation runs counter to the evidence before the agency, the agency relied on factors which Congress did not intend the agency to consider, and/or the decision is not otherwise the product of reasoned decision making. *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Final Rule is arbitrary and capricious for three reasons.  First, CMS's justification for the rule is contravened by the record evidence that demonstrates that federally deemed DSH hospitals that incur significant Medicaid losses are denied DSH funding.  Second, the Final Rule is not the product of reasoned decision making because it wrongly assumes that private insurance payments are for the same services provided under Medicaid, relies on a regulation governing excess Medicaid payments that has no rational relationship to private insurance payments, and claims that it reflects the "real economic burden" on hospitals when in fact it increases the economic burden on the precise hospitals Congress sought to assist through the DSH program.

27

Finally, CMS's assertion that the Final Rule is a "clarification of the existing policy" is directly

contrary to two federal district court decisions including this Court's prior ruling.

1.      **CMS Fails to Explain Any Rational Relationship Between the Final Rule and the Record Facts.**

CMS was required to "articulate a satisfactory explanation" and make a "rational

connection" between the policy it set in the Final Rule and the record facts.  *Motor Vehicle Mfs.*

*Ass'n*, 463 U.S. at 43.  *Id.*  Here, CMS offered an explanation for its decision that runs directly

counter to the record evidence.

CMS determined in the Final Rule that the policy was necessary: "because state DSH

payments are limited to an annual federal allotment, this policy is also necessary to ensure that

limited DSH resources are allocated to hospitals that have a net financial shortfall in serving

Medicaid patients."  82 Fed. Reg. at 16,117.  However, CMS failed to analyze or explain

whether the record facts promoted or contravened its policy justification for the Final Rule and

whether there was a rational connection between the justification and the record facts.  It could

not have because the record evidence demonstrates that application of private insurance

payments made on behalf of Medicaid eligible patients to the HSL calculation results in denying

DSH funding to hospitals that have among the highest MIURs in their respective states and have

the highest net financial shortfalls in serving Medicaid patients.  The record facts run directly

counter to Defendants' rationale for promulgation of the rule.  For example, Children's

Minnesota, a "deemed" DSH hospital, commented that "under the Proposed Rule, our Medicaid

related costs in 2015, would have exceeded revenue by $85.8 million" and the "Proposed Rule

will completely eliminate DSH funding for Children's Minnesota."  Ostendorf Decl., Ex. A, at 2.

Similarly, CHAT member Cook Children's commented that it "still incurred a loss of over $26.6

million in fiscal year 2012" even when private insurance payments are considered.  Kimmel

Decl., at Ex. A, at 3.[18]  These facts transgress upon the agency's articulated reason for its

promulgation and there is not even an attempt in the Final Rule to explain or analyze its policy in

light of these contravening facts.

Moreover, Defendants' APA violation is most confounding because both of these

hospitals treat an extremely high percentage of Medicaid patients, which is the very reason

Congress enacted the DSH supplemental program.  Congress's "intent was to stabilize the

hospitals financially and preserve access to health care services for eligible low-income

patients." *Va. Dep't of Med. Assistance Servs. v. Johnson*, 609 F. Supp. 2d 1, 3 (D.D.C. 2009).

"'[S]uch hospitals, especially in urban areas, are often multifaceted health care institutions,

which provide many public health and social services to all residents of their area, in addition to

serving as hospitals of last resort for the poor.  Their sizable Medicaid populations often require

extra social and public health services.'" *Id.* (quoting  legislative history).

Accordingly, the Final Rule is arbitrary and capricious.  *Motor Vehicle Mfrs. Ass'n* 463

U.S. at 43.

### 2.        The Final Rule is Not the Product of Reasoned Decision-Making.

CMS also justifies applying third-party payments in the calculation of the HSL by

asserting that these payments reimburse hospitals for *services covered by the Medicaid program.*

---

[18]*See also* McCabe Decl., Ex. M, New Hampshire Hospital Association Record Comments at 5 (explaining that for Valley Regional Hospital ("VRH"), a critical access hospital, the loss of DSH funds "will place VRH in a precarious cash flow situation, will likely cause it to breach its existing bond covenants, and will likely require VRH to cut access to critical programs and services for its patients in order to absorb these losses"); McCabe Decl., Ex. N, Doctor's Hospital at Renaissance Record Comments at 3 ("the policy in the Proposed Rule would substantially reduce DHR's HSL and would significantly impact the long-term financial ability of DHR to adequately serve these vulnerable patient populations"); McCabe Decl., Ex. O, Tennessee Hospital Association Record Comments at 3 (49 Tennessee hospitals were required to repay $14.6 million of 2011 DSH payments because of the policy set forth in the FAQs, 40 of which were rural hospitals and it is anticipated that similar results will take place in subsequent audits).

82 Fed. Reg. at 16,116 ("payments received from third party payers that exceed *the cost of a service* provided to a Medicaid eligible individual . . . must be included in the calculation of uncompensated care costs . . . regardless of what the *Medicaid incurred cost* is."); *id.* at 16120 ("the cost of *these services* are included in the hospital-specific limit calculation, revenue associated *with these same services* must be applied as offsets to arrive at net costs to the hospital *for the services.*").  CMS's justification is specious and not supported by the fact that private insurance pays for services that not covered by Medicaid.

To offer just one example, two children received similar outpatient services at Texas Children's Hospital, one of which was a Medicaid program patient and the other a Medicaid eligible patient covered by private insurance (Blue Cross/ Blue Shield PPS).  Simon Decl. ¶ 10. The physicians for both children ordered a series of laboratory services on the day of their outpatient visit, which were coded in the records by CPT codes 87181 and 87186.[19]  *Id.*  The Medicaid patient received a total of 10 laboratory services (five coded under 87181 and five under 87186) on the day of the patient's visit but Medicaid paid for only two of those services because each coded service is "limited to one per day for the same provider."  *Id.* at 11.  In stark contrast, Blue Cross/ Blue Shield paid for all the 87181 and 87186 services for the child who was Medicaid eligible but covered by private insurance (a total of six services in one day).  *Id.* Accordingly, CMS's justification that private insurance payments are "revenue associated with those same services" included on the Medicaid cost side of the HSL is erroneous.  Medicaid caps many services while also underpaying for them.  This was recognized by Congress.  *See, e.g.*, H.R. Rep. No. 101-247 at 481 (1989); Pub. L. No.101-239 (1989) (Congress is "seriously concerned by the delays in implementation of the disproportionate share hospital requirements

_____

[19]Services are coded on claim forms by what are known as "CPT" codes or Common Procedure Terminology.

and, in particular, by inadequate payment adjustments that persist in some States").  Private

insurance pays for services that providers contractually negotiate and generally covers more

services than those which Medicaid covers.  By including payments for services not covered by

Medicaid, the HSL calculation does not "arrive at net costs to the hospital for the services" as

CMS claims.  Rather, it shifts Medicaid losses to commercial insurance payers and denies

Plaintiffs the supplemental DSH funds they are entitled to receive.[20]

CMS further justifies the Final Rule by analogizing to CMS regulations governing how

excess Medicaid payments are applied in the HSL calculation.  82 Fed. Reg. 16,117 (citing

§ 455.304(d)(4)).  The regulation CMS relies upon is one of four auditor "verification"

requirements that requires the auditor to verify that "any Medicaid payments  . . . which are in

excess of the Medicaid incurred costs of such services, are applied against the uncompensated

care costs  of . . . services to individuals with no source of third-party coverage for such

services." 42 C.F.R. § 455.304(d)(4).  The regulation implements Congress's mandate that the

audit certify that the "state included *all payments under this title*, including supplemental

payments in the calculation of such hospital-specific limits."  § 1396r-4(j)(2)(D) (emphasis

added).  Congress therefore directed that all Medicaid payments ("all payments under this title")

be included in the calculation of the HSL without regard to their amount.

Recall that the HSL is made up of two components:  the Medicaid shortfall and the

uninsured component.  Thus, when Medicaid payments exceed Medicaid allowable costs (a

situation that seldom occurs) and are included in the Medicaid shortfall component of the HSL

---

[20]By offsetting Medicaid costs by private insurance that pays for services not covered by
Medicaid, CMS violates a fundamental principle of Medicaid cost reimbursement that no part of
Medicaid costs are borne by other patients.  *See*  42 C.F.R. § 413.5(a) ("the share of the total
institutional cost that is borne by the program is related to the care furnished beneficiaries so that
no part of their cost would need to be borne by other patients").

.

calculation, they mathematically offset losses in the uninsured component of the HSL to derive

total uncompensated costs.  There is no logical relationship between Congress's mandate that all

Medicaid payments be included in the HSL calculation and the Final Rule's inclusion of third-

party payments in the HSL calculation.  Congress clearly did not mandate that auditors certify

that all payments from third-parties are included in the calculation of the HSL.  Defendants

cannot offer any reasonable justification for including in the HSL calculation payments that arise

from outside of the Medicaid program and exceed Medicaid allowable costs.  And, Defendants

dismissed multiple comments that argued that there was "no reasonable justification" to offset

DSH uncompensated costs with third-party payments received on behalf of patients for whom

Medicaid did not receive a claim, nor did it pay, for any of the services received.  *See e.g.*,

McCabe Decl., Ex. I, America's Essential Hospitals Record Comments at 4; McCabe Decl., Ex.

J, State of California Department of Health Care Services Record Comment at 2; McCabe Decl.,

Ex. K, Colorado Department of Health Care Policy and Financing Record Comments at 1.

  Finally, as shown in the comments on the Rule, as well as in the attached declarations,

hospitals that treat disproportionate numbers of Medicaid patients incur significant losses, thus

upending in practice, CMS's articulated rationale for the rule.  *See, e.g.*, Wilson Decl. ¶ 4; Kinzig

Decl. ¶ 4; Haddican Decl. ¶7; Ryan Decl. ¶¶ 5-6; Kimmel Decl. ¶5.  This is especially true for

children's hospitals because their Medicaid populations are typically higher than adult general

hospitals and their revenue sources are more limited.  *See*, *e.g*., Wilson Decl. ¶ 4; McCabe Decl.,

Ex. E, Children's Hospital Association Record Comments at 2 (explaining that "[i]nadequate

Medicaid reimbursement poses serious ongoing financial challenges to children's hospitals" and

that "[t]he Medicaid DSH program plays an important role for children's hospitals in addressing

Medicaid underpayment . . . [and] is one of the limited opportunities available to help children's

hospitals stretch scarce resources to care for our most vulnerable children.").  Indeed, a recent study published in *Pediatrics*, a publication of the Journal of the American Medical Association, compared Medicaid losses across 1,485 hospitals in 23 states and found that freestanding children's hospitals' Medicaid financial losses were far greater compared to non-children's hospitals.  Wilson Decl. ¶ 5.  The study also found that the DSH program reduced these losses by almost one half.  *Id.*

Thus, children's hospitals rely heavily on DSH funds.  As Plaintiff Children's Minnesota's Chief Financial Officer attests, from 2011-2015, DSH funding accounted for nearly 60% of Plaintiff Children's Minnesota's total operating margin, which was only 3.2%.  Ostendorf Decl. ¶ 25.  Even though modest compared to other health systems, it permitted the hospital's reinvestment in essential services and facilities to maintain adequate access to quality care for their patients.  *Id.*  Had Children's Minnesota not received DSH funding for those years, its operating margin would have dropped to 1.3% or $9.4 million annually, on average.  *Id.*  An operating margin of $9.4 million is not adequate to ensure reasonable liquidity for the 4,200 employee health system or fund the annual investments in technology, care delivery equipment and general facilities that are required to continue to provide essential pediatric services for the region.  *Id.*

Despite these well-documented disproportionate Medicaid losses, the Final Rule denies DSH funding to children's hospitals—the very hospitals that most need and rely upon the funding.  CMS justifies this absurd result by maintaining that the Final Rule is necessary to "ensure[] that the DSH payment reflects the real economic burden of hospitals that treat a disproportionate share of low-income patients." 82 Fed. Reg. at 16,117.  To the contrary, the Final Rule ignores the "real economic burden" on DSH hospitals like Plaintiffs by considering

only the Medicaid-allowable costs (rather than the actual costs) in the HSL calculation and offsetting them against private insurance payments that pay far in excess of Medicaid-allowable costs and for services not covered by Medicaid.  Ostendorf Decl. ¶ 14.  By skewing the HSL calculation in this manner, the Final Rule increases Plaintiffs' economic burden in treating large numbers of Medicaid patients by forcing Plaintiffs to shift revenues earned from outside of the Medicaid program to further offset the significant loses they incur treating Medicaid patients— all at the expense of the important programs and services Plaintiffs provide.  Kimmel Decl. ¶ 5 (CMS's rationale that Final Rule reflects the "real economic burden" of hospitals "does not take into account the realty that hospitals like Cook Children's invest in technologies, programs, and services that are central to their non-profit mission of serving as centers of excellence for children."); McCabe Decl., Ex. L, Santa Clara Valley Medical Center Record Comments at 3 (CMS claims that the Rule ameliorates the economic burden of DSH hospitals, "yet in reality it penalizes such hospitals"); *see also* McCabe Decl., Ex. H, Minnesota Hospital Association Record Comments at 2 ("Over half of Minnesota's Medicaid DSH funds go to children's hospitals and safety net hospitals.  If these payments were cut out of the system due to CMS'[s] revised inclusion methodology of commercially insured patients, it would destabilize our state's Medicaid reimbursement system.").

CMS undeniably failed to consider this very "important aspect of the problem"— how the Final Rule adversely impacts children's and safety net hospitals, which as shown above treat larger numbers of Medicaid patients, incur greater financial losses, and more heavily depend upon the DSH program to help offset those losses than do other general hospitals.  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

### 3.      The Final Rule Is Not A Clarification of Existing Policy

Defendant characterizes the rule as a so-called "clarifying" amendment, meaning that the

Final Rule "is only a clarification of existing policy" and "the policy has been articulated in the

2008 DSH final rule,[21] as well as implementing guidance." 82 Fed. Reg. 16,118/3, 16,119/1.  As

this Court has found, "a clarifying amendment, which does not change the law, can be applied

retroactively."  *Grant Med. Ctr. v. Burwell*, 204 F. Supp. 3d 68, 81 (D.D.C. 2016).

Here, however, two federal courts, including this Court, have dissected existing law (the

2008 Rule) and found that the policy of subtracting private insurance payments in the DSH HSL

calculation was not contained in the 2008 Rule.  *Ne. Hosp. Corp. v. Sebelius*, 657 F.3d 1, 14

(D.C.Cir.2011) (a rule is impermissibly retroactive if "it effects a substantive change from the

agency's prior regulation or practice.") (internal quotation marks and citation omitted).  As this

Court found in enjoining FAQ 33, the Government's proffered preamble statements "are not

representative"; the codified formula "d[oes] not contemplate the inclusion of private-insurance

payments for Medicaid eligible individuals"; and "to the extent that the [codified] definition is

---

[21]The Final Rule also identifies an August 16, 2002 letter as containing the offending policy.  82 Fed. Reg. at 16116.  But that letter is harmonious with the statute: only Medicaid payments are subtracted in the Medicaid shortfall component of the HSL, and separately only third party payments are subtracted in the uninsured component of the HSL.  Construing the letter, the term "Medicaid patients" corresponds to the term "Medicaid payments" and the term "uninsured patients" corresponds to the term "third party payments."  This reading must be correct because "net of Medicaid payments" cannot apply to the uninsured for the uninsured are without any insurance including Medicaid.   This reading follows the interpretive canon *reddendo singular singulis* (referring each to each), 2A Sutherland Statutory Construction §47:26 (7th ed.) ("The maxim *reddendo singular singulis*… is a method to limit the effect of expressions which would reach to far if construed literally").  *See, e.g.*, *Huidekoper's Lesee v. Douglas*, 7 U.S. 1, 67 (1805) ("[T]he plain and natural mode of construing the act, is to apply the provisions distributively to the description of persons to whom they are adapted, *reddendo singular singulis*.)  Like the statute, the 2002 letter does not connect third party payments to the Medicaid shortfall component but only to the uninsured.  Moreover, CMS's claim that the 2002 Letter demonstrates its longstanding position on the policy is negated by the DAB's 2008 decision which held that the 1994 Letter – not the 2002 letter - is "an official CMS interpretation of the relevant language in section 1923(g)(1)(A)."  *N.H. Dept. of Health and Human Services*, DAB NO. 2399 at 10.

contradicted by the Rule's Preamble, the definition controls." *Texas Children's Hosp.*, 76 F.

Supp. 3d at 237 (citing *Barrick Goldstrike Mines, Inc. v. Whitman*, 260 F. Supp. 2d 28, 36

(D.D.C. 2003) ("Because the preamble to the 1988 rulemaking is inconsistent with the plain

language of the regulation, it is invalid.")). Thus, this Court found that the source of the policy is

not the 2008 Rule and CMS "offer[s] no convincing interpretation of this regulation." *Id.*

 In *N.H. Hosp. Ass'n*, the Court was even more direct: "Defendants' argument is without

merit.  The text of the 2008 Rule and other sections in the preamble make clear that the "'Rule

cannot support defendants' policy . . . FAQ 33 [and FAQ 34 are] the sole authority for it."  2017

WL 822094, at *10 (alteration in original).  After analyzing both the text of the Rule and the

preamble, the court specifically found that "the text of the 2008 Rule plainly does not

include…private insurance payments in calculating the hospital-specific DSH limit."  *Id.* at *11

(citing 42 C.F.R. § 447.299(c)(16)).  The court further found that "[e]ach of these sections of the

Preamble [cited by the government] limits revenues and payments to be considered to those

enumerated in §1396r-4(g)(1)(A), which do not include payments from private health

insurance…" *Id.*  The court concluded the "authority for the relevant policies, is FAQ[] 33,"

which does "not carry the force of law" *Id.*

 The courts' findings are correct.  Consistent with the Medicaid Act, the 2008 Rule

expressly provides the methodology for calculating Medicaid shortfall component of the HSL:

> The total annual uncompensated care cost equals the total cost of care for
> furnishing inpatient hospital and outpatient hospital services to Medicaid eligible
> individuals . . . *less the sum of regular Medicaid FFS rate payments, Medicaid
> managed care organization payments, [and] supplemental/enhanced Medicaid
> payments*[.]

42 C.F.R. § 447.299(c)(16) (emphasis added).  More specifically, the CMS regulations direct

that the Medicaid shortfall component of the HSL is calculated by "subtracting the amount

identified in § 447.299(c)(9) [Total Medicaid IP/OP Payments] from the amount identified in

§ 447.299(c)(10) [Total Cost of Care for Medicaid IP/OP Services]." *Id.* § 447.299(c)(11).

Total Medicaid IP/OP Payments are further delineated as (1) "Medicaid fee-for-service (FFS) basic rate payments" ("FFS Payments") (§ 447.299(c)(6)); (2) "Medicaid managed care organization payments" ("MCO Payments") (§ 447.299(c)(7)); and "Supplemental/enhanced Medicaid IP/OP payments" ("Supplemental Payments") (§ 447.299(c)(8)).  The regulatory formula for calculating the Medicaid shortfall [22] can properly be expressed as:

| Total cost of care for Medicaid inpatient/outpatient services | − | Total Medicaid inpatient/outpatient payments (the sum of Medicaid FFS, MCO; and Supplemental payments) | = | Medicaid shortfall |

Accordingly, the Final Rule is "a substantive change from the agency's prior regulation or practice," and thus cannot have retroactive effect.  *Ne. Hosp. Corp.*, 657 F.3d at 14. Moreover, the Final Rule takes away and impairs Plaintiffs rights to DSH funds.  For these reasons, the Final Rule is arbitrary and capricious and violates the APA § 706 (2)(A).

## II.      **UNTIL A JUDGMENT ON THE MERITS IS REACHED, PLAINTIFFS FACE IRREPARABLE INJURY**

At the May 24 status conference, the government attempted to dismiss the harm to Plaintiffs from the Final Rule, arguing that because the Rule would not become operative until June 2, 2017, there would not be any recoupment of 2017 DSH funds until 2021.  *See* 5/24/17

---

[22]Shortly after the HSL provisions were enacted, CMS sent a letter to all state Medicaid directors informing them that it was providing guidance which "represents [CMS's] interpretation of the new DSH statute" (the "1994 Letter").  McCabe Decl., Ex. C, at 1.  Under the title "CALCULATION OF THE LIMIT", the 1994 Letter unambiguously provides:  "The [Medicaid] shortfall is the cost of services furnished to Medicaid patients, less the amount paid under the non-DSH payment method under the state plan," *i.e.*, Medicaid payments.  *Id.* at 3.  The 1994 Letter is mentioned five times in the Preamble to the 2008 Rule as support and does not once suggest the subtraction of private insurance in the Medicaid shortfall formula.  And, as noted in Footnote 21, *supra*, the DAB held in 2008 that the 1994 Letter is "an official CMS interpretation of the relevant language in section 1923(g)(1)(A)."  *N.H. Dept. of Health and Human Services*, DAB No. 2399 at 10.

Status Call Tr. at 7.  The government is wrong in two crucial respects.  First, the government

cannot argue that the Final Rule has no effect until after June 2, 2017 when the Final Rule

expressly states that it is a "clarifying rule" that codifies a policy that the government contents

has been in place since 2008.  Thus, until the Court rules on whether the Final Rule is or is not a

"clarifying rule" the policy embodied in the Rule will be applied to the ongoing audits of the

2014 DSH funds, which as discussed below, irreparably harms Plaintiffs.[23]  Second, the

government refuses to acknowledge that the Final Rule and its policy of including third-party

payments in the calculation of the Medicaid shortfall component of the HSL is applied by the

states to determine the amount of DSH funds Plaintiffs receive on a going forward basis

including current DSH years.  As shown below, the Final Rule substantially reduces the amount

of DSH funds Plaintiffs receive now for the current DSH year, and in some cases, denies

Plaintiffs DSH funds altogether.

### A.      The Final Rule Will Cause the Recoupment of $75 Million

The application of the Final Rule to the 2014 audits will cause the certain recoupment of

at least $75 million dollars that Plaintiffs collectively received with no recourse to recover these

DSH funds.[24]  For example, in Minnesota "once the funds are recouped, the Minnesota state plan

directs MDHS to redistribute them to other qualifying hospitals in the state and there is no

administrative legal way "to get the funds back."  Haddican Decl. ¶ 19.  In Texas, once DSH

---

[23]At the May 24 status conference, counsel for Defendants all but admitted that if the Final Rule is a clarifying rule, it would have retroactive effect.  5/24/17 Status Call Tr. at 15 ("It's Defendants' position that the final rule simply clarifies what our position has always been…as set forth in FAQ 33 but . . . if Your Honor were to reject that contention, we conceded that the final – the text of the final rule does not have retroactive effect.").

[24]CHAT member plaintiffs collectively will be forced to repay $47 million, Wilson Decl. ¶ 10; $16 million will be recouped from Children's Minnesota, Ostendorf Decl. ¶ 18; Gillette will lose $3.9 million, Haddican Decl. ¶ 20; and CHKD will lose $8 million, Ryan Decl.¶ 7.

funds are recouped they are also redistributed to other hospitals and there is no legal avenue for the Texas Plaintiffs to recover the recouped monies.  Kimmel Decl. ¶ 8.

Economic injury for which Plaintiffs have no right of recourse constitutes irreparable harm.  *See Smoking Everywhere, Inc. v. FDA*, 680 F. Supp. 2d 62, 77 n.19 (D.D.C. 2010) (holding that economic injury caused by APA violation by the FDA is irreparable "because plaintiffs cannot recover money *damages* against FDA."); *Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20, 29 (D.D.C. 1997) ("While the injury to plaintiffs is admittedly economic, there is no adequate compensatory or other corrective relief that can be provided at a later date, tipping the balance in favor of injunctive relief.") (internal quotation marks omitted); *Hoffman-Laroche, Inc. v. Califano*, 453 F. Supp. 900, 903 (D.D.C. 1978) ("[S]ince no adequate compensatory or other corrective relief will be available at a later date, it is not one of the mere economic injuries [that are] insufficient to warrant a [n injunction].") (internal quotation marks omitted).  This Court has found that the inability to recover monetary damages from a federal agency "is more than sufficient, especially when considered together with the other factors, to justify a [preliminary] injunction."  *Brendsel v. Office of Fed. Hous. Enter. Oversight*, 339 F. Supp. 2d 52, 67 (D.D.C. 2004) (citing *Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Social & Rehab. Servs.*, 31 F.3d 1536, 1543 (10th Cir. 1994) ("Because the Eleventh Amendment bars a legal remedy in damages, . . . no adequate state administrative remedy existed . . . [and] plaintiffs' injury was irreparable.").

Critically, Plaintiffs' harm is great because the loss of these funds severely damages Plaintiffs' ability to deliver critical programs and services to the communities they serve.  As the Court found in the *Texas Children's Hospital* case, "[p]laintiffs  . . . are not for-profit entities facing the loss of profit; rather, they are non-profits for whom lost funds would mean reducing

hospital services to children." 76 F.Supp.3d at 243.  As attested to by Plaintiff Gillette's Chief

Financial Officer, losing 2014 DSH funds "will have a major impact on the hospital." Haddican

Decl. ¶ 24.  It would harm "important services funded exclusively by Gillette because Gillette

will need to reallocate revenues from other sources to subsidize actual losses it incurs in treating

Medicaid patients." *Id.* ¶ 25.  For example, Gillette funds outreach clinics to rural areas and a

critical access dental program, as well as provides social work and child & family support

programs, including interpreter services and a 24/7 telehealth service the costs of which together

exceed the DSH funds subject to recoupment.  *Id*.  These programs exceed revenues by millions

of dollars.  *Id*.  Thus, "it would be difficult to continue these services without DSH funding." *Id.*

For Children's Minnesota, the Final Rule will force the recoupment of $16 million in

2014 DSH funds as soon as the ongoing audit is complete.  A loss of $16 million will have a

devastating impact on 2017 operations and planning.  Ostendorf Decl. ¶¶ 20-21.  Capital

expenditures for 2017 are planned to be just under $54.0 million, with the majority of the

planned expenditures necessary just to sustain existing operations (*e.g*., care delivery equipment,

imaging equipment, technology, facility improvements, etc.).  *Id.* ¶ 21. If the Final Rule is not

enjoined, "the hospital's planned 2017 capital expenditures must be re-evaluated and potentially

delayed or stopped altogether." *Id.*  These include construction projects needed to meet the

growing demand for services, *e.g*., MRI facilities, outpatient clinics, operating rooms, as well as

replacing aged equipment and investing in new technologies.  *Id.*  In addition to impacting

capital expenditures made by the hospital, losing $16 million will have a major impact on the

day-to-day operations of the hospital.  *Id.* ¶ 22.$16 million would pay the full actual cost of  the

annual salaries and benefits for 120 full-time registered nurses (10.1% of Children's Minnesota

total RN staff); hospital care for 68 low-weight newborns (babies born weighting less than 1249

grams / 2.75 pounds); hospital care for 1,522 children requiring a hospital inpatient stay due to Bronchiolitis, one of the most common reasons for pediatric inpatient admissions; 193 bone marrow biopsies that are done to diagnose leukemia, some types of anemia and other blood disorders; 300 surgical procedures to expel excess cerebral spinal fluid from the brain for kids diagnosed with hydrocephalus; and 155 surgical procedures to repair atrioventricular canal defects. *Id.*

Cook Children's also faces great and actual harm because the Final Rule would require recoupment in connection with the ongoing 2014 audit of $17.1 million of DSH funding the hospital already received. Kimmel Decl. ¶¶ 9-10. Recoupment of $17.1 million of 2014 DSH payments will restrict Cook Children's ability to make substantial investments in programs such as Texas' Medicaid Star Kids managed care, neighborhood clinics, asthma programs, mental health/behavioral health initiatives and other community efforts established to better care for complex patients. The hospital will be forced to erode the continued investment in such under-reimbursed programs and services, from which Medicaid patients have always benefited. The impact of losing DSH funding of $17.1 million already paid to the hospital is the equivalent of 115 kidney transplants; or 775 inpatient behavioral health interventions; or 17,652 emergency room visits; or 97,844 urgent care visits. In short, the loss of DSH funding has significant programmatic implications. *Id.* ¶ 10.

The Final Rule also creates immediate and substantial financial uncertainty for Plaintiffs during the period of this lawsuit. For example, Generally Accepted Accounting Principles would hold that DSH funds subject to recoupment cannot be accrued as income or spent, and would be held as liabilities to be repaid. Haddican Decl. ¶ 26. This would severely curtail future capital expenditures impacting Gillette's ability to maintain a safe environment of care, assure medical

technologies are up-to-date and safe, and assure appropriate instruments and diagnostic

equipment for diagnoses  and treatment of complex conditions in the most effective and safe

manner.  *Id.*  For Children's Minnesota, "[s]tripping $16 million from the balance sheet would

"significantly impair" the hospital's liquidity position and "severely limit the organization's

ability to make capital investments and support existing clinical programs."  Ostendorf Decl.

¶ 21.

### B.     The Final Rule Denies Plaintiffs Current Year DSH Funds and in Some Cases, Shuts Plaintiffs Out of the DSH Program Altogether

The fact that the Final Rule will shut some Plaintiffs out of the DSH program creates

immediate further financial uncertainty for Plaintiffs.  For example, the Final Rule will deny

Seattle Children's approximately $6 million in DSH funds for the 2018 DSH program year

which runs from July 1, 2017 to June 30, 2018 and will disqualify the hospital from ever

receiving DSH funds in the future.[25]  Kinzig Decl. ¶ 8.  It will be shut out of the program despite

the fact that:  (1) its Medicaid-eligible patient population is 67.5 percent, *id.* ¶ 3; (2) it sustains

significant losses in treating Medicaid patients, *id.* ¶ 4; and (3) it does not bill Medicaid for any

costs for which it receives payment from private insurers.  Similarly, Texas Children's will not

receive approximately $35.6 million in 2018 it would otherwise be entitled to receive.  Simon

---

[25]Seattle Children's is a plaintiff in the *Texas Children's Hospital* case.  The application of the
policy of including third-party payments in the HSL calculation, embodied in FAQ 33, shut the
hospital out of DSH funding for 2012, 2013, and 2014 and would cause $7 million in DSH
funding received in 2011 to be recouped.  After this Court entered its injunction, the state did not
recoup the $7 million and Seattle Children's qualified to receive DSH funding in 2015, 2016,
and 2017.  However, because the preliminary injunction is not a final judgment, the state has
held the money in reserve pending outcome of the litigation.  Thus, should plaintiffs prevail in
the *Texas Children's Hospital* case, Seattle Children's will be made whole.  However, any relief
granted in the *Texas Children's Hospital* case would not be complete because the Final Rule
shuts Seattle Children's out of the DSH program for 2018 and beyond.  In addition, even if
plaintiffs prevail in the *Texas Children's Hospital* case, the Final Rule will apply to the audits of
2015, 2016, and 2017, which will result in the recoupment of all DSH dollars Seattle Children's
received for those years.

Decl. ¶ 7.  And, even if some Plaintiffs do receive 2018 DSH funds, they cannot rely upon the funds knowing that they will eventually be recouped.  Haddican ¶ 26.  This type of financial uncertainty constitutes irreparable harm.  *See Schalk v. Teledyne, Inc.*, 751 F. Supp.1261, 1268 (W.D. Mich. 1990) ("irreparable harm in the financial planning burden placed on plaintiffs" was caused  by "the uncertainty posed by the lack of knowing just how much money will be needed to cover" expenses) (granting preliminary injunction in ERISA context); *see also Tafas v. Dudas*, 511 F.Supp. 2d 652 (E.D.Va. 2007) (finding irreparable harm where uncertainty caused by challenged regulations will cause harm to investments) (citing *Synagro–Wwt, Inc. v. Louisa Cty.*, 2001 WL 868638 (W.D. Va. July 17, 2001)).

The harm is not only great and actual; it is imminent and certain to occur.  The Final Rule became effective June 2, 2017 and Plaintiffs will now be shut out from receiving any DSH funds even though they are all "deemed" DSH hospitals entitled to receive supplemental DSH payment adjustments.  Further, the 2014 audits are currently ongoing and must be complete no later than September 30 and submitted to CMS no later than December 31.  42 C.F.R. § 455.304(b); Kimmel Decl.¶ 9; Ostendorf Decl. ¶ 18; Ryan Decl. ¶ 8; Simon Decl. ¶ 6.  Although the states must recoup within one year of discovery of "overpayments" (42 C.F.R. § 433.312(a)), the states could move to recoup those funds immediately after submission between October 1 and December 31, 2017 or earlier if a state completes the audit before September 30 and submits it to CMS.  This Court has held the harm is imminent when the DSH audit is submitted to CMS because the states could recoup those funds "immediately and irrevocably" thereafter.  *Texas Children's Hosp.*, 76 F. Supp. 3d at 243.  Once taken, Plaintiffs will have no recourse to recover these DSH funds even if Plaintiffs fully prevail on the merits of their suit. Thus, Plaintiffs will likely suffer irreparable harm.

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs

motion vacate the Final Rule.

Dated:  June 5, 2017                          Respectfully submitted,

                                             */s/* Geraldine E. Edens
                                             Geraldine E. Edens
                                             D.C. Bar No. 437056
                                             Christopher H. Marraro
                                             D.C. Bar No. 395152

                                             **Baker & Hostetler LLP**
                                             Washington Square, Suite 1100
                                             1050 Connecticut Avenue, NW
                                             Washington, DC  20036-5304
                                             Telephone:   (202) 861-1500
                                             Facsimile:    (202) 861-1783
                                             gedens@bakerlaw.com
                                             cmarraro@bakerlaw.com

                                             Susan Feigin Harris (admitted *pro hac vice*)
                                             Texas Bar No.06876980

                                             **Baker & Hostetler LLP**
                                             811 Main St. Suite 1100
                                             Houston, Texas 77002
                                             Telephone: 713-646-1307
                                             Facsimile: 713-751-1717
                                             sharris@bakerlaw.com

                                             *Attorneys for Plaintiffs Children's Hospital
                                             Association of Texas, Children's Health Care
                                             d/b/a Children's Hospitals and Clinics of
                                             Minnesota, Gillette Children's Specialty
                                             Healthcare, Children's Hospital of the King's
                                             Daughters, Incorporated, and Seattle Children's
                                             Hospital*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 5th day of June, 2017, a true and exact copy of Plaintiffs' Combined Memorandum of Law in Support of Application for a Preliminary Injunction and For Summary Judgment, and the supporting papers filed contemporaneously therewith, were served via operation of the ECF system on all counsel of record.


*/s/* Geraldine E. Edens
Geraldine E. Edens