# KIMMEL DECLARATION EXHIBIT A

## CASE NO.: 1:17-CV-00844-EGS



Comments to Medicaid DSH payments- Treatment of Third Party Payers in Calculating
Uncompensated Care Costs

Published August 15, 2016; Comments Due Sept. 14, 2016

**Via Overnight or Express Mail:**                    **Electronically:**

Centers for Medicare and Medicaid Services          http://www.regulations.gov
Dept. of Health and Human Services
Attention: CMS-2399-P
Mail Stop C4-26-05
7500 Security Boulevard
Baltimore, MD 21244-1850

September 13, 2016

Andrew M. Slavitt
Acting Administrator
Centers for Medicare & Medicaid Services
Hubert H. Humphrey Building
200 Independence Avenue, S.W., Room 445-G
Washington, DC 20201

**Re: CMS-2399-P; Medicaid Program; Disproportionate Share Hospital Payments-
Treatment of Third Party Payers in Calculating Uncompensated Care Costs; Proposed
Rule (Vol. 81, No.157) August 15, 2016.**

Dear Acting Director Slavitt:

On behalf of Cook Children's Medical Center ("Cook Children's"), we appreciate the
opportunity to submit these comments on the above- notice of proposed rulemaking ("Proposed
Rule"), published in the Federal Register on August 15, 2016.

**Introduction.**

Cook Children's is a non-profit freestanding children's hospital located in Fort Worth, Texas and
serves as a significant pediatric provider in the North Texas, Dallas/Ft. Worth area, attracts
pediatric patients in need of specialized pediatric services from all over the state, the region and
the nation. Additionally, Cook Children's partners with the state's Medicaid program in its
Medicaid managed care program through our provider-sponsored health plan and care
coordination programs serving the Medicaid and Children's Health Insurance Program (CHIP)

programs and, in particular, children with special health care needs. As such, we serve as a significant provider of pediatric services to the state's Medicaid population.

As a significant provider to children in the Medicaid program, Cook Children's Medical Center has long relied upon the Medicaid program as an important partner in caring for the large percentage of Medicaid program patients treated at our facility. Cook Children's Medical Center treats many patients who rely entirely on Medicaid to cover their health care.

Medicaid eligibility extends not only to children from low-income families, but also to children, regardless of their families' income, with certain serious medical conditions, including all babies born weighing less than 1200 grams, and children with severe anomalies, heart ailments, cancer and other serious illnesses. Thus, this patient population is treated primarily at the children's hospitals in this nation. The Medicaid program provides important benefits to children and their families that may not be covered by private insurance and that include services that occur wholly outside the hospital inpatient or outpatient construct. That is, the Medicaid program may cover the cost of transportation and lodging for families of children requiring extended hospitalization far from home, or the cost of special equipment and support services after the child leaves the hospital. In fact, it has been the practice, in our hospital and many others around the country, to help families identify such benefits and to help families enroll in the Medicaid program, even when the hospital itself, or any of its extended or affiliated medical entities would not expect to ever seek or receive Medicaid reimbursement for the care of the child. This is simply part of our overall mission as a non-profit, charitable institution.

Many of our patients suffer from conditions or illnesses Medicaid covers specifically in children and, therefore, we treat large numbers of children who are eligible to enroll in Medicaid because of family indigency, medical condition, or both, but also children who may be fully covered by private insurance, but whose medical illness qualifies them for Medicaid coverage, should they need it. These patients have not sought Medicaid coverage for hospital services and none would have been provided due to the Medicaid secondary payor rules.

In the application of the Proposed Rule, the Centers for Medicare and Medicaid Services ("CMS") now wishes to use private party contracts to reduce or negate entirely its Medicaid disproportionate share hospital ("DSH") supplemental payment obligations to the children's hospitals. In its Proposed Rule, CMS seems to imply that hospitals, such as Cook Children's, do not bear a "real economic burden". In essence, the practical effect of CMS' position is to cost shift Medicaid program expenses to children's hospitals in situations where Medicaid makes no payment to the hospital for inpatient or outpatient services rendered to patients who are, for all practical purposes "commercial patients", just because they are deemed "Medicaid eligible" due to the severity of their illness, rather than because the program actually paid any money to the hospital.

With inpatient admissions, outpatient visits, and hospital physician clinic visits, Cook Children's has approximately 147,000 Medicaid-eligible patient encounters a year. The majority of Medicaid-eligible patients that Cook Children's Medical Center treats are from low-income families, but some are from families of means who have privately purchased commercial insurance coverage or health benefit program coverage. Approximately 58% of the "patient days" of hospitalization at Cook Children's Medical Center are for Medicaid-eligible patients.

Over 96% of Medicaid days are for children whose claims are submitted to the Medicaid program for payment, either in whole or in part. The remaining 4% of these patient days are for Medicaid-eligible patients with private insurance for whom Hospital receives absolutely no payment from the Medicaid program.

**The Critical Role of Medicaid DSH Funding**.

Medicaid DSH payments are a critical component of Cook Children's overall financing mechanism, allowing the hospital to sustain the significant losses associated with caring for a disproportionate share of Medicaid program patients, while also allowing us to invest in the community and ensure that we can provide the other services we provide to Medicaid program patients, such as the care coordination services and the health plan services component of our overall system of care.

Cook Children's is reimbursed by Medicaid for approximately 84% of its Medicaid –allowable costs for providing Medicaid-covered services to Medicaid patients. This is approximately 76% of our annual incurred costs of serving Medicaid patients. Even with the help of supplemental Medicaid DSH funding, our losses were somewhat mitigated, but not extinguished. This Proposed Rule threatens further our overall financial wherewithal.

As noted above, only 4% of Medicaid days are attributable to Medicaid eligible patients who are covered by private insurance. This equates to 3500 children. Even if the costs attributable to the 3,500 children who are Medicaid-eligible but covered by private insurance are factored out, the hospital still incurred a loss of over $26.6 million in fiscal year 2012. This is the difference between the hospital's total cost of treating 61,800 Medicaid and uninsured patients, which was $271.6 million, and the total payments the hospital received for those patients from Medicaid or uninsured patients, which was over $245.0 million. With the application of FAQ #33, the real loss sustained is eliminated by the inclusion of the enhanced private payments associated with those 3500 children to totally eliminate any remaining shortfall.

As the above impact demonstrates, Cook Children's will be significantly adversely impacted by the enforcement and application of FAQ #33.

Cook Children's has potential liability of $13,205,893 in recoupments for cost reporting year 2012,; $16,174,507 in 2013; $16,310,251 in 2014; $15,205,186 in 2015 and $13,672,712 in 2016, should the application of FAQ #33 be implemented as described. This type of dramatic reduction in DSH payments will obviously make it more difficult to make substantial investments in our community for complex patients if dollars associated with the potential recoupment cannot be used for investment purposes in programs such as Texas' Medicaid Star Kids managed care, neighborhood clinics, asthma programs, mental health/behavioral health initiatives, and the like. If CMS's new calculation moves forward through the implementation of this Proposed Rule, the hospital will be forced to erode the continued investment in such under-reimbursed programs and services, from which Medicaid patients have always benefited.

To assert that the DSH payment formula, as set forth in the statute and regulation, without the application of FAQ#33, does not reflect the "real economic burden" of hospitals that treat a disproportionate share of low-income patients is insulting. This statement, which appears

throughout the Proposed Rule, does not reflect the reality that hospitals, like Cook Children's, serve as regional care providers, which draw much larger numbers of Medicaid program patients and whose beds care for unique patients. Cook Children's is a Center of Excellence and we have invested in the facilities, technology and physicians to ensure we can serve our region and the nation as a Center of Excellence in pediatric care. This, in fact, is core to our mission.

The State of Texas, pursuant to CMS' pressure,  has been illegally implementing the policy set forth in FAQ #33 for some time now and the negative impact of FAQ #33's application, set forth in the Proposed Rule on Cook Children's can be demonstrated through our 2012 DSH data year. For DSH year 2012, Cook Children's received approximately $20,206,591 in DSH funds based on the calculation of its hospital specific limit ("HSL"). In its 2015 audit of DSH year 2012, the state performed the HSL calculation using final 2012 data and the methodology in FAQ #33 to partially offset the hospital's Medicaid allowable costs with Medicaid payments AND payments from private third party insurers, a reduction in excess of $13,000,000.

CMS' proposed methodology does not take into account the differing cost structures for commercial patients versus Medicaid patients.  It makes no sense to apply Medicaid cost-to-charge percentages to commercial payments with fully loaded costs.  CMS would in effect be double-dipping to some extent. This is particularly upsetting because that allegation has been made by CMS in its contention to the children's hospitals.  There is absolutely no double payment occurring and can't be, if the hospital never receives a dime for a patient day covered by private payor. There is no claim submitted and no payment made.

Notwithstanding Medicaid's enrollment eligibility rules, Medicaid serves only as the "payor of last resort". Under the Medicaid secondary payor rules, Medicaid is not billed and does not pay for any healthcare services, equipment, or products that are covered by a patient's own health insurance policy, employer health benefit plan, another governmental program, or any other liable third-party payer.

The same cannot be said of CMS with regard to the application of private payments to the Medicaid shortfall formula. The cost reporting process simply doesn't take into account many treatments, payments, services and costs that are allowed in the commercial world. The Proposed Rule converts the private commercial contract payments to Medicaid dollars, supplementing the Medicaid program with the enhanced payments associated with treatments, payments, services and costs of the commercial world that are not Medicaid covered or allowable. If CMS can classify commercial payments as "Medicaid in nature," can or should CMS also classify charitable donations, tax receipts, waiver payments – anything in the nature of "revenue" – in the same fashion – thus treating many public or governmental institutions in the same manner as it proposes to treat children's hospitals?  The criterion is Medicaid patients – not the type of facility.

CMS indicates in its Proposed Rule that, prior to the 2008 final rule, the calculation of the HSL led to the "artificial inflation of uncompensated care costs and, correspondingly, of hospital-specific DSH limits and permitted some hospitals to be paid based on the same costs by two payers-once by Medicare or other third party payer and once by Medicaid." This statement is patently wrong in the context of a children's hospital. The hospital is not paid by Medicaid for any costs associated with a patient who is also covered by a third party payer. The hospital does

not bill nor collect any payments from the Medicaid program associated with a child who is fully covered by private insurance. The fact is that only a very few number of children even qualify in this category, to begin with.  Therefore, the concept of double payment proffered by CMS is a fiction.

The Proposed Rule utilizes a completely fabricated hypothetical formula to illustrate its point. This hypothetical (81 Fed. Reg. 53983-74) incorrectly assumes that all hospitals are equal and that hospitals without Medicaid-eligible, privately insured patients are unfairly ndercompensated by DSH, while hospitals with Medicaid-eligible, privately insured patients are overcompensated. As these comments illustrate, CMS's assumption is wrong. Children's hospitals are regional and national providers of care that house experts drawn to the institution because of the intellectual, academic, research and other resources made available to ensure that they can provide life-saving treatment to the very patients that are the cause of this issue: children who are uniquely sick and who have very serious illnesses. It is precisely because all hospitals are NOT equal that the DSH program Medicaid shortfall component was created, *e.g.* to recognize those hospitals that run towards the most difficult problems for children and that run toward Medicaid program patients.

The DSH Medicaid shortfall component of the DSH Hospital Specific Limit (HSL) formula was designed specifically for institutions like ours, where Medicaid never fully compensates the hospital for providing care.  Further, in a state like Texas, with a large number of poverty stricken families and a poorly funded Medicaid program, financial challenges are even more significant.

**The Proposed Rule Violated Two Preliminary Injunctions.**

The issuance of the Proposed Rule by CMS is surprising, to say the least, given our understanding of the law, the current lawsuits and preliminary injunctions issued especially in Texas, and the intent of the DSH program itself, which recognizes the fact that children's hospitals play a unique role in caring for our nation's most vulnerable patients, many of whom only have insurance coverage through the Medicaid program.

Two different federal district courts have preliminarily enjoined CMS from "enforcing, applying, or implementing" the policy contained in FAQ 33. *Texas Children's Hospital et al v. Burwell et al.*, 76 F. Supp. 3d 224 (D.D.C 2014) ("*Texas Children's*") and *New Hampshire Hospital Association et al v. Burwell, et al.*, (D.N.H. 2016). There is no question that if promulgated, CMS would be "implementing" the policy contained in FAQ 33 which is clearly enjoined by both courts. Moreover, the case in *Texas Children's* has been fully briefed, argued and submitted to the court for a decision since July 13, 2016. The *New Hampshire Hospital* case is scheduled for a hearing on the motions for summary judgment on September 13, 2016. In the likely event that either court strikes down the policy contained in FAQ 33 and this rulemaking were to continue forward, CMS would be creating immense uncertainty within the provider community (more than it already admittedly has) as to future compliance with the DSH program audits. CMS should await the courts' decisions before proceeding any further with this rulemaking. Cook Children's Medical Center has attached, as part of our comments, the legal briefs submitted by Plaintiffs in *Texas Children's* in support of their motion for summary judgment. These legal briefs set forth an explanation of our position, as well, on the statutory authority issue upon which CMS has solicited public comment.

Cook Children's has been closely following the legal case and briefs submitted by Plaintiff's in *Texas Children's Hospital et. al. v. Burwell, et. al.*, and is in support of their motion for summary judgment. These legal briefs set forth an explanation of our position, as well, on the statutory authority issue upon which CMS has solicited public comment.

First, we note that in the Proposed Rule, CMS principally has attempted to justify its position that third party payments must be netted against costs, based upon Section 1923 (j) (2)[1] of the Medicaid Act which provides that "Only the uncompensated care costs of providing inpatient hospital and outpatient hospital services to individuals … are included in the calculation of the hospital specific limits under such subsection." 81 Fed. Reg. 53982/1-2.  In justifying its reliance on Section 1923 (j)(2) for support of its position in the Proposed Rule, CMS provides: " Congress explicitly addressed any ambiguity about whether the hospital specific limit could include costs that have been compensated by payers other than individuals or the Medicaid program" and concludes that this provision of the Medicaid Act requires the netting out of third party payments from costs to arrive at "uncompensated care costs". *Id.*

CMS's stance is not only disingenuous, but is completely inconsistent with the legislative intent of the statute and Congressional intent. In its 2003 Conference Report, Congress restated existing law, making clear that the hospital specific limit set forth in § 1396r-4(g)(1) is, by definition, the calculation of "unreimbursed costs:"

> DSH payments to each inpatient general hospital are limited to some percentage of the costs of providing inpatient and outpatient services to Medicaid and uninsured patients at that hospital, less payments received from or on behalf of Medicaid and uninsured patients. *These costs are considered to be unreimbursed costs.*

(H.R. Rep. No. 108-391, at 807-808 (Nov. 21, 2003) (citing "Present Law".)  Thus, the phrase "uncompensated care costs" [2] in § 1396-r4(j)(2)(C) describes the whole DSH payment equation (costs minus payments), not only the cost side of the equation, as CMS now seems to offer. Rather than giving support to the government's interpretation, Section 1923 (j) is contrary to the government's position of netting out of third party payments against costs.

The plain language of the statute and the context in which it appears in the Medicaid Act also fails to support CMS's proposed policy. The plain language of Section 1396r-4 (g)(1) unambiguously differentiates costs from payments and nowhere does it reference private insurance payments.  The distinction between costs and payments is reinforced by the legislative history, where Congress explained that DSH payments cannot exceed "the costs of providing inpatient and outpatient services to Medicaid patients and uninsured patients, less payments received from Medicaid . . . and uninsured patients."  H.R. Rep. No. 103-213, at 835 (Aug. 4, 1993) (Budget Conference Report).

---

[1] 42 U.S.C. § 1396-r4(j)(2)(C)

[2] CMS cannot justify its proposed policy on the (g) (1) statutory heading "Uncompensated Costs". This seems to be a very weak link to justify a clearly contrary position to longstanding policy and Congressional intent. Here, the caption is mere shorthand for the HSL formula prescribed in (g) (1) which is costs minus payments.

801 Seventh Avenue
Fort Worth, TX  76104-2796
682-885-4000
www.cookchildrens.org

CMS's proposal that costs incurred somehow means <u>uncompensated</u> costs defies the plain meaning of the word "incur"—"[t]o become liable or subject to, esp[ecially] because of one's own actions" (WEBSTER'S II NEW RIVERSIDE UNIV. DICTIONARY 562 (1999). Cost report accounting principles do not support this convenient CMS interpretation. The 2008 Final DSH audit rule also fails to support this proposal. The DHS Audit rule says (73 Fed. Reg. 77,904, 77,906):"the calculation of hospital costs is subject to longstanding cost principles contained in [OMB] Circulars, including Circular A-110, and, to the extent not addressed in those Circulars, in Generally Accepted Accounting Principles.[3]  The various briefs make very cogent arguments relating to the tortured interpretation of Medicare and Medicaid cost reporting principles engaged in by CMS in order to support this Proposed Rule.

To somehow convert payments to costs strains common understanding, much less longstanding cost reporting rules.

Moreover, the statute itself tells the story: Section 1396r-4 (g)(1), when juxtaposed to Section 1396r-4 (g)(2), confirms that CMS's reading of the statute to allow the Secretary discretion to net out third party payments from the cost side of the hospital specific limit calculation  is wrong. In § (g)(2), Congress set forth a formula for determining additional DSH payments to public hospitals during a statutory transition period.  The formula first takes "the costs of furnishing hospital services described in [(g)(1)]" and then subtracts from those costs certain payments, including payments "from third party payors."  If Congress meant to provide the Secretary the discretion to subtract third party payments from costs under (g)(1), Congress would have had no need to expressly subtract payments from third party payers under (g)(2).  Here, the language of Section (g) (2) reinforces the point that the applicable HSL statute, Section 1396r-4(g) (1) does not allow what CMS proposes here.  For these reasons and those set forth in the appended briefs, we contend that the CMS's proposed policy is contrary to statutory authority and illegal.

As a freestanding children's hospital, Cook Children's Medical Center receives no other supplemental aide from governmental programs to sustain its operations, unlike our counterparts on the adult acute side, who also receive supplemental payments for the uninsured (who are mostly adults in this nation today) under both Medicaid and the Medicare DSH program. The federal DSH statute requires that DSH payments be made "to disproportionate share hospitals, including **children's hospitals**, on the basis of the proportion of low-income and Medicaid patients… served by such hospitals." 42 U.S.C. §1396r-4(a)(1)(D). Children's hospitals were specifically called out in the statute, because of the unique role they play and Congress' expectation is that children's hospitals would be specially recognized in this role. The "economic burden" experienced by a children's hospital is exacerbated due to the fact that it does not benefit from the better reimbursement of a Medicare program, nor the better patient mix, nor the Medicare DSH program- all of which benefit hospitals that are not children's hospitals.

---

[3] The concept of "cost incurred" is an accrual accounting concept, where an entity records a cost for which it has become liable.  *See generally* Statement of Financial Accounting Concepts No. 6.  Thus, Circular A-110 defines "accrued expenditures" as "the charges incurred by the recipient during a given period" without reference to any reimbursement payments, which naturally would be recorded on the revenue side of the ledger.  *See* Circular A-110, Appendix A, *available at* https://www.whitehouse.gov/omb/circulars_a110.

801 Seventh Avenue
Fort Worth, TX  76104-2796
682-885-4000
www.cookchildrens.org

Freestanding children's hospitals, such as Cook Children's Medical Center, while comprising only 1% of all hospitals, treat 40% of Medicaid patients. As such, Cook Children's Medical Center is more reliant on Medicaid reimbursement than other such hospitals.

Approximately 57% of Cook Children's Medical Center patient mix is traditional Medicaid/Medicaid managed care/CHIP with the remaining being commercial or uninsured patients. There is no other governmental or other program, other than sheer philanthropy, that can help support the provision of tertiary and quaternary care to all children, including the large proportion of Medicaid program patients we treat. The economic burden argument set forth by CMS in the Proposed Rule ignores the dedication that children's hospitals have toward the Medicaid program and runs counter to the legislative intent of the DSH program.

CMS has ignored Congressional intent, openly stated in the law, and moved to implement a policy that makes dramatic changes to the DSH funding scheme based apparently on general assumptions of the financial "wellness" of children's hospitals and without following legally required rule making procedures.

This Proposed Rule does not fix the inherent violation by CMS of the law or Congressional intent, and its devastating impact on children's hospitals, such as Cook Children's, will adversely impact children and the hospitals and physicians who treat them, by taking for granted the resources that have long sustained the Medicaid program for children in this country.

In its notice of proposed rulemaking, CMS invites comments to the Secretary's statutory authority to require that third party payments be netted out against Medicaid eligible costs in deriving the hospital specific limit of the DSH Medicaid shortfall calculation of Section 1396r-4 (g)(1). 81 Fed. Reg at 53984/2. We firmly assert that the Secretary does not have any statutory authority to move forward in the fashion contemplated under the Proposed Rule, nor previously in the actions of the agency. The agency has exceeded its statutory authority, plain and simple and its actions, in this regard, are illegal. As the court in *New Hampshire Hospital Association* ruled, the agency's interpretation – that private insurance payments should be netted out against Medicaid eligible costs – "represent[s] an unreasonable agency interpretation of the Medicaid Act, which is not entitled to deference under <u>Chevron</u>     [ <u>U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>]."

**The Proposed Rule is a Substantive Amendment to the Regulation and is not a Mere Clarification; it cannot be applied retroactively.**

CMS does not have the authority by statute to apply the Proposed Rule, but even if it did, the policy outlined is a substantive one and cannot be applied retroactively. We strongly disagree with any CMS contention that the Proposed Rule is a "mere clarification" and any intent to apply the policy retroactively.

The 2002 Letter demonstrates that CMS's reference to third party payments applies only to the uninsured component of the HSL calculation and not to the Medicaid shortfall element. That this letter has never before been used by CMS as support for its proposed policy is evident in that at no place in the December 19, 2008 final DSH rule (73 Fed. Reg. 77904) was this 2002 Letter ever referenced as support for the Medicaid shortfall calculation. To the contrary, the agency's

own 1994 guidance document that was published with the DSH statutory amendments and which offers CMS's only interpretation of "costs incurred" under the statute makes clear that "cost incurred" means the costs of furnishing hospital services without regard to offsetting third party payments. Indeed, CMS's 1994 guidance was its contemporaneous "interpretation of key provisions of the law". Nowhere are third party payments mentioned, except as to the uninsured component of the HSL. CMS cited the 1994 guidance five times in the 2008 final rule as authority for its position that the Medicaid HSL formula was limited to costs minus payments, but did not cite the 2002 Letter which it now seeks to use to support its actions.

In this instance, two federal district courts have already determined, in their preliminary injunctions, that the authorizing legislation is inconsistent with the language of its regulation and have enjoined CMS from implementing the offending FAQ, determining it is a substantive rule change. CMS, through this Proposed Rule, is attempting to circumvent the court by attempting to apply the Proposed Rule to a period where reimbursement was governed under a valid regulation that did NOT include this new position. Consequently, the Proposed Rule cannot be applied retroactively.

**Conclusion.**

Cook Children's requests that CMS withdraw its Proposed Rule. In the alternative, we request that CMS follow the court's determination and ensure that the Proposed Rule, if applied, apply only prospectively. We believe that CMS is prohibited from applying this Proposed Rule retrospectively, as it constitutes a substantive rulemaking.

Cook Children's Medical Center has devoted itself to the care of all children regardless of their ability to pay. The costs of amassing the array of medical care that enable Cook Children's Medical Center provide those services to Medicaid program patients far exceed the DSH HSL Cook Children's Medical Center was receiving prior to the implementation of this newfound policy articulated in FAQ #33. Cook Children's Medical Center will be hindered in its ability to invest in new therapies or treatments for children and carry out its mission to serve the children in its community. To characterize our facilities as not equally economically burdened by CMS as other facilities is inaccurate and takes for granted the historical quality of care and services that we have been able to amass for the benefit of all children. Implementation of the Proposed Rule would greatly harm our institution and the ability to continue to provide services to Medicaid program children in this nation.

It is our hope that CMS reconsiders its position and this policy. There are other options that would enable CMS to move forward without compromising the financial underpinnings of children's hospitals that rely on the DSH HSL. We remain committed to working with CMS on these options, should you wish to engage in further conversation.

_____
Stephen Kimmel,
Chief Financial Officer
Cook Children's Healthcare System

ever referenced as support for the Medicaid shortfall calculation. To the contrary, the agency's own 1994 guidance document that was published with the DSH statutory amendments and which offers CMS's only interpretation of "costs incurred" under the statute makes clear that "cost incurred" means the costs of furnishing hospital services without regard to offsetting third party payments. Indeed, CMS's 1994 guidance was its contemporaneous "interpretation of key provisions of the law". Nowhere are third party payments mentioned, except as to the uninsured component of the HSL. CMS cited the 1994 guidance five times in the 2008 final rule as authority for its position that the Medicaid HSL formula was limited to costs minus payments, but did not cite the 2002 Letter which it now seeks to use to support its actions.

In this instance, two federal district courts have already determined, in their preliminary injunctions, that the authorizing legislation is inconsistent with the language of its regulation and have enjoined CMS from implementing the offending FAQ, determining it is a substantive rule change. CMS, through this Proposed Rule, is attempting to circumvent the court by attempting to apply the Proposed Rule to a period where reimbursement was governed under a valid regulation that did NOT include this new position. Consequently, the Proposed Rule cannot be applied retroactively.

**Conclusion.**

Cook Children's requests that CMS withdraw its Proposed Rule. In the alternative, we request that CMS follow the court's determination and ensure that the Proposed Rule, if applied, apply only prospectively. We believe that CMS is prohibited from applying this Proposed Rule retrospectively, as it constitutes a substantive rulemaking.

Cook Children's Medical Center has devoted itself to the care of all children regardless of their ability to pay. The costs of amassing the array of medical care that enable Cook Children's Medical Center provide those services to Medicaid program patients far exceed the DSH HSL Cook Children's Medical Center was receiving prior to the implementation of this newfound policy articulated in FAQ #33. Cook Children's Medical Center will be hindered in its ability to invest in new therapies or treatments for children and carry out its mission to serve the children in its community. To characterize our facilities as not equally economically burdened by CMS as other facilities is inaccurate and takes for granted the historical quality of care and services that we have been able to amass for the benefit of all children. Implementation of the Proposed Rule would greatly harm our institution and the ability to continue to provide services to Medicaid program children in this nation.

It is our hope that CMS reconsiders its position and this policy. There are other options that would enable CMS to move forward without compromising the financial underpinnings of children's hospitals that rely on the DSH HSL. We remain committed to working with CMS on these options, should you wish to engage in further conversation.

Stephen Kimmel,
Chief Financial Officer
Cook Children's Healthcare System