**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
CHILDREN'S HOSPITAL ASSOCIATION OF      )
TEXAS; CHILDREN'S HEALTH CARE d/b/a     )
CHILDREN'S HOSPITAL AND CLINICS OF      )
MINNESOTA; GILLETTE CHILDREN'S          )
SPECIALTY HEALTHCARE; CHILDREN'S        ) Civil Action No.
HOSPITAL OF THE KING'S DAUGHTERS,       ) 17-844 (EGS)
INC.; and SEATTLE CHILDREN'S HOSPITAL,  )
                                        )
             Plaintiffs,                )
                                        )
        v.                              )
                                        )
ALEX AZAR, in his official              )
capacity, Secretary of Health and       )
Human Services; SEEMA VERMA, in her     )
official capacity, Administrator of     )
the Centers for Medicare and Medicaid   )
Services; and CENTERS FOR MEDICARE      )
AND MEDICAID SERVICES,[1]               )
                                        )
             Defendants.                )
_____ )

## MEMORANDUM OPINION

Medicaid is a federal program that helps to cover the costs
of providing medical care to qualified individuals. Some
hospitals treat significantly higher percentages of Medicaid-
eligible patients than others. Because Medicaid does not
generally provide the same level of reimbursement as other types

_____

[1]     Pursuant to Federal Rule of Civil Procedure 25(d), the
Court substitutes as defendant the Secretary of Health and Human
Services, Alex Azar, for former Secretary of Health and Human
Services, Thomas E. Price.

of insurance coverage, such hospitals are often at a financial disadvantage. To rectify this disadvantage, and thereby encourage hospitals to serve Medicaid-eligible patients, Congress has provided for supplemental Medicaid payments to such hospitals. The supplemental payments are subject to limits to ensure that no hospital receives payments that would result in a profit, rather than covering Medicaid-related costs to rectify the disadvantage. This case concerns the method of calculating the limit of these supplemental payments.

Specifically, this lawsuit challenges a final rule that defines how "costs" are to be calculated for purposes of determining the limit on the amount of the supplemental payment a hospital serving a disproportionate share of Medicaid-eligible individuals is entitled to receive. *See* Medicaid Program: Disproportionate Share Hospital Payments – Treatment of Third Party Payers in Calculating Uncompensated Care Costs, 82 Fed. Reg. 16114-02, 16117 (Apr. 3, 2017) ("Final Rule"). Defendants – the Secretary of Health and Human Services ("the Secretary"), Centers for Medicare and Medicaid Services ("CMS"), and the CMS Administrator – claim that the Medicaid Act permits them to define "costs" in the Final Rule as "costs net of third-party payments, including, but not limited to, payments by Medicare and private insurance." 42 C.F.R. § 447.299(c)(10)(i). Plaintiffs – one children's hospital association, whose members

are eight free-standing children's hospitals in the state of
Texas, and four other free-standing children's hospitals located
in Minnesota, Virginia, and Washington – ask the Court to vacate
the Final Rule as contrary to the plain language of the Medicaid
Act and as arbitrary and capricious under the Administrative
Procedures Act.

Pending before the Court are plaintiffs' combined motion
for a preliminary injunction and for summary judgment,
defendants' motion to strike exhibits supporting plaintiffs'
motion for summary judgment, defendants' motion for summary
judgment, and plaintiffs' motion for a status hearing. Upon
consideration of the parties' memoranda, the parties' arguments
at the motions hearing, the administrative record, the
applicable law, and for the following reasons, the Court grants
plaintiffs' motion for summary judgment and vacates the Final
Rule. The Court further grants defendants' motion to strike,
denies defendants' motion for summary judgment, denies
plaintiffs' motion for a preliminary injunction, and denies
plaintiffs' motion for a status hearing.

I.   **BACKGROUND**

     A. **The Medicaid Act**

     Medicaid is a "joint state-federal program in which
healthcare providers serve poor or disabled patients and submit
claims for government reimbursement." *Universal Health Servs.,*

*Inc. v. United States*, 136 S. Ct. 1989, 1996-97 (2016). In addition to serving low-income individuals, Medicaid also provides benefits to children with certain serious illnesses, without regard to family income. *See, e.g.*, 42 U.S. C. § 1396a(a)(10)(A)(i)(II) (children are eligible for Medicaid if they are eligible for Supplemental Security Income ("SSI")); 20 C.F.R. § 416.934(j) (children born weighing less than 1,200 grams are presumptively eligible for SSI).

To encourage states to participate in Medicaid, "[f]ederal and state governments jointly share the cost." *Va. Dep't of Med. Assistance Servs. v. Johnson*, 609 F. Supp. 2d 1, 2 (D.D.C. 2009). Participating states administer their own program "pursuant to a state Medicaid plan which must be reviewed and approved by the Secretary of HHS." *Id.; see also* 42 U.S.C. § 1396a. Once the Secretary or the Secretary's designee approves a state plan, the state receives federal financial participation to cover part of the costs of its Medicaid program. 42 U.S.C. § 1396b(a)(1). If a state fails to comply with the statutory or regulatory requirements governing Medicaid, the federal government may recoup federal funds from the state. *See id.* §§ 1316(a), (c)-(e).

## B. Disproportionate Share Hospitals

In 1981, facing "greater costs . . . associated with the treatment of indigent patients," *D.C. Hosp. Ass'n v. District of*

*Columbia*, 224 F.3d 776, 777 (D.C. Cir. 2000), Congress amended Medicaid to require states to ensure that payments to hospitals "take into account . . . the situation of hospitals which serve a disproportionate number of low-income patients with special needs," 42 U.S.C. § 1396a(13)(A)(iv). This amendment reflected "Congress's concern that [M]edicaid recipients have reasonable access to medical services and that hospitals treating a disproportionate share of poor people receive adequate support from [M]edicaid." *W. Va. Univ. Hosps. v. Casey*, 885 F.2d 11, 23 (3d Cir. 1989).

These payments do not compensate a hospital for providing a particular service to a particular patient; rather, they seek to rectify in part any deficit the hospital may face solely because it treats more Medicaid-eligible patients than most. *See Johnson*, 609 F. Supp. 2d at 3 ("The intent was to stabilize the hospitals financially and preserve access to health care services for eligible low-income patients."). Accordingly, the amendment created "payment adjustment[s]" for qualifying hospitals. *See* 42 U.S.C. § 1396r-4(c). Such payments are available to any hospital that treats a disproportionate share of Medicaid patients (a disproportionate-share hospital or "DSH"). *See id.* § 1396r-4(b). In particular, Congress "deemed" hospitals to be DSH hospitals if "the hospital's medicaid inpatient utilization rate . . . is at least one standard

deviation above the mean medicaid inpatient utilization rate for hospitals receiving medicaid payments in the State" or if "the hospital's low-income utilization rate . . . exceeds 25 percent." *Id.* § 1396r-4(b)(1).

In 1993, the Medicaid program was amended to limit DSH payments on a hospital-specific basis to assuage concerns that some hospitals were receiving DSH payments in excess of "the net costs, and in some instances the total costs, of operating the facilities." H.R. Rep. No. 103-111, at 211 (1993), *reprinted in* 1993 U.S.C.C.A.N. 278, 538. Congress was particularly concerned by reports that some states were "making DSH payment adjustments to hospitals that d[id] not provide inpatient services to Medicaid beneficiaries" at all. *Id.* Because the very purpose of DSH payments was "to assist those facilities with high volumes of Medicaid patients," Congress wanted to ensure that payments were directed to hospitals that were "unlikely to have large numbers of privately insured patients through which to offset their operating losses on the uninsured." *Id.* To mitigate these concerns, the amendment provided that a DSH payment may not exceed:

> [T]he costs incurred during the year of furnishing hospital services (as determined by the Secretary and net of payments under this subchapter, other than under this section, and by uninsured patients) by the hospital to individuals who either are eligible for medical assistance under the State plan or

6

have no health insurance (or other source of
third party coverage) for services provided
during the year.

42 U.S.C. § 1396r-4(g)(1)(A). Thus, for Medicaid patients, the

Medicaid Act sets the hospital-specific limit ("HSL") for DSH

payments as "the costs incurred during the year of furnishing

hospital services" to Medicaid-eligible individuals "as

determined by the Secretary and net of payments" under the

Medicaid Act (referred to as the "Medicaid shortfall"). *Id.*

### C. Auditing and Reporting Requirements

To ensure that DSH payments comply with statutory

requirements, the Medicaid Act was again amended in 2003 to

require that each state provide an annual report and an audit of

its DSH program. *See id.* § 1396r-4(j). The audit must confirm,

among other things, that:

> (C) Only the uncompensated care costs of
> providing inpatient hospital and outpatient
> hospital services to individuals described in
> [Section 1396r-4(g)(1)(A)] . . . are included
> in the calculation of the hospital-specific
> limits[;]
>
> (D) The State included all payments under this
> subchapter, including supplemental payments,
> in the calculation of such hospital-specific
> limits[; and]
>
> (E) The State has separately documented and
> retained a record of all of its costs under
> this subchapter, claimed expenditures under
> this subchapter, uninsured costs in
> determining payment adjustments under this
> section, and any payments made on behalf of
> the uninsured from payment adjustments under
> this section.

*Id.* § 1396r-4(j)(2). Overpayments must be recouped by the state within one year of their discovery or the federal government may reduce its future contribution to that state. *See id.* § 1396b(d)(2)(C)-(D).

In 2005, CMS issued a Notice of Proposed Rulemaking in order to implement the 2003 amendment's auditing and reporting requirements. *See* 70 Fed. Reg. 50262 (Aug. 26, 2005). A final rule was issued on December 19, 2008. *See* 73 Fed. Reg. 77904 (Dec. 19, 2008) ("2008 Rule"). The 2008 Rule made two changes to the applicable provisions of the Code of Federal Regulations.

**First**, the 2008 Rule required that states begin to submit, on an annual basis, certain information "for each DSH hospital to which the State made a DSH payment in order to permit verification of the appropriateness of such payments." *Id.* at 77950. One such piece of information is the hospital's "total annual uncompensated care costs," which the rule defined as an enumerated set of "costs" less an enumerated set of "payments":

> The total annual uncompensated care cost equals the total cost of care for furnishing inpatient hospital and outpatient hospital services to Medicaid eligible individuals and to individuals with no source of third party coverage for the hospital services they receive less the sum of regular Medicaid [fee-for-service] rate payments, Medicaid managed care organization payments, supplemental/enhance Medicaid payments, uninsured revenues, and Section 1011 payments for inpatient and outpatient hospital services.

*Id.* at 77950; 42 C.F.R. § 447.229(c)(16). The regulation also defined different types of costs and payments. *See* 42 C.F.R. § 447.229(c)(10) (defining total costs for Medicaid-eligible patients as "[t]he total annual costs incurred by each hospital for furnishing inpatient hospital and outpatient hospital services to Medicaid eligible individuals"); *id.* § 447.229(c)(14) (defining total costs for uninsured individuals as "the total costs incurred for furnishing . . . services to individuals with no source of third party coverage for the hospital services they receive"); *id.* §§ 447.229(c)(6)-(9) (defining the various Medicaid-related payments); *id.* § 447.229(c)(12) (defining total uninsured revenues as "[t]otal annual payments received by the hospital by or on behalf of individuals with no source of third party coverage for . . . services they receive," exclusive of "payments made by a State or units of local government, for services furnished to indigent patients"); *id.* § 447.229(c)(13) (describing "Section 1011 payments," which are "Federal Section 1011 payments for . . . services provided to Section 1011 eligible aliens with no source of third party coverage").

**Second**, the 2008 Rule stated that the annual audit "must verify," among other things, that:

> Each hospital that qualifies for a DSH payment
> in the State is allowed to retain that payment
> so that the payment is available to offset its

> uncompensated care costs for furnishing
> inpatient hospital and outpatient hospital
> services during the Medicaid State plan rate
> year to Medicaid eligible individuals and
> individuals with no source of third party
> coverage for the services in order to reflect
> the total amount of claimed DSH expenditures.
>
> . . .
>
> Only uncompensated care costs of furnishing
> inpatient and outpatient hospital services to
> Medicaid eligible individuals and individuals
> with no third party coverage for the inpatient
> and outpatient hospital services they received
> as described in Section 1923(g)(1)(A) of the
> Act are eligible for inclusion in the
> calculation of the hospital-specific
> disproportionate share . . . payment limit.

73 Fed. Reg. at 77951; 42 C.F.R. § 455.304(d). To ease the move

to the new audit and reporting regime and to avoid subjecting

any state to "immediate penalties that would result in the loss

of Federal matching dollars," CMS provided for a six-year-long

transition. 73 Fed. Reg. at 77906. Accordingly, any audits "from

Medicaid State plan rate year 2005 through 2010" would be "used

only for the purpose of determining prospective hospital-

specific cost limits and the actual DSH payments associated with

a particular year," not for "requiring recovery of any

overpayments." *Id.* For payments made for all years after 2011,

DSH overpayments would be recovered by the state, and the

federal share would be returned to the federal government unless

the excess payments "are redistributed by the State to other

qualifying hospitals." *Id.*

## D. Frequently Asked Questions ("FAQs") 33 and 34

On January 10, 2010, CMS posted answers to FAQs regarding the audit and reporting requirements. *See* A.R. 730-771, Additional Information on the DSH Reporting and Audit Requirements, https://www.medicaid.gov/medicaid/financing-and-reimbursement/downloads/part-1-additional-info-on-dsh-reporting-and-auditing.pdf. FAQ 33 asked whether "days, costs, and revenues associated with patients that have both Medicaid and private insurance coverage" would be included in the calculation of the DSH limit. A.R. 747, *id.* at 18. In response, CMS explained that private-insurance payments made on behalf of Medicaid-eligible patients should be included in the calculation of the hospital-specific DSH limit." *Id.* Likewise, FAQ 34 asked "[u]nder what circumstances" would Medicare payments on behalf of patients dually eligible for both Medicare and Medicaid be included in the uncompensated care costs. *Id.* CMS explained that hospitals were required "to take into account" any Medicare payments made on behalf of dually-eligible individuals in calculating a hospital's Medicaid DSH payment. *Id.*

FAQs 33 and 34 were subsequently challenged in multiple courts as an unlawful amendment of the 2008 Final Rule and as inconsistent with the Medicaid Act. Each of the six federal courts to have evaluated FAQs 33 and 34 have entered either a preliminary or permanent injunction prohibiting defendants from

11

reducing a hospital's DSH payment through enforcement of the FAQs. *See, e.g.*, *Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224 (D.D.C. 2014) (granting preliminary injunction prohibiting the enforcement of FAQ 33); *New Hampshire Hosp. Ass'n v. Burwell*, No. 15-cv-460, 2017 WL 822094 (D.N.H. Mar. 2, 2017) (permanently enjoining defendants from enforcing FAQs 33 and 34); *Children's Hosp. of the King's Daughters, Inc. v. Price*, 258 F. Supp. 3d 672 (E.D. Va. 2017) (granting preliminary injunction prohibiting the enforcement of FAQ 33 against plaintiff); *Tennessee Hosp. Ass'n v. Price*, No. 16-cv-3263, 2017 WL 2703540 (M.D. Tenn. June 21, 2017) (granting plaintiffs' summary judgment and enjoining defendants from applying FAQ 33 to plaintiffs' hospitals); *Children's Health Care v. Centers for Medicare & Medicaid Servs.*, No. 16-cv-4064, 2017 WL 3668758 (D. Minn. June 26, 2017)(permanently enjoining defendants from enforcing FAQ 33); *Missouri Hosp. Ass'n. v. Hargan*, No. 17-cv-4052, 2018 WL 814589 (W.D. Mo. Feb. 9, 2018) (permanently enjoining enforcement of the final rule).

Each of these courts found the FAQs invalid on procedural grounds – i.e., that defendants violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 500 *et seq.*, by failing to properly promulgate the policy embodied in the FAQs in accordance with the notice-and-comment provisions of section 553. Two of these courts also evaluated whether the FAQs

12

violated section 706(2) of the APA because they conflict with the plain language of the Medicaid Act. *See Children's Hosp. of the King's Daughters*, 2017 WL 2936801, at *8 (finding that the Medicaid statute is "unambiguous" and foreclosed defendants' interpretation as set forth in FAQ 33); *Tennessee Hosp. Ass'n*, 2017 WL 2703540, at *8 ("the Court finds that Defendants' policies set forth in the responses to FAQs 33 and 34 violate the APA because they conflict with the unambiguous language of the Medicaid Act").

### E. 2017 Final Rule

On August 15, 2016, defendants published a notice of proposed rulemaking to address the HSL on DSH payments. 81 Fed. Reg. 53980, 53981 (Aug. 15, 2016). Specifically, defendants explained that the new rule was intended to "make clearer . . . an existing interpretation" – which was also embodied in FAQs 33 and 34 – that "uncompensated care costs include only those costs for Medicaid eligible individuals that remain after accounting for payments received by hospitals by or on behalf of Medicaid eligible individuals, ***including Medicare and other third party payments*** that compensate the hospitals for care furnished to such individuals." *Id.* (emphasis added). In other words, under the proposed rule, the HSL must be based on the costs for Medicaid-eligible individuals for which a "hospital has not received payment from any source." *Id.*

On April 3, 2017, CMS published the Final Rule entitled
"Medicaid Program: Disproportionate Share Hospital Payments –
Treatment of Third Party Payers in Calculating Uncompensated
Care Costs." 82 Fed. Reg. 16114-02, 16117 (Apr. 3, 2017). CMS
stated that it "received 161 timely comments from state Medicaid
agencies, provider associations, providers, and other interested
parties" in response to the proposed rule. 82 Fed Reg. 16114,
16117 (Apr. 3, 2017). Defendants identified ten general comment
areas in which they received multiple comments, along with nine
additional specific comments that did not fit into any of the
general areas, and provided responses to those comments. *Id.* at
16117-16120. Many commentators "suggested that CMS'
interpretation of the hospital-specific limit" was "inconsistent
with the statutory language" of the amendment. *Id.* at 16117.
Defendants disagreed, explaining that the statute explicitly
gave the Secretary authority to determine the "costs" of
providing services, and therefore the Secretary had "discretion
to take Medicare and other third party payments into account
when determining a hospital's costs for the purpose of
calculating Medicaid DSH payments." *Id.* at 16117-18.

Other commentators suggested that the proposed rule should
not apply to patients eligible for both Medicaid and another
source of insurance ("dual-eligible patients") in cases where
Medicaid does not actually pay on behalf of that patient. *Id.* at

14

16118. According to these commentators, application of the proposed rule to hospitals serving a high number of dual-eligible patients would render those hospitals "ineligible for DSH funds, even though they have substantial losses for Medicaid-paid admissions and for the uninsured." *Id.* In response, defendants pointed out that the statutory language referred to those "eligible for medical assistance" and did "not condition eligibility on whether the cost of the service was claimed." *Id.* As such, "all costs and payments associated with Medicaid eligible individuals must be included in the hospital-specific limit calculation, regardless of whether Medicaid made a payment." *Id.* Defendants also stated that the commentators' belief that, under the proposed rule, a hospital could incur substantial losses for treating Medicaid-eligible and uninsured individuals despite receiving a DSH payment was "incorrect." *Id.* Although these hospitals may incur losses for "[a]ncillary programs and services," any "actual uncompensated care costs for furnishing [inpatient and outpatient] hospital services" would be eligible to be covered by DSH payments. The purpose of the rule, according to defendants, was simply to ensure that a DSH payment did not constitute "double pay for costs that ha[d] already been compensated" by, for example, private insurance or Medicare. *Id.*

The Final Rule modifies 42 C.F.R. § 447.299(c)(10) "to make it explicit that 'costs' for purposes of calculating hospital-specific DSH limits are costs net of third-party payments received." *Id.* Specifically, the Final Rule provides:

> (10) Total Cost of Care for Medicaid IP/OP Services. The total annual costs incurred by each hospital for furnishing inpatient hospital and outpatient hospital services to Medicaid eligible individuals. The total annual costs are determined on a hospital-specific basis, not a service-specific basis. For purposes of this section, costs—
>
> (i) Are defined as **costs net of third-party payments, including, but not limited to, payments by Medicare and private insurance.**
>
> (ii) Must capture the total burden on the hospital of treating Medicaid eligible patients prior to payment by Medicaid. Thus, costs must be determined in the aggregate and not by estimating the cost of individual patients. For example, if a hospital treats two Medicaid eligible patients at a cost of $2,000 and receives a $500 payment from a third party for each individual, the total cost to the hospital for purposes of this section is $1,000, regardless of whether the third party payment received for one patient exceeds the cost of providing the service to that individual.

*Id.* at 16122 (emphasis added). The Final Rule became effective June 2, 2017. *Id.* at 16115. Defendants note that, because the Final Rule merely "provid[es] clarification to existing policy," there is "no issue of retroactivity, nor a need for a transition period." *Id.* at 16118.

The only other federal court to have adjudicated a challenge to the Final Rule found that it was enacted in excess of defendants' statutory authority under the Medicaid Act. *See Missouri Hosp. Ass'n. v. Hargan*, No. 17-cv-4052, 2018 WL 814589, at *10-12 (W.D. Mo. Feb. 9, 2018). The court held that "42 U.S.C. § 1396r-4(g)(1)(A) is unambiguous that the calculation of a DSH hospital's HSL does not involve consideration of private insurance or Medicare payments, and a DSH hospital's total uncompensated costs of care for calculating the HSL is reduced only by the total of other Medicaid program payments." 2018 WL 814589, at *12. In so holding, the court found that the context and legislative history of the statute supported plaintiffs' reading of the statute that only Medicaid payments were to be included in the HSL. *Id.* Based on the language of the statute, its context, and its legislative history, the court concluded that, "[w]hile the Secretary may be authorized to define 'costs,'" under the statute, the Secretary's "authority stops short of defining 'payments.'" *Id.*

### F. This Lawsuit

The plaintiffs in this case represent twelve not-for-profit children's hospitals located in Texas, Washington, Minnesota, and Virginia. Compl. ¶¶ 13-17, ECF No. 1. The hospitals are "dedicated to the treatment and special needs of children and the advancement of pediatric medicine" and provide care for

17

critically-ill children "regardless of whether their families have health insurance or ability to pay for their care." *Id.* ¶¶ 13-17. As a result, these hospitals each serve a disproportionate number of Medicaid and uninsured patients. *See, e.g.*, *id.* ¶ 13 (the Children's Hospital Association of Texas' "members have among the highest Medicaid utilization rates of all hospitals in the state of Texas"); *id.* ¶ 14 ("Children's Minnesota is federally 'deemed' a DSH hospital entitled to receive DSH funding under the Medicaid Act."); *id.* ¶ 15 ("Gillette Children's typically serves the highest proportion of patients covered by Medicaid in Minnesota."); *id.* ¶ 16 (Children's Hospital of the King's Daughters "is federally 'deemed' a DSH hospital entitled to receive DSH funding under the Medicaid Act because it serves a disproportionate number of Medicaid and uninsured patients.").

Plaintiffs filed this lawsuit on May 8, 2017. Compl., ECF No. 1. On May 15, 2017, plaintiffs filed a motion for a preliminary injunction requesting the Court to "enjoin[] Defendants – on a nationwide basis – from enforcing, applying, or implementing (or requiring any state to enforce, apply, or implement)" the Final Rule. Mot. for Prelim. Inj., ECF No. 8. On May 23, 2017, in accordance with the Court's May 19, 2017 Order, the parties filed a joint status report in which they agreed that plaintiffs' motion for a preliminary injunction could "be

combined with the merits and treated also as a motion for summary judgment." Joint Status Report at 2, ECF No. 11. The Court entered an order consolidating plaintiffs' motion for a preliminary injunction with a determination of the merits under Federal rule of Civil Procedure 65(a)(2) on May 24, 2017. Plaintiffs filed a combined application for a preliminary injunction and summary judgment on June 5, 2017. Pls.' Combined Mem. in Supp. of Appl. for a Prelim. Inj. and for Summ. J. ("Pls.' Mem."), ECF No. 12-1. On June 16, 2017, in addition to filing their combined response to plaintiffs' motion and cross-motion for summary judgment, defendants moved to strike certain exhibits filed in support of plaintiffs' motion. Defs.' Mot. to Strike, ECF No. 14; Defs.' Mem. in Supp. of Mot. for Summ. J. and Opp. to Pls.' Mot. for Prelim. Inj. and Summ. J. ("Defs.' Opp."), ECF No. 15. The parties' briefing on their cross-motions for summary judgment and defendants' motion to strike was complete on July 12, 2017, and the Court held a hearing on the motions on August 1, 2017. Those motions are now ripe for the Court's considerations. Because the Court's opinion decides the underlying merits, plaintiffs' request for a preliminary injunction is moot.

## II.  Defendants' Motion to Strike

Plaintiffs attach thirty-six exhibits to their "combined application for a preliminary injunction and for summary judgment," *see* ECF Nos. 12-3 to 12-38, seventeen of which were not "presente[ed] to the agency in the administrative process," *see* Defs.' Mot. Strike at 1, ECF No. 14. These seventeen exhibits consist of: (1) declarations from representatives of each plaintiff, *see* ECF Nos. 12-3, 12-5, 12-7, 12-24, 12-26, 12-28, and 12-34; (2) two publications from the Journal of the American Medical Association ("JAMA"), ECF Nos. 12-12 and 12-38; (3) various documents attached to the Declaration of Robert Simon ("Simon Declaration") purporting to explain the relationship between Medicaid cost-reporting principles and inclusion of third-party payments in the HSL calculation, *see* ECF Nos. 12-30, 12-31,12-32, and 12-33; and (4) various documents setting forth facts specific to certain plaintiff-hospitals, *see* ECF Nos. 12-27, 12-35, 12-36, and 12-37. Defendants move to strike these seventeen exhibits, arguing that judicial review under the APA "is limited to the administrative record, which consists of the materials directly or indirectly considered by the agency decision-makers at the time they made the challenged decision." Defs.' Mot. Strike at 3, ECF No. 14.

"[I]t is black-letter administrative law that in an APA case, a reviewing court 'should have before it neither more nor

less information that did the agency when it made its decision.'" *Hill Dermaceuticals, Inc. v. Food & Drug Admin.*, 709 F.3d 44, 47 (D.C. Cir. 2013) (quoting *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984)). This is because, under the APA, the court is confined to reviewing "the whole record or those parts of it cited by a party," 5 U.S.C. § 706, and the administrative record only includes the "materials 'compiled' by the agency that were 'before the agency at the time the decision was made,'" *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996) (citations omitted).

Accordingly, when, as here, plaintiffs seek to place before the court additional materials that the agency did not review in making its decision, a court must exclude such material unless plaintiffs "can demonstrate unusual circumstances justifying departure from th[e] general rule." *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008) (citation omitted). For example, a court may appropriately consider extra-record materials: (1) if the agency deliberately or negligently excluded documents that may have been adverse to its decision; (2) if background information is needed to determine whether the agency considered all the relevant factors; and (3) in cases where the agency failed to explain the administrative action so as to frustrate judicial review. *Id.*

Plaintiffs make three arguments as to why the Court should consider their proffered extra-record materials: (1) the declarations, and certain exhibits attached to them, should be considered because they support plaintiffs' request for a preliminary injunction and establish plaintiffs' standing, Pls.' Strike Opp. at 4-7, ECF No. 22; (2) that certain paragraphs of the Simon Declaration and all of the exhibits attached to it are proper extra-record evidence because they show that defendants did not adequately explain their decision, *id.* at 7-9; and (3) one JAMA study is included merely to support a "statement of fact" that "put[s] into context the specialized care Plaintiffs provide to Medicaid children" and thus is appropriately before the Court, *id.* at 10. The Court considers each argument in turn.

## A. The Court Need Not Consider Extra-Record Materials To Determine Whether Plaintiffs Will Suffer Irreparable Harm Or Have Standing.

Plaintiffs are correct that in APA cases, courts have considered declarations offered to prove that plaintiffs will suffer "irreparable harm" absent a preliminary injunction. *See id.* at 4; *see also, e.g.*, *Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 247 (D.D.C. 2003) ("the Court concludes that this case fits squarely within one of our Circuit's stated exceptions for allowing consideration of extra-record declarations in administrative review cases – cases involving preliminary injunctions"). Here, however, plaintiffs

concede that consolidation of their motions for preliminary-
injunctive relief and summary judgment under Federal Rule of
Civil Procedure 65 "effectively moots the Court's consideration
of the preliminary injunctive factors because the court will
enter judgment on the merits." Pls.' Mem. at 2, ECF No. 12-1.
Accordingly, the Court need not determine whether plaintiffs
will suffer "irreparable harm" absent an injunction – and,
therefore, plaintiffs' extra-record proof of such harm need not
be considered.

Whether plaintiffs may supplement the record in order to
establish standing is a closer question. *See, e.g.*, *Amfac
Resorts, L.L.C. v. U.S. Dep't of the Interior*, 282 F.3d 818, 830
(D.C. Cir. 2002) (stating that those challenging agency action
must establish that they have standing and, in so doing, "[t]hey
are not confined to the administrative record," but rather,
"must support their claim of injury with evidence"); *Chesapeake
Climate Action Network v. Export-Import Bank of the U.S.*, 78 F.
Supp. 3d 208, 217 (D.D.C. 2015) ("Although judicial review of
agency action is typically confined to the administrative
record, where there is not sufficient evidence of standing in
the record because the question was not before the agency,
plaintiffs may submit extra-record evidence to establish
standing."). Notably, although defendants do not contest
standing here – perhaps because this Court previously found that

at least one of the plaintiffs in this case, Seattle Children's Hospital, likely did have standing to challenge defendants' enforcement of FAQ 33, *see Texas Children's*, 76 F. Supp. 3d at 238-39 – defendants recognize that plaintiffs may be "entitled to make a record on standing for purposes of further review." Defs.' Reply in Supp. Mot. Strike at 3, ECF No. 25. Furthermore, even when no party challenges standing, "federal courts, being courts of limited jurisdiction, must assure themselves of jurisdiction over any controversy they hear." *Noel Canning v. N.L.R.B.*, 705 F.3d 490, 496 (D.C. Cir. 2013).

Here, given that there is no dispute that plaintiffs are subject to the Final Rule, the Court finds that plaintiffs' standing is self-evident and therefore the Court need not consider the declarations attached to plaintiffs' motion. *See Sierra Club v. E.P.A.*, 292 F.3d 895, 899-900 (D.C. Cir. 2002) ("In many if not most cases the petitioner's standing to seek review of administrative action is self-evident; no evidence outside the administrative record is necessary for the court to be sure of it."); *see also Fund For Animals, Inc. v. Norton*, 322 F.3d 728, 733 (D.C. Cir. 2003) (confirming that parties are "not require[d]. . . to file evidentiary submissions in support of standing in every case"). In particular, when, as here, plaintiffs are the "object of the [agency] action (or foregone action) at issue . . . there should be little question that the

action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Id.* (citation and internal quotation marks omitted). No party contests that the Final Rule, if allowed to stand, could "have the effect of shifting DSH funds from Plaintiffs to other DSH hospitals within each of their respective states." Defs.' Opp. at 31, ECF No. 15. These recoupment decisions – or, going forward, decisions about how to allocate DSH funds – by state Medicaid agencies are inextricably intertwined with defendants' promulgation and enforcement of the Final Rule. *See Texas Children's*, 76 F. Supp. 3d at 239 (noting that defendants could "revoke federal financial participation" from states that do not comport with defendants' view of Medicaid's requirements) (citing 42 U.S.C. §§ 1316(a), (c)–(e), 1396a, 1396b). Accordingly, the Court need not consider plaintiffs' proffered declarations in conducting its analysis of the Final Rule.[2]

---

[2]    This conclusion is buttressed by the fact that plaintiffs' declarations appear to address topics that far exceed the standing inquiry. *See, e.g.*, Declaration of Todd Ostendorf ¶ 5 ("Medicaid currently reimburses Children's Minnesota an average of only $0.65 for every dollar of the cost to provide care to Medicaid patients.") (cited at Pls.' Mem. at 12); Declaration of Stephen Kimmel ¶ 5 ("Cook Child's sustains significant losses treating large numbers of Medicaid patients") (cited at Pls.' Mem. at 32). As another court recently found, "plaintiffs may not smuggle in extra-record evidence relevant to the merits of this APA action by contending that the evidence pertains to standing." *Hispanic Affairs Project v. Acosta*, No. 15-CV-01562 (BAH), 2017 WL 2951881, at *7 (D.D.C. July 7, 2017). This Court

**B. The *Esch* Exceptions Do Not Apply.**

Plaintiffs invoke *Esch v. Yeutter*, 876 F.2d 976 (D.C. Cir. 1989), to argue that certain paragraphs of the Simon Declaration and all of the exhibits to that declaration are proper extra-record evidence. Pls.' Strike Opp. at 7-9, ECF No. 22. In particular, plaintiffs urge the Court to consider portions of the Simon Declaration because, during the notice-and-comment process, CMS dismissed Mr. Simon's comment "with an explanation that failed to address the issue raised" as to whether the inclusion of third-party payments in the calculation of the hospital-specific limit violates Medicare/Medicaid cost reporting principles. *Id.* at 8. The Court of Appeals for the District of Columbia Circuit ("D.C. Circuit"), however, has "severely limited" the application of *Esch* to allow such extra-record evidence. *Chamber of Commerce v. NLRB*, 118 F. Supp. 3d 171, 188 n.12 (D.D.C. 2015). In *Hill Dermaceuticals*, for example, the D.C. Circuit explained that, at most, *Esch* "may be invoked to challenge **gross procedural deficiencies** – such as where the administrative record itself is **so deficient as to**

---

agrees. *See also Watersheds Project v. Salazar*, 766 F. Supp. 2d 1095, 1104 (D. Mont. 2011) ("The Court believes that the Declarations containing both standing allegations and the extra-record submission should be stricken in full because standing is not in dispute and the extra-record submissions are intermixed with the standing allegations.").

*preclude effective review*." 709 F.3d at 47 (emphases added); *see also American Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008) (exception only applies when an agency's failure to adequately explain its actions "frustrates judicial review").

Here, plaintiffs offer no evidence that CMS's decision was so procedurally deficient as to preclude judicial review. Given that courts have repeatedly held that an agency's decision need not "be a model of analytic precision to survive a challenge," such evidence would need to be provided to justify consideration of the extra-record evidence. *Dickinson v. Sec. of Defense*, 68 F.3d 1396, 1404-05 (D.C. Cir. 1995); *see also Camp v. Pitts*, 411 U.S. 138, 143 (1973) (rejecting argument that agency had failed to provide an adequate explanation when agency had provided a "contemporaneous explanation" that simply stated that "a new bank was an uneconomic venture in light of the banking services already available in the surrounding community"; "[t]he explanation may have been curt but it surely indicated the determinative reason for the final action taken").

**C. The Court Declines To Consider The 2016 JAMA Study.**

Plaintiffs also contend that the Court should consider a 2016 study published in Pediatrics, a JAMA publication, because it supports plaintiffs' argument that free-standing Children's hospitals rely heavily on DSH funding. Pls.' Opp. at 7, 10, ECF No. 22. Defendants maintain that the Court must strike the

article because it was "not presented to the agency in the course of the rulemaking process." Defs.' Mot. Strike at 5. The Court agrees, and therefore also strikes the article from the record. *See Hispanic Affairs Project v. Acosta*, No. 15-CV-01562 (BAH), 2017 WL 2951881, at *9 (D.D.C. July 7, 2017) (agreeing that the Court was not permitted to consider "the two referenced news articles" in an exhibit attached to plaintiffs' summary-judgment motion in APA action).

In sum, the Court strikes ECF Nos. 12-3, 12-5, 12-7, 12-12, 12-24, 12-26 to 12-28, and 12-30 to 12-38 from the record.

## III.   Standard of Review

Although "summary judgment is [the] appropriate procedure" when a party seeks review of an agency action under the APA, the normal standards for summary judgment set forth in Federal Rule of Civil Procedure 56 do not apply. *See Assoc. Builders & Contractors, Inc. v. Shiu*, 30 F. Supp. 3d 25, 34 (D.D.C. 2014); *Bimini Superfast Operations LLC v. Winkowski*, 994 F. Supp. 2d 106, 119 (D.D.C. 2014). Instead, the court's function is limited to reviewing the administrative record to "determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Nicopure Labs, LLC v. Food & Drug Admin.*, No. 16-cv-0878, 2017 WL 3130312, at *13 (D.D.C. July 21, 2017).

In reviewing agency action, the court must be "thorough and probing, but if the court finds support for the agency action, it must step back and refrain from assessing the wisdom of the decision unless there has been a 'clear error of judgment.'" *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995) (quoting *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989)). In its review, a court should consider "whether the agency acted within the scope of its legal authority, whether the agency has explained its decision, whether the facts on which the agency purports to have relied have some basis in the record, and whether the agency considered the relevant factors." *Id.*

Under the APA, a reviewing court must set aside a challenged agency action that is found to be, *inter alia*, "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A). The party challenging the agency action bears the burden of proof. *See Abington Crest Nursing & Rehab. Ctr. v. Sebelius,* 575 F.3d 717, 722 (D.C. Cir. 2009).

IV. **Analysis**

Plaintiffs challenge the Final Rule on two grounds: (1) defendants acted in excess of their statutory authority under

the Medicaid Act; and (2) the Final Rule is arbitrary and capricious because (a) the agency's justification of the Final Rule is contravened by the record evidence, (b) the Final Rule is not a product of reasoned decisionmaking, and (c) the Final Rule is not merely a clarification of existing policy. As set forth below, because the Court finds that the Final Rule is inconsistent with the plain language of the Medicaid Act, the Court need not reach plaintiffs' second argument. *See, e.g.*, *Am. Petroleum Inst. v. S.E.C.*, 953 F. Supp. 2d 5, 23 (D.D.C. 2013) ("Because the Court has invalidated the Rule, other APA arguments cannot change the disposition.").

### A. The Final Rule is Inconsistent with the Plain Language of the Medicaid Act.

Plaintiffs and defendants both argue that the relevant statutory language is clear and unambiguously compels a decision in their respective favor. Plaintiffs contend that "the DSH provisions of the Medicaid Act are unambiguous that only Medicaid payments are netted out in the Medicaid shortfall component" of the hospital-specific limit. Pls.' Mem. at 16, ECF No. 12-1. Defendants, on the other hand, argue that the Medicaid Act "is unambiguous that only 'uncompensated' costs are to be included" in calculating the hospital-specific limit. Defs.' Opp. at 13, ECF No. 15.

A court's review of whether an agency has acted within its statutory jurisdiction falls under the well-worn framework set out in *Chevron U.S.A., Inc. v. Natural Resources Def. Council, Inc.*, 467 U.S. 837 (1984). Under *Chevron*'s two-step framework, a reviewing court must first determine "whether Congress has directly spoken to the precise question at issue." *Id.* at 843. To decide whether Congress has spoken to the precise question, the court must "employ[] traditional tools of statutory construction." *Chevron*, 467 U.S. at 843 n.9. These tools include "examination of the statute's text, legislative history, and structure, as well as its purpose." *Petit v. U.S. Dep't of Educ.*, 675 F.3d 769, 781 (D.C. Cir. 2012); *see also Pharm. Research & Mfrs. of Am. v. Fed. Trade Comm'n*, 44 F. Supp. 3d 95, 112 (D.D.C. 2014) (tools of statutory construction "include evaluation of the plain statutory text at issue, the purpose and structure of the statute as a whole, while giving effect, if possible, to every clause and word of a statute, and – where appropriate – the drafting history").

Importantly, to prevail under *Chevron* step one, plaintiffs "must show that the statute **unambiguously** forecloses the agency's interpretation." *Petit*, 675 F.3d at 781 (citation and internal quotation marks omitted). The statute may foreclose the agency's interpretation if the statute "prescrib[es] a precise course of conduct other than the one chosen by the agency" or if

the statute "grant[s] the agency a range of interpretive discretion that the agency has clearly exceeded." *Vill. of Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650, 659 (D.C. Cir. 2011). "[I]f the agency has either violated Congress's precise instructions or exceeded the statute's clear boundaries then, as *Chevron* puts it, 'that is the end of the matter' – the agency's interpretation is unlawful." *Id.* at 660 (quoting *Chevron*, 467 U.S. at 842). On the other hand, if the statute's "ambiguity has left the agency with a range of possibilities" and if the "agency's interpretation falls ***within*** that range, then the agency will have survived *Chevron* step one." *Id.*

Thus, under *Chevron* step one, the threshold determination – whether the Secretary's determination that the calculation of the hospital-specific limit should include only costs not otherwise reimbursed by private insurers is consistent with the Medicaid Act – turns on whether Congress has directly spoken on the issue. To make this determination, the Court examines the statutory text, the structure and context of the statute as a whole, and the legislative history in turn.

### (1) Statutory Text

The 1993 amendments to Medicaid imposed hospital-specific limits on the amount of payment adjustments received by DSH hospitals. Specifically, the statute makes clear that a DSH payment cannot exceed:

> **the costs incurred** during the year of
> furnishing hospital services (**as determined by
> the Secretary and net of payments under this
> subchapter, other than under this section, and
> by uninsured patients**) by the hospital to
> individuals who either are eligible for
> medical assistance under the State plan or
> have no health insurance (or other source of
> third party coverage) for services provided
> during the year.

42 U.S.C. § 1396r-4(g)(1)(A) (emphases added).

Plaintiffs argue that this section "unambiguously specifies the 'payments' that are to be included in the calculation of a hospital's HSL" – "i.e., Medicaid payments and payments made by or on behalf of uninsured patients." Pls.' Mem. at 16-17, ECF No. 12-1. In other words, because the statutory provision sets forth a formula for calculating a hospital's HSL, and because that formula makes clear what payments can be considered, the Final Rule's inclusion of payments by third parties "contravenes the plain language of the statute." *Id.* at 17. Moreover, plaintiffs claim that the statute plainly forecloses defendants' attempt to "rewrite" the statutory formula by mandating that third-party payments be subtracted from the "cost" side of the equation. *Id.*

Defendants argue that the heading, which refers only to "uncompensated" costs, along with the language of the audit provision makes clear that "Congress did not intend to treat

care that is well compensated as uncompensated." Defs.' Opp. at 13-14, ECF No. 15.

The Court agrees with plaintiffs. On its face, the statute clearly indicates which payments can be subtracted from the total costs incurred during the year by hospitals: (1) "payments under this subchapter," i.e., payments made by Medicaid; and (2) payments made by uninsured patients. The statute nowhere mentions subtracting other third-party payments made on behalf of Medicaid-eligible patients from the total costs incurred. *Id.*

Furthermore, while the statute expressly delegates to the Secretary the authority to determine "costs," the remainder of the statutory text forecloses the reading offered by defendants in the Final Rule. That text, after all, indicates that only payments made by Medicaid and by uninsured patients may be netted out from "costs" to arrive at the hospital-specific limit. To allow the Secretary to redefine "costs" to net out a third category of payments – i.e., "third-party payments, including but not limited to, payments by Medicare and private insurance," 82 Fed. Reg. 16114-02, 16117 – would "render the Congressional definition of 'payments' in the very same clause superfluous." *Children's Hosp. of the King's Daughters, Inc. v. Price*, No. 2:17CV139, 2017 WL 2936801, at *9 (E.D. Va. June 20, 2017); *see also New Hampshire Hosp. Ass'n v. Burwell*, No. 15-CV-460-LM, 2016 WL 1048023, at *12 (D.N.H. Mar. 11, 2016) ("The

Medicaid Act separately describes the 'payments' that are subtracted from the 'costs' to obtain the Medicaid Shortfall. Congress could not have intended to grant the Secretary the discretion to include other payments within the term "costs," while separately defining payments. If it did, the definition of payments that must be subtracted from costs to determine the Medicaid Shortfall would be surplusage.").

Because the Court must "give effect, if possible, to every clause and word of a statute," *see United States v. Menasche*, 348 U.S. 528, 538-39 (1955), and because defendants' interpretation of the statute would render portions of the statutory language superfluous, the Court rejects defendants' reading of the statute to permit the Secretary to define "costs" to include certain "payments" when "payments" are defined in the statutory language.

**(2)    Statutory Structure and Context**

The fact that Congress specifically provided for subtracting Medicaid payments but not payments by third parties becomes all the more salient upon examination of the subsequent statutory section. That section permits additional DSH payments to certain state-owned hospitals during a transitional period so long as the state certifies that the additional payments are used for "health services." 42 U.S.C. § 1396r-4(g)(2). In

particular, section 1396r-4(g)(2)(A) provides, in relevant part, as follows:

> In determining the amount that is used for [health] services during a year, there shall be excluded any amounts received . . . ***from third party payors*** (not including the State plan under this subchapter) that are used for providing such services during the year.

42 U.S.C. § 1396r-4(g)(2)(A)(emphasis added).

Thus, while Congress expressly excluded amounts received from third-party payors in section 1396r-4(g)(2)(A), it declined to do so in section 1396r-4(g)(1)(A). That omission is significant. Indeed, it is well-settled that, "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (citation and internal quotation marks omitted); *see also Jama v. Immigration & Customs Enforcement,* 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest."); *D.C. Hosp. Ass'n. v. D.C.*, 224 F.3d 776, 780 (D.C. Cir. 2000) (fact that Congress had specified that only a State's "direct" payments

were to be taken into account in preceding section of statute
was compelling evidence that Congress did not intend to limit
the computation of payments in such a way under the section at
issue, which did not include such a limitation).

   To be clear, the fact that Congress specifically excluded
payments by third party insurers in subsection (g)(2) does not
necessarily demonstrate intent to exclude payments by third
party insurers in other subsections. *See, e.g.*, *Waterkeeper All.
v. Envtl. Prot. Agency*, 853 F.3d 527, 534–35 (D.C. Cir. 2017)
("The canon of *expressio unius est exclusio alterius* is 'an
especially feeble helper in an administrative setting, where
Congress is presumed to have left to reasonable agency
discretion questions that it has not directly resolved.'")
(citation omitted). Indeed, had Congress done nothing more than
instruct the Secretary to determine the "costs incurred" by each
hospital receiving DSH funds, the Court could reasonably
conclude that the Secretary had discretion to determine,
consistent with the purpose of the statute, which payments ought
to be subtracted in completing that calculation. Here, however,
by granting the Secretary discretion to determine "costs,"
Congress specifically mandated which payments should be
subtracted to arrive at the hospital-specific limit. Thus, it is
compelling that Congress did not include payments by third-party

insurers in subsection (g)(1), despite excluding precisely such payments in the subsection (g)(2).

Defendants attempt to muddy the waters by pointing to other aspects of the statutory structure that they claim show that Congress intended for the hospital-specific limit to be based on "uncompensated costs." Defs.' Opp. at 13-14. Specifically, defendants point to the heading of section 1396r-4(g)(1)(A) – "Amount of adjustment subject to **uncompensated** costs" – and to the audit requirements that require states to certify that "[o]nly the **uncompensated** care costs . . . are included in the calculation of the hospital-specific limits" described in § 1396r-4(g)(1)(A)). *See id.* (citing 42 U.S.C. § 1396r-4(g)(1) and § 1396r-4(g)(1)(A)). Neither argument is persuasive.

**First**, although the heading of the section may "supply cues" as to Congress' intent, *Yates v. United States*, 135 S. Ct. 1074, 1083 (2015), a reviewing court must "place[] less weight on captions" than on statutory text, *Lawson v. FMR LLC*, 134 S. Ct. 1158, 1169 (2014). In *Lawson*, the defendant pointed to two statutory headings that read, in relevant part, "Protection for Employees of Publicly Traded Companies" to argue that the statutory provisions were limited to "employees of public companies." *Id.* Rejecting this conclusion, Justice Ginsburg explained that other aspects of the statute made it "apparent" that the statutory headings were "under-inclusive[]." *Id.*

Accordingly, the headings were nothing more than "a short-hand reference to the general subject matter of the provision, not meant to take the place of the more detailed provisions of the text." *Id.* (citation and internal quotation marks omitted). So here too. While the heading of the section at issue refers to "uncompensated costs," the statutory text indicates precisely which payments Congress intended to be subtracted to derive a hospital's costs. Consequently, the Court will not rely on the provision's heading to alter the plain meaning of the statutory text.

*Second*, the legislative history belies defendants' argument with respect to the language used in the audit provision. This is because the summary of the law contained in the Conference Report reiterates the statutory definition of uncompensated care costs – i.e., "the costs of providing inpatient and outpatient services to Medicaid and uninsured patients at that hospital, *less payments received from or on behalf of Medicaid and uninsured patients*." H.R. Conf. Rep. 108-391, 808, reprinted at 2003 U.S.C.C.A.N. 1808, 2160 (emphasis added). Moreover, as plaintiffs point out, the auditor-reporting protocol makes clear that "Medicaid IP/OP hospital costs (including Medicaid managed care costs) must be measured against *Medicaid IP/OP revenue received* for such services" in determining the existence of a Medicaid shortfall. Pls.' Mem. at 21 (citing General DSH Audit

and Rep. Protocol, CMS-2198-F), ECF No. 12-1. Again, neither the legislative history not the auditor-reporting protocol mention exclusion of third-party payments.

### (3)    Legislative History

The legislative history accompanying the amendment setting hospital-specific limits demonstrates that Congress intended to ensure hospitals providing inpatient services to a disproportionate share of "Medicaid and other low-income patients with special needs" were receiving DSH payments. H.R. Rep. No. 103-213, at 211 (1993), *reprinted in* 1993 U.S.C.C.A.N. 378, 538. Congress noted two concerns that prompted the amendment, neither of which are relevant here.

*First*, Congress was "concerned by reports that some States [we]re making DSH payment adjustments to hospitals that do not provide inpatient services to Medicaid beneficiaries." *Id.* According to the Committee, the purpose of the supplemental payments was "to assist those facilities with high volumes of Medicaid patients in meeting the costs of providing care to the uninsured patients that they serve, since th[ose] facilities [we]re unlikely to have large numbers of privately insured patients through which to offset their operating losses on the uninsured." *Id.* Thus, Congress prohibited states from designating a hospital as a disproportionate-share hospital eligible for supplemental Medicaid funds unless "at least 1

percent of the facility's inpatient days [we]re attributable to Medicaid patients." *Id.* Here, both parties agree that plaintiffs "treat an extremely high percentage of Medicaid patients" and "are deemed DSH hospitals that are eligible to receive DSH payments." Defs.' Opp. at 24; Pls.' Mem. at 23-24.

**Second**, Congress was also concerned by "reports that some States have made DSH payment adjustments to State psychiatric or university hospitals in amounts that exceed the net costs, and in some instances the total costs, of operating the facilities." H.R. Rep. No. 103-213, at 211. Those excess Medicaid DSH payments were then "transferred to the State general fund, where they may be used to fund public health or mental health services, to draw down more Federal Medicaid matching funds, or to finance other functions of State government, such as road construction and maintenance." *Id.* at 211-212. Such use of federal Medicaid funds was, according to Congress, "a clear abuse of the program." *Id.* at 212. Here, there is no indication that plaintiffs are transferring DSH funds to "finance other functions of State government"; accordingly, this concern is also irrelevant to the Court's analysis.

### B. The Proper Remedy is Vacatur.

Defendants assert that, should the Court find the Final Rule invalid, "the appropriate remedy would be to set aside the Final Rule *as it applies to Plaintiffs*." Defs.' Opp. at 32 n.11,

ECF No. 15. According to defendants, because "'litigation is conducted by and on behalf of the individual named parties only,'" any remedy should be limited to "'provid[ing] complete relief to the plaintiff[s]'" only. *Id.* (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-701 (1979)).

Under the APA, a court must "hold unlawful and **set aside** agency action" that is found to be "in excess of statutory jurisdiction, authority or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C) (emphasis added). Accordingly, "'[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated – not that their application to the individual petitioners is proscribed.'" *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n. 21 (D.C. Cir. 1989)). In *National Mining Association*, the district court invalidated a Corps of Engineers regulation and entered an injunction prohibiting the Corps and the Environmental Protection Agency from enforcing the regulation nationwide. 145 F.3d at 1408. The D.C. Circuit upheld that nationwide application, notwithstanding the fact that non-parties to the litigation would specifically be affected. *Id.* at 1409-10.

Defendants argue that vacatur is particularly inappropriate here given that "other federal district judges are considering

the questions that are at issue in this case," and an order
vacating the Final Rule here "would effectively prevent those
other courts from reaching their own decisions." Defs.' Opp. at
32 n.11. But in *National Mining Association*, the D.C. Circuit
addressed this very argument, pointing out that a District of
Columbia court's "refusal to sustain a broad injunction is
likely merely to generate a flood of duplicative litigation"
given that venue is often proper in this court for challenges to
agency actions. 145 F.3d at 1409. Accordingly, some diminishment
in the scope of the "non-acquiescence doctrine" was "an
inevitable consequence of the venue rules in combination with
the APA's command that rules 'found to be . . . in excess of
statutory jurisdiction' shall be not only 'h[e]ld unlawful but
'set aside.'" *Id.* at 1410.

Defendants further contend that, even if vacatur of an
unlawful regulation is the "ordinary result," it need not always
be required. Defs.' Summ. J. Reply at 17 n.9, ECF No. 21. The
Court agrees that "[a]n inadequately supported rule . . . need
not necessarily be vacated." *Allied-Signal, Inc. v. U.S. Nuclear
Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993).
Rather, "[t]he decision whether to vacate depends on 'the
seriousness of the [regulation's] deficiencies (and thus the
extent of doubt whether the agency chose correctly) and the
disruptive consequences of'" vacatur. *Id.* (quoting *International*

*Union, UMW v. FMSHA,* 920 F.2d 960, 967 (D.C. Cir. 1990)); *see also Humane Soc'y of the United States v. Jewell*, 76 F. Supp. 3d 69, 136 (D.D.C. 2014) ("The law in this Circuit directs consideration of two principal factors in deciding whether to vacate a flawed agency action: (1) the seriousness of the . . . deficiencies' of the action, that is, how likely it is the [agency] will be able to justify its decision on remand; and (2) the disruptive consequences of vacatur.") (citations and internal quotation marks omitted).

Here, application of these factors militates strongly in favor of vacatur.

***First***, the Final Rule's deficiency is not merely procedural; rather, as explained above, the Court finds that the agency acted outside of the scope of its statutory authority under the Medicaid Act. Thus, this is not a case where the agency could conceivably "be able to substantiate its decision on remand." *Allied-Signal*, 988 F.2d at 151. To the contrary, "the agency cannot arrive at the same conclusions reached in the Final Rule because the actions taken were not statutorily authorized." *Humane Soc'y*, 76 F. Supp. 3d at 137.

***Second***, the Court concludes that it is unlikely that vacating the rule would have "disruptive consequences" given that the Final Rule only became effective on June 2, 2017 – and given that defendants were already previously enjoined from

enforcing the policies underlying the Final Rule as embodied in their FAQs. Accordingly, vacatur of the Final Rule is the appropriate remedy in this matter.

## V.  CONCLUSION

Accordingly, for the reasons set forth in this Memorandum Opinion, plaintiffs' motion for summary judgment is **GRANTED**, and defendants' motion for summary judgment is **DENIED**. The Final Rule promulgated by CMS, published at 82 Fed. Reg. 16114, 16117, is **VACATED**. Defendants' motion to strike is **GRANTED**. Plaintiffs' motions for a preliminary injunction and for a hearing are **DENIED AS MOOT**. An appropriate Order was entered on March 2, 2018.

**SO ORDERED.**

**SIGNED:   Emmet G. Sullivan**
**          United States District Judge**
**          March 6, 2018**